UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY & | : | |
| ALLSTATE INDEMNITY COMPANY | : | |
|     Plaintiffs | : | CASE NO. 3:03-CV 0577(MRK) |
| | : | |
| vs. | : | |
| | : | |
| ARTHUR M. SEIGEL, M.D., | : | |
| ARTHUR M. SEIGEL, M.D., P.C. and | : | |
| ELLEN SEIGEL | : | OCTOBER 21, 2003 |

## <u>REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

Pursuant to Local Civil Rule 9(g)[1], defendants Arthur M. Seigel, M.D. ("Dr. Seigel"),

Arthur M. Seigel, M.D., P.C. ("Seigel, P.C."), and Ellen Seigel respectfully submit this Reply

Brief in further support of their motion to dismiss the complaint filed against them by

plaintiffs (collectively referred to as "Allstate").

## <u>Preliminary Statement</u>

In its Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.

Mem."), Allstate simply ignores, with respect to its third party claims,  both the significant

remoteness between its damages and defendants' alleged fraud, and the <u>inherently</u>

speculative nature of those damages.  It argues the sufficiency of its RICO claim as it would

any intentional tort, without regard to the particular constraints of RICO statutory standing.

Although Allstate argues fervently that defendants intended to procure money from

insurance companies, including Allstate, it ignores the fact that in evaluating RICO proximate cause, <u>remoteness</u> between tortious conduct and damages is determined without regard to intent.  Moreover, in emphasizing that defendant's have "notice" of the statistical model by which Allstate intends to prove its damages, it is unresponsive to the fact that, whatever the attempt at proof, any third party damage claim is inherently speculative – given the infinite number of factors that play into a settlement or judgment. Finally, Allstate fails to rebut defendants' contentions that its claims under 18 U.S.C. §1962(a), 18 U.S.C. 1962(b), and in all claims in Count II are defective.

## A. Allstate's Request To Convert Defendants' Motion to Dismiss into a Motion For Summary Judgment Should Be Denied

The Court should not consider extrinsic evidence.  The complaint itself is defectively pled, and the claims asserted are not ones upon which relief may be granted, whatever evidence is offered to support them.  If the Court grants Allstate's request, defendants will be forced to undergo extensive and costly discovery on invalid claims.  Those claims are better addressed at this stage, before extensive resources have been expended on claims that should not remain in the case.  <u>See</u>, <u>e.g.</u>, Moore's Federal Practice (3d ed.) §12.34[3][b] (2003) (noting that conversion under Rule 12(b)(6) has limited utility because of the required early timing of motions to dismiss; consideration of materials outside the pleadings necessarily must wait until substantial discovery has been performed).

---

[1] By agreement between the parties, the deadline for filing this Reply was extended to October 21, 2003 and the maximum page limit was raised to 25 pages.

Accordingly, the Court should not consider Allstate's many references to materials outside the pleadings. Friedl v. City of New York, 210 F.3d 79 (2nd Cir. 2000) (where court considers Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), it may not consider materials outside of the pleadings); Zeising v. Kelly, 152 F.Supp.2d 335 (S.D.N.Y. 2001).

## B. Allstate Fails Sufficiently To Allege Proximate Cause

### 1. Standard for RICO Proximate Cause

The direct injury test is key in determining RICO proximate cause. Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235 (2d Cir.1999). As defendants noted in our April 4, 2003 Memorandum, while there is no bright line for identifying directness, it is nonetheless a stringent test, and what Allstate describes as a "flexible rule" is only marginally so. See Moore v. Paine Webber, 189 F.3d 165 (2d Cir. 1999) ("In practice, our cases have held RICO plaintiffs to a more stringent showing of proximate cause than would be required at common law."). Where the predicate act is remote from the alleged injury, there is no RICO standing. Laborers Local 17 Health and Welfare Fund v. Philip Morris, Inc., 191 F.3d 229, 236 (2d Cir. 1999).

### 2. Allstate's Third Party Claims Do Not Satisfy RICO's Strict Standard for Proximate Cause

The injuries alleged in Allstate's third party claims are too remote for RICO standing. Allstate does not even attempt to respond to defendants' description of the multi-tiered connection between defendants' alleged predicate acts (mail fraud) and Allstate's alleged damage. Lerner, 318 F.3d at 123 (quoting Newton v. Tyson Foods, 207 F.3d 444, 447 (8th

Cir. 2000) ("The mere recitation of the chain of causation alleged by the plaintiffs is perhaps the best explanation of why they do not have standing . . . .").

Under the alleged chain of events, a patient injured by Allstate's insured tortfeasor would treat with Dr. Seigel and, in some instances, incur a fraudulently inflated bill. The bill was submitted to the <u>patient</u>, who was legally obligated to pay defendants. The patient either settled with or sued Allstate's insured tortfeasor (often much later) and, through jury verdict or settlement, the tortfeasor became responsible to compensate the patient for his damages.[2] Finally, by reason of its contract with the tortfeasor, Allstate became responsible to pay the tortfeasor's obligation to the patient.

The Court should note several facets of that multi-link chain in evaluating whether Allstate has claimed a direct injury. First, there were several steps, several years, and several parties between Allstate and the alleged fraud. Moreover, at the time of the alleged fraud (when the patient was treated and the bill sent), any obligation Allstate might have, even to its insured, was merely a contingent future event, since the liability of its insured tortfeasor would not be established for some time. <u>First Nationwide Bank</u>, 27 F.3d at 772 ("When a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to something in the interim.").

---

[2] It is significant that the award is for patient's "damages" as opposed to his "bills." The bills are merely evidence of those damages.

Further, the patient, not Allstate, was the direct victim of the alleged fraud. It was the <u>patient</u> who incurred the bill and the legal obligation to pay, and the patient who, in fact, paid the bill.[3] Allstate was never directly responsible to defendants for any of the third party charges.[4] Rather its own obligation depended entirely upon 1) that of the insured/third party plaintiff to the defendants and 2) that of the tortfeasor to the insured/third party plaintiff. Where a plaintiff's injury thus derives from that of a third party, the RICO plaintiff can not establish proximate cause. <u>Bona v. Barasch</u>, 2003 WL 1395932 at *25 (S.D.N.Y. March 20, 2003).

Finally, any fraud passed on to Allstate was only a result of its contractual obligation to its insured tortfeasor, an additional degree of remoteness. ." <u>Laborers Local 17 Health and Welfare Fund v. Philip Morris, Inc.</u>, 191 F.3d 229, 242 (2d Cir. 1999) (citations omitted) ("[W]here a third person suffers damage by reason of a contractual obligation to the injured party, such damages is too remote and indirect to become the subject of a direct action . . . in the absence of subrogation.")

Allstate does not make a serious effort to dispute the chain of remoteness described above. Instead, the insurer relies heavily on its argument that defendants intentionally targeted insurance companies, including Allstate, and that they submitted bills with the knowledge that insurance companies, would eventually be harmed as a result. (Pl. Mem.

---

[3] Compare Allstate's first party claims, which defendants have not challenged at the pleadings, where a bill was submitted to Allstate which pays the bill directly.

[4] Unlike some jurisdictions, in Connecticut there is ordinarily no direct right of action against a liability insurer. <u>See</u>, Conn. Gen. Stat. § 38a-321 (right of direct action against liability insurer only

pp. 10-12).  The problem with that argument is that "intent" and "foreseeability" do not narrow the gulf between Allstate's damages and defendants' conduct.  It is therefore, unresponsive to a challenge based on remoteness.

Although traditional elements of proximate cause, such as foreseeability and intent, are incorporated into RICO proximate cause, they are evaluated <u>separate and distinct</u> from the element of remoteness, and "both must generally be established by a plaintiff." <u>Laborers Local 17</u>, 191 F.3d at 236; <u>Steamfitters</u>, 171 F.3d at 926; <u>Service Employees</u>, 249 F.3d at 1076.  Foreseeability and intent can not substitute for a close nexus between predicate act and injury because "[a]lthough the likelihood that the injury would result from the wrongful conduct is a consideration, the [direct injury] rule often has as much to do with problems of proof as with foreseeability."  <u>First Nationwide</u>, 27 F.3d at 770.

Courts therefore have dismissed claims where damages are remote from the tortious conduct, even where the complaint alleges that the plaintiff's injuries were the intended, foreseeable consequence of the racketeering activity. <u>Laborers Local 17</u>, 191 F.3d at 242 ("[t]he existence of specific intent does not answer the question of whether the injury is specifically direct") (citations omitted);  <u>Pillsbury, Madison & Sutro v. Lerner</u>, 31 F.3d 924, 929 (9th Cir. 1994)(noting that "nothing in *Holmes* suggests that allegations of specific intent to cause RICO harm override the necessity to evaluate the directness of injury.");  <u>Service Employees International Union Health and Welfare Fund v. Philip Morris</u>

---

extends to the judgment creditor [here the patient/plaintiff], and then only after judgment against the insured).

Incorporated, 249 F.3d 1068, 1074 (D.C. Cir. 2001)(noting that the circuits have rejected the contention that either specific intent or foreseeability is sufficient to demonstrate proximate cause); Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 924 n. 5 (3d Cir. 1999) (noting that "an allegation of improper motive, although it may support a plaintiff's damages claim . . . is not a panacea that will enable any complaint to withstand a motion to dismiss.") (citations omitted).

Given the indirect chain of causation, with Allstate's alleged injuries derivative of those visited first on Dr. Seigel's patients, the Court should dismiss the third-party RICO claims.[5] Bona v. Barasch, 2003 WL 1395932 at *25 (S.D.N.Y. March 20, 2003).

**3.      The Holmes Policy Factors Require Dismissal**

The derivative and indirect relationship set forth above is alone sufficient to justify dismissal.[6] The policy factors set forth in Holmes require the same result.

### a.  The First Holmes Factor

The first Holmes factor measures the impact remoteness has on the complexity of plaintiff's damages claim.  The Holmes court recognized that the number of intervening factors rises in direct proportion to the remoteness of the claim, and that the "massive and complex damages litigation" inherent in remote claims "would not only burden the courts,

---

[5] Plaintiffs concede that the third-party state law claims will be evaluated under the same standard. (Pl. Mem. p. 8 n. 5).  They should be dismissed for the same reason.

[6] Although Allstate urges that Holmes policy factors are "dispositive," (Pl. Mem. p. 18 n. 12), they are not.  As the Bona Court held, "the threshold question in analyzing RICO standing is 'whether the damages a plaintiff sustains are derivative of an injury to a third party,' . . . The three policy factors 'buttress the principle that plaintiffs with indirect injuries lack standing' . . . but satisfying those policy

but would also undermine the effectiveness of treble-damages suits." Holmes, 503 U.S. 258, 274, 112 S.Ct. 1311, 1321 (1992); De Falco v. Burnas, 244 F.3d 286, 290 (2nd Cir. 2001), *cert. denied*, 534 U.S. 891, 122 S.Ct. 207 (2001).

Allstate makes little attempt to respond to defendants' argument that the litigating the damages for its third party claims would be a horror. With regard to bills "for medical tests not performed, or not performed completely," it merely argues that the Complaint alleges the precise amount for each. (Pl. Mem. p. 21). But Allstate was never responsible to pay these bills. Rather, it was responsible to its insured to pay a verdict or settlement amount representing the negotiated liability of its insured. Whether, and to what extent that award included monies for Dr. Seigel's bill, for tests not performed, or for inflated charges, would be a separate (and thoroughly disputed) question.[7] See, e.g., Childs v. Bainer, 235 Conn. 107, 663 A.2d 398 (1995) (under Connecticut law, it is not necessary that all of the plaintiff's claimed special damages be awarded).[8]

Regarding the so-called "Seigel Effect," Allstate makes the conclusory assertion that the Complaint "adequately alleged . . . that [Allstate] had sustained injury caused by the influence of Dr. Seigel and his fraudulent medical documentation had on Allstate

---

considerations is not an independent prerequisite to RICO standing." Id. at 29 (citing Laborers Local 17, 191 F.3d at 238-39.).

[7] Negotiated settlements do not routinely distinguish between economic and non-economic damages, or between particular bills and others.

[8] It is unlikely Allstate ever agreed to compensate the full amount of these bills since it routinely reduced its settlement offers where it considered the treating doctor, including Dr. Seigel, a "hired gun."

settlements." (Pl. Mem. p. 21). It does not, however, articulate what those "adequate allegations" are.

The reality is that so many factors determine the number placed on a settlement award or verdict that "[c]onsiderable speculation would be involved in identifying the" precise amount of damages. Service Employees, 249 F.3d at 1074. In proving the claimed marginal impact of defendants' alleged fraud, the parties will have to litigate all those variables including: the actual extent of the patient's injuries; the credibility of the parties; the skill of the lawyers or the claims adjuster; what amount, if any, of the general verdict or settlement award was a result of alleged fraud; whether Dr. Seigel's diagnoses were consistent with other treaters; whether the patient would have accepted a lower offer from Allstate if its medical bills were lowered by a few hundred dollars; determining whether a collateral source paid some or all of Dr. Seigel's bill which, in its allegedly inflated form, made Allstate's financial obligation smaller than it would have been absent fraud. Moreover, those inquiries will take place retrospectively as to each of the hundreds of files that Allstate lists.

The list is endless and in the end, tea leaves might be a more accurate method of determining a single variable's impact on a litigated award.

That Allstate hired a mathematician to purportedly quantify its damages has no bearing on proximate cause. Although Dr. Weisbeg's model attempts to make calculation of plaintiff's multi-million dollar damage claim simpler for Allstate, that task will be no easier on the Court. Defendants obviously oppose the "model", and will argue that any model's

attempt to isolate the impact of a single variable on a negotiated settlement is nonsense.[9]
Hence, the model will not obviate the need to consider the infinite number of variables
determining a litigated award.

The <u>Holmes</u> court's concern for "massive and complex" damage litigation will be
realized. Because these complexities are a clear result of the indirect nature of Allstate's
claim, the first factor weighs heavily against standing.

### b. The Second Holmes Factor: Apportionment

The Second <u>Holmes</u> factor considers the difficulty in apportioning damages between
plaintiffs at varying levels of remoteness.  Where, as here, parties in varying proximity to
the underlying tort might be damaged, determining defendants' marginal liability to each
would be painful and tortuous.  <u>Laborers Local 17</u>, 191 F.3d at 240.

---

[9]     For reasons stated earlier, we believe there is no justification to turn defendants' Motion to
Dismiss into a Summary Judgment Motion, or to incorporate the factual matters relied on by
plaintiffs in opposition to the pending motion.  While statistical analyses have often been admitted
into evidence, there is nothing in the Weisberg Affidavit which begins to explain how the separate
issues/data in Subparagraphs (a) through (j) of Paragraph 31 were adjusted so as  to somehow
separate out the impact of  the claimed "Seigel Effect" overall on the hundreds of third party claims.
Further, Weisberg posits the fact that Dr. Seigel's "professional opinions may have led to an
increased level of other treatment" and that **"participation and treatment by a medical specialist
such as Dr. Seigel may have provided justification for a larger evaluation of general
damages."**   Such effects, even if present, would have nothing to do with fraud or RICO damages.
In fact, it is clear that the so-called "Seigel Effect", even by the Weisberg methodology, applies
either to the presence of this defendant or to "another specialist".  It appears that, based upon
Paragraph 46, a reduction in actual settlement that would be expected in the absence of treatment
by Seigel was a **smaller reduction** than that "attributable to other specialists".  Unless Allstate is
claiming that every specialist in New Haven is engaged in fraud, the calculation of damages set
forth in Paragraphs 48 through 50 (1) is nonsense and/or (2) the so-called "Seigel Effect" should
really be called a "Specialist Effect", which has absolutely nothing to do with this RICO fraud claim.

Allstate claims it is the only party with a cause of action.  (Pl. Mem. p. 22).  Its argument appears to be that since it claims broadly to have overpaid the third party plaintiffs, they were not "injured" by Dr. Seigel's fraud -- and have no standing to complain of overbilling.  That argument has two problems.  First, there is nothing to prevent other "remote payors," such as patients' health insurers, from bringing suit claiming that they ultimately bore the costs.[10]  See, Laborers Local 17, 191 F.3d at 240.  Further, Dr. Seigel's patients, non-parties to this action, are free to raise their own claims alleging that they have been overbilled and that the compensation they did receive was for other aspects of their damage.  See, Steamfitters, 171 F.3d at 933 (noting in this context that "fund participants who have not been fully reimbursed for their out-of-pocket costs that are traceable to defendants' alleged fraud and conspiracy might bring RICO or antitrust claims").  Just because Allstate *claims* it shouldered the entire marginal impact of defendants' fraud does not prevent other parties from making the same claim.  Service Employees, 249 F.3d at 1072 (rejecting funds' argument that as payors, it was they who suffered the only actionable economic injury).

Allstate cites two cases, both standing only for the proposition that, under 18 U.S.C. 1964(c), a party must suffer an actual loss to its "business or property."  In Berg v. First State Ins. Co., 915 F.2d 460 (9th Cir. 1990), former directors of a corporation sued their

---

[10]  Even considering a motion to dismiss, the court need not accept Allstate's assertions that it is the only party injured.  In re American Exp. Co. Shareholder Litigation, 39 F.3d 395, 400 (2nd Cir. 1994) (noting that conclusory allegations as to the legal status of parties "need not be accepted as true for the purpose of ruling on a motion to dismiss.")

liability insurers under §1962(c), alleging that by canceling the directors' policies, the insurers caused a loss of "protection" and "peace of mind." Id. at 464. The Ninth Circuit simply held that those claims sounded in personal injury and were not compensable under RICO. Id. In Dornberger v. Metropolitan Life Ins. Co., 961 F. Supp. 506, 521 (S.D.N.Y. 1997), the court simply noted 1964(c) requires a showing of "out-of-pocket" loss.[11]

Those cases are inapposite here where other parties closer on the chain to the alleged fraud *can* claim an out-of-pocket loss. Dr. Seigel's patients were responsible for and in fact did pay Dr. Seigel's bills. Further, health insurers could credibly argue that they ultimately bore the inflated costs. Moreover, if a party becomes "uninjured" simply because the cost is passed along, Allstate likely loses its own cause of action.[12] Service Employees, 249 F.3d at 1075 (noting that the "insurers have likely already passed the costs on to the directly injured through higher premiums").

### c. The Third Holmes Factor

The Holmes court's third factor concerns whether parties having more direct injuries can avoid the complications of indirectness by suing in their own right. Holmes, 503 U.S. at 269-70, 112 S.Ct. at 1311. Unlike the Courts that consider it, Allstate places much emphasis on this factor, asking: "Who, if not Allstate, could and would sue to vindicate the law violated by Dr. Seigel?".

---

[11] Allstate neglects to cite the very next sentence, which articulates defendants' argument that indefinite injuries will not confer standing: "Injuries that are speculative or unprovable in nature or amount are not recoverable." Dornberger, 961 F. Supp. at 521.

[12] This argument might also apply to Allstate's first party payments, but we lack sufficient factual basis to raise it at this stage in the litigation.

We have already noted that Dr. Seigel's patients may maintain a cause of action. Further, that they may not have a *RICO* cause of action, but rather might be forced to assert their rights in Connecticut courts, remain in State court, actually weighs against Allstate's standing. <u>Laborers Local 17</u>, 191 F.3d at 229 ("Where those directly injured have remedies outside of RICO, the third Holmes factor actually weighs against RICO standing."); <u>Bona v. Barasch</u>, 2003 WL 1395932 at *29 (S.D.N.Y., Mar 20, 2003).

Whether or not the Court deems those actions very likely does not affect Defendants' Motion to Dismiss. Courts are clear that even where the Holmes Court's third factor weighs in favor of standing, it does not outweigh the complications considered by the first two factors:

> The argument mistakenly assumes that it was Congress' intent that there must be recoveries, regardless of the burdens inflicted on the legal system and the significant policies captured in the first two Holmes factors . . . By its very nature, the common law proximate cause requirement adopted by the Supreme Court in Holmes . . . leaves open the possibility that 'some injuries caused by an antitrust or RICO violation may this be left unremedied for lack of a proper plaintiff.

<u>Service Employees</u>, 249 F.3d at 1075.

## 4.    The State Farm Case

Allstate misleadingly cites <u>State Farm Mutual Automobile Insurance Co. v. Abrams</u>, 2000 WL 152143 (N.D. Ill., Feb 04, 2000) for the "Seventh Circuit Treatment of Analogous Issue." That case was neither decided by the Seventh Circuit,[13] nor is it "identical in all material respects" to the case at bar, as Allstate claims. (Pl. Mem. p. 25).

---

[13] Although Allstate refers to <u>State Farm</u> as a "Seventh Circuit" case, (Pl. Mem. pp. 25-27), it was in fact decided by the District Court for the Northern District of Illinois. The Seventh Circuit declined interlocutory review of the issue. <u>State Farm Mutual Automobile Insurance Company v. Abrams</u>, 2000 WL WL 574466 (N.D. Ill. May 11, 2000).

This case is distinct from <u>State Farm</u> in several material respects. First, Allstate inaccurately describes <u>State Farm</u> as a suit against "defendant medical providers and personal injury attorneys." (Pl. Mem. p. 25). In reality, the case was brought against medical providers, attorneys, and *the accident "victims",* alleging that *all three* colluded to (1) stage the accidents and (2) present false medical and property claims to the insurer. <u>State Farm Mutual Automobile Insurance Company v. Abrams</u>, 2000 WL 574466 (N.D. Ill. May 11, 2000).

Thus, unlike this case, the <u>State Farm</u> "accident victims" were not directly injured by fraud but were rather participants. Further, the <u>entirety</u> of each claim submitted to <u>State Farm</u> was a sham. In our case, Dr. Seigel's patients submitted valid claims to Allstate, of which a small component is claimed to be fraudulent.

Further, the <u>State Farm</u> court, in distinguishing the tobacco cases, emphasized that "unlike the Plaintiffs in <u>Holmes</u> and <u>Teamsters</u>, State Farm made payments directly to the Legal and Medical Defendants, the alleged wrongdoers, and not to its insured." <u>Id</u>. at *2. In this case, Allstate's third party claims are defective precisely because Allstate *was not* obligated to pay defendants directly – or even indirectly.

Thus, while State Farm might have bearing on Allstate's first party claims, which defendants have not contested, it is not authority for a finding of proximate cause in the third party context.

**5.     The Desiano Case**

Allstate cites <u>Desiano v. Warner-Lambert Co.</u>, 326 F.3d 339 (2d Cir. 2003) for the proposition that its injuries were the "direct and intended result of defendants' fraudulent conduct." <u>Desiano</u>, however, is not a RICO case, and can not be cited as authority for RICO proximate cause. In that case, plaintiff health insurers sued Warner-Lambert alleging

that it had misrepresented a diabetes drug as "safe and more effective" than its competitors.  Id. at 341.  All relief was sought under New Jersey law. Id. at 345.  When defendants moved to dismiss, the district court (erroneously) evaluated proximate cause for the state law claims under the RICO standard set forth in Holmes.  Id.

The Second Circuit was quick to point out that the RICO proximate cause analysis was inapplicable to plaintiffs' claims.[14]  Id. at 348 ("Unlike Holmes and Laborers Local 17 the legal standard of proximate cause that is relevant to the case before us is not the law of RICO; it is, rather, the law of New Jersey. . . Our task is, therefore, to determine what New Jersey's common law of proximate cause requires.").  Therefore, any discussion of the RICO standard is pure dicta.

Further, the insurers in Desiano stood in very different proximity to the defendant than Allstate here.  In Desiano the insurers were the direct purchaser of the fraudulently advertised medication. Id. at 249.  They argued that, absent fraudulent statements made to the plaintiffs, they would have chosen to purchase a different, cheaper drug.  Id.  Unlike Allstate's, the Desiano insurers' damages was a result of direct fraud and direct payment – with no intervening third party claim.

**6.      Alleging Fraud In the Complaint Is Not, By Itself Sufficient to Meet RICO's Proximate Cause Requirement**

Finally, Allstate argues that simply by pleading predicate acts of mail or wire fraud, together with their claimed reliance, it has satisfied RICO's proximate cause requirement.

---

[14] In fact, the only time Desiano has ever been cited in the RICO context was for the proposition that "the proximate cause requirements of RICO are more stringent than those of most states." Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 344 F.3d 211 (2nd Cir. 2003) (quoting Desiano at 348).

(Pl. Mem. pp. 33-42). This is an incredible assertion. No court in the country has ever held that a RICO plaintiff is immune from a proximate cause challenge simply because it pled a mail fraud predicate act. Indeed, it is the law of this circuit that statutory standing under 18 U.S.C. 1964(c) is considered distinct from that of the underlying predicate act. Lerner, 318 F.3d at 122 ("[I]f the standing issue may be resolved on proximate cause grounds, the question whether the plaintiff must also satisfy the standing requirements of the underlying statutes whose violations constitute predicate acts . . . need not be reached.").

 Further, Allstate's argument was rejected by the Holmes majority. Theargument seems to find its origin in Justice Scalia's unjoined concurring opinion in Holmes. Holmes, 503 U.S. at 288, 112 S. Ct. 1311 (Scalia, J. concurring) (rejecting the Holmes majority's position that RICO proximate cause derived from the language of §1964, instead asserting it arose from the proximate cause principles applicable to the underlying statute). Neither Justice Scalia nor Allstate cite authority for that general proposition, nor for the more specific proposition that allegations of fraud per se satisfy RICO proximate cause.

Allstate ignores a mountain of precedent applying proximate cause analysis in cases where mail fraud is alleged. Powers v. British Vita, P.L.C., 57 F.3d 176 (2nd Cir. 1995) (upholding dismissal of complaint for failure to adequately allege proximate cause notwithstanding that complaint adequately alleged intent to defraud); Sperber v. Boesky, 849 F.2d 60, 64 (2nd Cir. 1988) ("The alleged wire and mail fraud did not *directly* deprive plaintiffs of money or property," thus the proximate cause requirement was unfulfilled.)

Whatever the underlying predicate act, each RICO plaintiff must satisfy the stringent statutory requirements of RICO proximate cause. First Nationwide, 27 F.3d at 770 (in alleging mail or wire fraud, the RICO plaintiff "must allege loss causation with sufficient particularity such that [the court] can determine whether the factual basis for its claim, if proven, could support an inference of proximate cause."). Allstate has failed in this regard.

**C.    Allstate's Alleged Damages From Third-Party Claims Are Inherently Too Indefinite To Confer Standing Under Rico**

RICO requires that a plaintiff' claimed damages be concrete and non-speculative in nature. Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1104 (2d Cir. 1988); First Nationwide Bank at 768-69.   Aside from reference Dr. Weisberg's statistical model, Allstate makes no effort to refute defendants' argument that the third party damage claim is inherently speculative.  Absent from its memorandum is any discussion of how its "Seigel Effect" can be made concrete.

Allstate responds that its Complaint "contains an enormous amount of factual detail sufficient to put defendants on notice of the nature and amount" of its damages.  (Pl. Mem. p. 4).  The issue, however, is not notice but inherent speculation.  Plaintiffs have attempted to cobble together a damages claim based on third-party settlements on behalf of its insured tortfeasors.  As previously set forth, isolating the marginal impact of any single variable is an intrinsically speculative task – and no model can hope to account for all of the potential variables.

Plaintiffs (needlessly) cite a vast array of cases for the proposition that "statistical sampling techniques have routinely been deemed admissible" in federal courts. (Pl. Mem. p. 47). Admissibility, however, is not the issue. None of plaintiff's cases stand for the proposition that a statistical model (with its inevitable assumption that all factors outside the model are equal) can resolve the speculative nature of a claim so as to satisfy RICO's standing requirements. In fact *the RICO cases* hold the opposite. Service Employees International Union Health and Welfare Fund v. Philip Morris Incorporated, 249 F.3d 1068, 1074 (D.C. Cir. 2001); Steamfitters 171 F.3d at 929.[15] As set forth above, all factors are not equal.

In assessing the inherently speculative nature of damages sought here under RICO, a careful look at the complaint is enlightening. In addition to approximately 30 allegations that needle EMG tests were not given (about half of which are claimed to be supported by an Affidavit or Questionnaire), Allstate lumps into in its third-party damage claims a myriad of instances where it claims Nerve Conduction Tests ("NCT") were "incomplete" because "no amplitude measurements were included in the exam", and with Allstate allegations that Dr. Seigel's purported findings were sometimes inconsistent with negative electrodiagnostic data.

---

[15] As the court is aware, defendants object to plaintiffs' attempt to turn this Motion to Dismiss into a Motion for Summary Judgment -- with their cherry picked factual submissions. The Weisberg model, however, serves is illustrative as to why no model can resolve the speculative nature of Allstate's damages. Earlier we pointed out huge problems with use of the Weisberg Affidavit to serve as a statistical damage model -- even according to Dr. Weisberg value was added not by a "Seigel Effect", rather that the presence of other specialists added even greater value than when Dr. Seigel was a treating/consulting physician.

Defendants will strongly dispute that reporting on normal Nerve Conduction Testing **requires** reports of specific amplitude measurements. However, whether or not that is so, it is clear Allstate relies on Dr. Seigel's reports it received over the past seven or eight years. Whatever was lacking must have been perfectly obvious to Allstate and its sharp-eyed adjusters. There is no claim that these reports were anything other than accurate concerning the findings -- only that there were no specific amplitude readings noted. There is no claim the tests were not done just because the amplitude readings were not noted -- only that the tests were somehow "incomplete". Since the failure to record specific amplitude readings on normal NCTs could not possibly have misled plaintiffs -- and because they settled those cases with full knowledge there were no recorded amplitudes, there is no possible RICO violation, and no RICO damages. The apparent total irrelevance of NCT testing to settlement values seems absolutely clear where one reviews the tables on pages 76-80, with almost always $360.00 charged -- resulting in settlement ranging between $2,500.00 and $225,000.00.

The same thing is true concerning plaintiffs' nitpicking, in their complaint, through a small number of Dr. Seigel's reports, claiming that his findings of soft tissue injury were inconsistent with the electrodiagnostic reports. The defense claims those reports and notations were perfectly proper and accurate. However, what could not be more clear is that Allstate had these reports years and years ago. Nothing was learned in 2003 which

somehow changed the settlement value, or settlement approach, on cases where Dr. Seigel had written reports.

Problems found by many, many federal courts in RICO cases because of the speculativeness of alleged damages are startlingly present in this case, made worse  by plaintiffs' attempting to interject non-fraudulent reasons why, they claim, perhaps they paid more money than they (now) believe they should have.  These claims do not approach the level of "concreteness" required to assert a RICO claim.

**D.     Allstate's Second Count Fails to State A Cause of Action Upon Which Relief May Be Granted**

Allstate concedes that under §1962(c), an entity may not simultaneously be the RICO "enterprise" and a RICO defendant.  (Pl. Mem. p. 53).  It seeks to save Count II by designating Allstate as the RICO "enterprise" (or "innocent victim enterprise") and Seigel, P.C. as the defendant, resolving any issue related to §1962(c)'s requirement of separation between enterprise and defendant.  Allstate then cites a string of cases for the (accurate) proposition that a plaintiff is free to name itself as the enterprise. (Pl. Mem. p. 53 n. 29).

The problem with that designation in <u>this</u> case, however, is that it runs afoul of a separate §1962(c) mandate. A "person" liable under that section must be "employed by or associated with" the enterprise and must "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c)(2003).  "Courts in the Second Circuit have interpreted this standard stringently." <u>Heffernan v. HSBC Bank USA</u>, 2001 WL 803719 at *6 (E.D.N.Y. 2001).

Here, if Allstate is to be the "Enterprise," it must prove that defends "conducted or participated in the conduct of its affairs." It makes no such allegation. The meaning of that phrase was articulated by the Supreme Court in, Reves v. Ernst & Young. 507 U.S. 170, 113 S.Ct. 1163 (1993). In that case, the Court held that "one is not liable under [§1962(c)] unless one has participated in the operation or management of the enterprise itself." Id. at 185, 113 S.Ct. at 1174 (emphasis added).[16] In the Second Circuit, "the 'operation and management' test ... is a very difficult test to satisfy....There is a 'substantial difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under Reves.'" Redtail Leasing, Inc. v. Bellezza, 2001 WL 863556 (S.D.N.Y. Jul 31, 2001); Dubai Islamic Bank v. Citibank, N.A., 256 F.Supp.2d 158, 164 (S.D.N.Y. 2003).

Under the "operation or management" test, a defendant must have "some part in directing the enterprise's affairs." Id. at 178, 113 S.Ct. at 1170. Although an "outsider" to a corporation may meet this test, it may do so only if it is "associated with [the] enterprise and participate[s] in the conduct of its affairs--that is, participate[s] in the operation or management of the enterprise itself." Id. 185, 113 S. Ct. at 1173. U.S. v. Masotto, 73 F.3d 1233, 1238 (2nd Cir. 1996).

---

[16] The construction was consistent with 1962(c)'s language and with Congress's concern that RICO not extend beyond the activities which motivated its passage, organized crime and its acquisition and control of legitimate interstate businesses. Id.

There is not basis in the Complaint for an allegation that defendants, in any way, participated in the operation or control of Allstate. At best, defendants merely placed bills in the stream of litigation which eventually contributed to a damage calculation against Allstate's insured tortfeasor. Allstate does state that the "defendant participated and associated with Allstate by acting with intent to cause Allstate to pay him money to which he was not entitled." (Pl. RICO Case Statement p. 17). Simply making statements, however, that have an effect on the enterprise is, in no way, "operating or managing" its affairs. See, e.g., Zito v. Leasecomm Corp., 2003 WL 22251352, S.D.N.Y., Sep 30, 2003 at 18 ("Neither making statements knowing that they will be exploited by an enterprise, nor being a shareholder of an entity involved in that enterprise, constitutes a 'part in directing' it.").

## E. ALLSTATE'S CLAIM UNDER 18 U.S.C. §1962(a) MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT ALLEGE AN "INVESTMENT INJURY" INDEPENDENT FROM THE RACKETEERING INJURIES

A RICO plaintiff may not satisfy its pleading burden under §1962(a) by alleging that the RICO defendant reinvested the proceeds of its racketeering activity back into the enterprise. The Second Circuit made clear in Ouaknine that "the essence of a violation of § 1962(a) is not commission of predicate acts but investment of racketeering income." Ouaknine v. MacFarlane, 897 F.2d 75, 82-83 (2d Cir.1990). Thus, "we have required that the plaintiff allege a 'use or investment injury' that is distinct from the injuries resulting from predicate acts." Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1063 (2nd Cir 1996), *vacated on other grounds*, 525 U.S. 128, 119 S. Ct. 493 (1998)).

Following the rules set forth in Ouaknine and Discon, courts in this circuit have unwaveringly held that mere reinvestment of racketeering income into the enterprise that generated the income is insufficient under §1962(a). Daczmarek v. IBM Corp., 20 F. Supp.2d 626, 628 (S.D.N.Y. 1998) ("[U]nder these circumstances, the real cause of injury remains the racketeering acts, not the investment of the proceeds in the enterprise."); Calabrese v. CSC Holdings, Inc., --- F.Supp.2d ----, 2003 WL 22052824 at *10 (E.D.N.Y. Aug.13, 2003) ("[W]ith respect to Plaintiffs' claim of 1962(a) violations, they have not alleged distinct injuries from those set forth under § 1962(c) resulting from the predicate acts."); Allen v. New World Coffee, Inc., 2002 WL 432685, *4 (2002 S.D.N.Y. Mar. 19, 2002) ("As a matter of law, reinvestment of racketeering income is insufficient to make out a cause of action under RICO."); Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 657 (S.D.N.Y.1996); Kaczmarek v. IBM Corp., 30 F. Supp.2d 626, 628 (S.D.N.Y. 1998); Berk v. Tradewell, 2003 WL 21664679 (S.D.N.Y. July 16, 2003) (plaintiff did not allege an injury stemming directly from investment of alleged racketeering funds).[17]

Allstate responds that the Complaint "clearly alleges that Dr. Seigel used and/or invested the proceeds of fraudulently obtained income in the maintenance and operation of Seigel, P.C. to Allstate's detriment." (Pl. Mem. p. 54). That is precisely the argument that

---

[17] Allstate reaches back in time to cite two cases that arguably permitted such a "re-investment injury." Constellation Bank, N.A. v. C.L.A. Management Co.,1995 WL 42285 (S.D.N.Y. 1995); Official Publications, Inc. v. Kable News Co., Inc., 775 F. Supp. 631, 634 (S.D.N.Y. 1991). In light of the subsequent caselaw detailed above, neither remain "good law."

loses Count III for Allstate.  Reinvesting racketeering proceeds into the racketeering that generated it is not a §1962(a) investment injury.

## F.    ALLSTATE'S CLAIMS UNDER RICO §1962(b) SHOULD BE DISMISSED BECAUSE ALLSTATE PLED NO DISTINCT "ACQUISITION INJURY"

For similar reasons, Allstate does not adequately plead an "acquisition or maintenance injury" as required by 18 U.S.C. § 1962(b).  That section prohibits the "acquisition or maintenance" of an enterprise through a pattern of racketeering activity.  18 U.S.C. §1962(b) (2003).  In order to have §1962(b) standing, a plaintiff must allege an injury that is derived solely from the defendant's "acquisition or maintenance" of the alleged enterprise, rather than from the predicate acts themselves.  Discon, 93 F.3d at 1063 (dismissing section 1962(b) claim where plaintiff did not allege injury from defendants' acquisition or maintenance of a telephone company enterprise).  "Without a distinct 'acquisition injury,' [a plaintiff] cannot state a cause of action under subsection 1962(b)." Id.; Berk, supra at *2 (dismissing plaintiff's 1962(b) count where the Complaint did not allege harms distinct from the racketeering activity itself).

Defendants can formulate no distinct "acquisition or maintenance injury."  They respond only that "Dr. Seigel's Maintenance of an interest in Seigel, P.C. is manifest throughout the Complaint . . . [and] Dr. Seigel directed the fraudulent medical billing scheme through Seigel, P.C."  (Pl. Mem. P. 55-6).  The problem with that response is that the alleged damages were still brought about only as a result of the alleged predicate acts (here mail fraud).  Such an allegation can confer standing under §1962(c) (providing a

cause of action for damage caused by a pattern of racketeering activity) but is insufficient under §1962(b) (damage must stem from the acquisition or maintenance rather than the predicate act). <u>Kaczmarek v. IBM Corp.</u>, 30 F. Supp.2d 626, 628 (S.D.N.Y. 1998); <u>Crawford & Sons, Ltd. Profit Sharing Plan v. Besser</u>, 216 F.R.D. 228 (E.D.N.Y. 2003) (alleged damages stemmed from predicate acts of mail, wire and bank fraud rather than the "acquisition or maintenance" of the enterprise).

Accordingly, Allstate's claims under 18 U.S.C. §1962(b) must be dismissed.

**G.  Conclusion**

For the foregoing reasons, defendants' Motion to Dismiss should be granted.

THE DEFENDANTS

By_____
Ira B. Grudberg (ct 00178)
David L. Belt (ct 04274)
Josh Lanning (ct 24529)
JACOBS, GRUDBERG, BELT & DOW, P.C.
350 Orange Street
New Haven, Connecticut 06503
Telephone No. (203) 772-3100
Facsimile No. (203) 772-1691
email: igrudberg@jacobslaw.com
email: dbelt@jacobslaw.com

## <u>CERTIFICATION</u>

I hereby certify that the foregoing Reply Brief in Support Motion to Dismiss has been served by placing a copy thereof in the United States mail, first class postage prepaid, addressed to:

Joel Rottner, Esq.
Skelley Rottner, P.C.
P.O. Box 340890
Hartford, CT 06134-0890

David O. Brink, Esq.
Richard D. King, Jr., Esq.
Nathan A. Tilden, Esq.
Smith & Brink, P.C.
122 Quincy Shore Drive, 2nd Floor
Quincy, MA  02171

this 21st day of October, 2003.


_____
Joshua D. Lanning