3—577 m File

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

FILED

**C. A. NO.  303 CV 0577 MRK**

U.S DISTRICT COURT
NEW HAVEN, CONN.

ALLSTATE INSURANCE COMPANY and )
ALLSTATE INDEMNITY COMPANY )
    Plaintiffs, )
     )
     )
v. )
     )
ARTHUR M. SEIGEL, M.D., )
ARTHUR M. SEIGEL, M.D., P.C., )
and ELLEN SEIGEL, )
    Defendants. )

## UNOPPOSED MOTION FOR LEAVE TO FILE SURREPLY MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs respectfully request leave of the Court to submit a surreply memorandum in the above-entitled matter. As reasons in support of this motion, plaintiffs aver as follows:

1.    The surreply is necessary to provide the Court with a complete analysis of legal arguments raised for the first time in the defendants' Reply Brief;

2.    The surreply is necessary to correct factual inaccuracies and mischaracterizations of the record contained in defendants' Reply Brief;

3.    The surreply will provide the Court with a complete argument and response to each legal and factual argument advanced by the defendants in support of their Motion to Dismiss; and

4.    Counsel for the defendants have been consulted and do not oppose the submission of Allstate's Surreply Memorandum.

For all of the foregoing reasons, Allstate Insurance Company and Allstate Indemnity Company respectfully request leave of the Court to file a surreply memorandum, a copy of which has been filed together herewith.

Respectfully Submitted
Allstate Insurance Company and
Allstate Indemnity Company
By their Attorneys,

David B. Brink
Federal Bar No. CT23989
Richard D. King, Jr.
Federal Bar No. CT23997
Nathan A. Tilden
Federal Bar No. CT24011
Smith & Brink, P.C.
122 Quincy Shore Drive
Quincy, MA  02171
Tel.    (617) 770-2214

Joel Rottner, Esq.
Federal Bar No. CT05612
Skelley Rottner, P.C.
P.O. Box 340890
Hartford, CT 06134

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

**C. A. NO.  303 CV 0577 MRK**

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY and** | ) |
| **ALLSTATE INDEMNITY COMPANY** | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ARTHUR M. SEIGEL, M.D.,** | ) |
| **ARTHUR M. SEIGEL, M.D., P.C.,** | ) |
| **and ELLEN SEIGEL,** | ) |
| **Defendants.** | ) |

## PLAINTIFFS' SURREPLY MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## I.  INTRODUCTION

The plaintiffs, Allstate Insurance Company and Allstate Indemnity Company (hereinafter collectively referred to as "Allstate") submit the within Memorandum to address factual and legal issues raised for the first time by the defendants in their Reply Brief in Support of Defendants' Motion to Dismiss and to rebut certain factual and legal inaccuracies contained therein.

### A.  Conversion Of Defendant's Motion To Dismiss To A Motion For Summary Judgment Is Appropriate At This Time

The parties have already begun discovery on the merits of the underlying claims and, especially, in connection with the issues material to defendants' Motion to Dismiss.  Both parties have served written discovery.  In addition, the deposition of Dr. Seigel was commenced on October 22, 2003.  Moreover, the defendants' motion does not seek dismissal of all claims and the defendants have not requested a stay of discovery pending the outcome of the Motion to Dismiss.

The nature of the defendant's Motion to Dismiss (that the injury is too remote and/or damages impermissibly speculative) has been addressed, in part, through discovery and extrinsic

evidence already exists to support Allstate's opposition.  In addition to the extrinsic evidence previously referred to in Allstate's Memorandum of Law in Opposition to the Defendants' Motion to Dismiss and herein, admissions made by Dr. Seigel during the first day of his deposition on October 23, 2003, are probative of issues material to this Court's decision on defendants' motion, including as follows:

- Dr. Seigel admitted that the purpose for his repeated commission of fraud in connection with the non-performance of needle EMG testing was to realize medical fees without performing the test.  Deposition of Arthur M. Seigel, M.D. (hereinafter "Exhibit A. at ____") at 54;

- Dr. Seigel could only estimate that the frequency that he committed fraud through the non-performance of needle EMG testing was something less than a "preponderance" of the 7,000 tests for which he sought payment during the relevant period.  A. at 10-12;

- Dr. Seigel described the charade he would perform of selecting a needle and showing the needle to his patient (at times even placing the needle on the skin of his patient) and allow several moments to pass as if the test were actually being performed.  A. at 248-253;

- Dr. Seigel admitted that insurance companies were the intended target of his fraudulent medical billing scheme.  A. at 143-146;

- Dr. Seigel admitted he was aware that payment for his alleged medical services was paid by insurance companies.  A. at 138-140;

- Dr. Seigel testified that he has taken no affirmative steps to notify his patients, referring physicians or legal counsel that the medical invoices Dr. Seigel and

- 2 -

Seigel, P.C. generated may contain false medical documentation for medical

testing that was not rendered. A. at 71-76.

Clearly, these admissions are probative of issues raised by defendants in their Motion to

Dismiss. To the extent that such extrinsic evidence will assist the Court and informs the

underlying decisions to be made, and is not unreasonably prejudicial to the parties, such evidence

should be considered so that the ultimate decision reflects full consideration of the relevant record

evidence.

Moreover, defendant's challenge regarding the speculative nature of Allstate's "Seigel-

Effect" damages is rebutted by Dr. Weisberg's statistical analysis. Defendants have been in

possession of this expert evidence since May 20, 2003 – two and one half months prior to the date

defendants filed their Motion to Dismiss. There will be no prejudice to the defendants should this

Court elect to consider these probative materials.

**B.     Allstate Adequately Alleges Proximate Cause**

For the first time in their reply brief, the defendants attempt to distance Dr. Seigel's fraud

from its intended victim -- Allstate. It is undisputed that Dr. Seigel had no intent to defraud his

patients. Dr. Seigel Int. Ans., No. 3; Complaint Appendix at 36. It is further undisputed that the

payment for treatment allegedly rendered by Dr. Seigel was anticipated to be and, in fact, was paid

for by insurance companies. See Allstate Opposition to Defendants' Motion to Dismiss, pages 33-

42. This is best exemplified by the routine practice of Seigel, P.C. to issue letters of protection,

and to write off fees for alleged medical services not collected from insurance. Id. Thus,

defendants attempt to characterize of Dr. Seigel's fraud (and concomitant victimization of

Allstate) as elaborate and byzantine in nature is no more than a self-serving effort to elevate form

over substance. It should not be overlooked by this Court that Dr. Seigel has confessed that he

- 3 -

intentionally defrauded insurance carriers.  Complaint Appendix, pages 8-9.  Thus, defendants'

assertion at page 5 that "the patient, not Allstate, was the direct victim of the alleged fraud",

contradicts Dr. Seigel's prior admissions that he intended to defraud insurance companies and did

not intend to harm his patients.  Id.

Defendants correctly note that Allstate has established that its injury was foreseeable and

caused by the intentional acts of the defendants.  However, Allstate has also established that each

facet of its injury including (1) first party claim damages, (2) money paid for fraudulent medical

testing in the context of third party claims, and (3) the "Seigel-Effect" damages, were all the direct

(not remote), intended consequence of Dr. Seigel's intentional conduct.

     **C.**     **The Holmes Factors Weigh In Favor Of Finding Proximate Cause**

Contrary to the defendant's assertion at footnote 6 of defendant's reply brief, even the

narrow interpretation imposed by the Second Circuit in Laborers Local 17 recognized that the

principles announced in Holmes do more than "buttress" proximate cause analysis.  Instead, the

Holmes factors are dispositive in determining whether plaintiff has standing under federal RICO.

Laborers Local 17, 191 F.3d at 239 n.4. (recognizing that "to the extent [its] description of 'single

direct' or 'derivative' injury [in determining proximate causation] might seem to encompass cases

where recovery by the plaintiff would not run a follow of the policy concerns ...[in the Holmes

remoteness inquiry], the outer limits of the direct injury test are described more by those concerns

then by any bright-line, verbal definition").

     1.     The First Holmes Factor

Allstate addresses defendant's challenge that Allstate's damages are too speculative.  See

Plaintiffs' Opposition to Defendants' Motion to Dismiss, pp. 44-54.  Allstate's unrebutted expert

statistical evidence accounts for all statistically relevant factors to Allstate's claim-evaluation

- 4 -

process. Clearly, at a minimum, there is a genuine issue of material fact created by defendants' repeated reference to infinite, yet-to-be defined factors they claim *may* have had an impact on claim values. Defendants' unsupported, self-serving conclusions stand in stark contrast to the reasoned tested, expert statistical evidence provided by Allstate's expert Dr. Weisberg which quantifies, to a high degree of statistical confidence, the impact Dr. Seigel's fraud had on Allstate claim settlement values. While such analysis may be complex, Allstate should not suffer further or be denied its legal remedy because of the expanse and complexity of defendants' fraud.

Importantly, defendants claim (again without support), in footnote 7 of their Reply Brief, that "negotiated settlements do not routinely distinguish between economic and non-economic damages." Notwithstanding, Allstate's expert evidence shows that the amount of medical bills incurred is a statistically relevant factor in Allstate's claim-evaluation process[1]

For the sake of brevity, this Court should recognize that defendants' arguments regarding the first Holmes factor (difficulty in ascertaining amount of damages attributable to defendant's conduct) and defendants' argument regarding the alleged speculative nature of Allstate's damages, are essentially identical. At page 9 of the defendant's Reply Brief, defendants dismiss (or ignore) Dr. Weisberg's statistical analysis as irrelevant to the proximate cause analysis, and indicate for the record that they "obviously" oppose Dr. Weisberg's model. Clearly, there is a dispute as to material facts. However, it is undisputed that Weisberg's analysis will assist the trier of fact in quantifying the damages Allstate sustained as a result of Seigel's intentional scheme to defraud.

In footnote 9 of their Reply Brief, defendants recognize that the involvement of a specialist, such as Seigel, inflated the value of claims. Apparently, however, defendants fail to

---

[1] In footnote 8, defendants make further (irrelevant) factual assertions not supported in the record "that Allstate routinely reduced settlement offers" where Dr. Seigel was involved. Dr. Weisberg's expert analysis takes into account those instances when Allstate considered and paid less than 100% of any given medical invoice in evaluating third party settlements. See Weisberg Affidavit.

appreciate that in Dr. Seigel's case the inflation to claim values was fraudulent and artificial because of Dr. Seigel's illegal conduct.  That is why Allstate seeks "Seigel-Effect" damages only in those cases where Dr. Seigel committed fraud and violated RICO by way of the submission of fraudulent medical documentation.  Allstate does not seek so-called "Seigel-Effect" damages in connection with claims not otherwise deemed fraudulent.

### 2. The Second Holmes Factor

In the present case there is no complicated apportionment of damages.  As set forth in plaintiff's Opposition, Allstate is the only party with a legally cognizable claim for damages arising from the defendant's intentional fraud against Allstate.  Whether defendants defrauded other parties who may be capable of presenting a meritorious cause of action has no bearing on the direct injury Allstate sustained, which is limited to its out of pocket losses.

### 3. The Third Holmes Factor

In their Reply Brief, the defendants again ignore the import of the third Holmes factor.  The Holmes Court did not ask whether there are plaintiffs that "may" possess a theoretical injury.  Rather, the Court was concerned with those plaintiffs who could be counted on to vindicate rights as private attorneys general.  Allstate is the only plaintiff with (1) provable out-of-pocket damages, and (2) a demonstrated motive to hold defendants liable.

### D.  The State Farm Case

Clearly, Allstate did not intend to mislead the Court in its citation to State Farm Mut. Ins. Co. v. Abrams, 2000 U.S. Dist. LEXIS 1524 (N.D. Ill. Feb. 4, 2000).   The reference in Allstate's choice of heading -- "Seventh Circuit Treatment of Analogous Issue" was merely a reference to Allstate's referral to persuasive case law outside the Second Circuit.  Moreover, this is readily

apparent at page 28 of Allstate's Opposition Memorandum wherein it is noted that the Seventh

Circuit declined interlocutory review of the trial court's certified question.

Defendants' attempt to distinguish the State Farm case is similarly weak – the distinctions

claimed by defendants are bereft of any meaningful difference. The defendants incorrectly state

"unlike this case, the State Farm 'accident victims' were not directly injured by fraud, but were

rather participants." Reply Brief at p. 14. However, while Allstate claimants (i.e., Seigel

patients) may have been injured in motor vehicle accidents, their injuries were not caused by Dr.

Seigel's fraudulent conduct. Moreover, Dr. Seigel has always maintained that he was not

defrauding his patients. Seigel Interrogatories, No. 3; Complaint Appendix at 36.

### E.      Proximate Cause Analysis Under RICO Requirement Must Be Interpreted In Light Of Underlying Predicate Act -- Mail Fraud

Defendants misinterpret Allstate's argument at page 33 of its Opposition to the Motion to

Dismiss. Distilled to its essence, Allstate recognizes (and argues) that in considering whether the

proximate cause element of RICO has been established, a court must closely consider the nature of

the underlying predicate act. In other words, the proximate cause analysis should not be

performed in a vacuum. In this case, Allstate's adequate allegations establishing the underlying

predicate acts of mail fraud are, in and of themselves, sufficient to satisfy the Holmes test. See

Plaintiffs' Opposition to Defendants' Motion to Dismiss at pp. 33-42.

Allstate does not claim to be "immune from a proximate cause challenge" as defendants

suggest at page 16 of their Reply Brief. Simply, Allstate recognizes that the principles important

to the court in Holmes are congruent with the requisite elements of mail fraud, and the facts

necessary to support such mail fraud allegations, as pled by Allstate in this case.

Defendants' reliance upon Sperber v. Boesky, 849 F.2d 60, 64 (2d Cir. 1988), is clearly not

on point, distinguishable, and, arguably, disingenuous. Defendants cite the Boesky decision for

- 7 -

the quoted proposition that "the alleged wire and mail fraud did not *directly* deprive plaintiffs of

money or property". Reply Brief at 16 (emphasis not in original). A full reading of the passage

from the Court of Appeals decision reveals that the Court was noting that the plaintiffs in Boesky

had *acknowledged* that their injury was not caused directly by defendant's predicate crimes.

In Boesky, the underlying predicate acts alleged by the plaintiffs consisted of commercial

bribery, violation of securities laws, and wire and mail fraud. In Boesky, the plaintiffs claimed

that they had been damaged as a result of their investment decisions to invest in companies

targeted for takeover by the defendant which prices had been artificially inflated as the result of

the unlawful activities of the defendant, as well as the defendant's investment reputation which had

been falsely created and maintained. Id. at 62.

The district court found that the plaintiffs' allegations were consistent with two

interpretations. First, that Boesky's reputation as a wizard in the financial markets was obtained

through his various racketeering activities and, thus, his purchase of stocks drove up their prices.

Id. A second reasonable interpretation of plaintiffs' allegations was that Boesky's illegal

investment successes made all takeover stocks more expensive by encouraging more people to

enter the market and drive up the price of the targeted stock. Id. Essentially, plaintiffs claimed to

have paid stock prices inflated by Boesky's racketeering-created reputation. Id. at 62.

The Court of Appeals affirmed the dismissal of plaintiffs' RICO complaint concluding that

the price increase caused solely by increased attention to takeover stocks in which Boesky was

involved was too distant from Boesky's alleged predicate conduct. Id. at 4. Moreover, the Court

of Appeals noted that the plaintiffs "admittedly did not know that Boesky was involved in the

stock purchase," thus they could not have been the intended victim of the predicate acts (to which

- 8 -

they acknowledged they had not sustained injury) nor could they maintain an allegation of reliance upon the defendant's involvement in any given stock. Id. at 64.

Citing its usual skepticism of claims that a defendant could be liable to hundreds of thousands or even millions of people, the Court of Appeals summarized its reasoning, as follows:

> Plaintiffs here were neither the target of the racketeering enterprise nor the competitors, nor the customers of the racketeer. Boesky did not cheat or deceive plaintiffs in any way with regard to the particular stocks in question since they did not know that he purchased and that he did not trade them illegally. He did not corner the relevant market or control the stocks in questions. As noted above, the doctrine of proximate cause reflects social policy decisions based on shared principles of justice. Applying these principles, we conclude that Congress did not intend us to allow RICO recovery to plaintiffs with claims as attenuated as these.

Id. at 64.

Clearly, Allstate's case is worlds apart from the facts at issue in Boesky. Unlike the plaintiffs in Boesky, Allstate has pled (and Dr. Seigel has acknowledged) that insurance carriers were the intended target of Dr. Seigel's fraudulent conduct. Thus, in those cases in which Allstate bore the burden insurance coverage, Allstate was the intended target of Dr. Seigel's fraudulent conduct. Further, again distinguishing the claims at issue in Boesky, in this case Allstate knew about and relied upon the information supplied by Dr. Seigel in evaluating claim values. Social policy concerns and "shared principles of justice" clearly counsel in favor of recognizing Allstate's standing in the case at bar to seek legal remedy for the wrong committed against it.

**F.    Proof Necessary for Nerve Conduction Study Fraud**

On page 19 of their brief, defendants spill much ink in furtherance of their "strong" dispute that amplitude need not be recorded in connection with nerve conduction testing. This is a factual dispute for the finder of fact at trial. This factual dispute is clearly not sufficient to warrant

- 9 -

dismissal of Allstate's RICO claim.  Moreover, defendants' apparent waiver argument raised for the first time here is (1) not susceptible to resolution at this procedural posture, (2) unsupported in the record, and (3) demonstrative of a further factual dispute barring summary judgment.

### G.    Dr. Seigel And Seigel, P.C. Participated In The Conduct Of Allstate's Affairs

For the first time in their Reply Brief, defendants argue that Allstate cannot maintain a cause of action against either Dr. Seigel and/or Seigel, P.C., where Allstate is the "enterprise" for purposes of RICO.  Reply Brief at 20.

The United States Supreme Court in <u>Reves v. Ernst & Young</u>, 507 U.S. 170 (1993) held that "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, . . .one must participate in the operation or management of the enterprise itself." <u>Id</u>. at 185.  An enterprise is operated not by upper management, but also by lower rung participants in the enterprise who are under the direction of upper management.  An enterprise also might be "operated" or "managed" "by others associated with the enterprise who exert control over it as, for example by bribery". <u>Id</u>. at 184.

In <u>Chubb & Son, Inc. v. Kelleher,</u> 1998 U.S. Dist. LEXIS 22542 (E.D.N.Y. 1998), the district court, after a detailed analysis and survey of extrajurisdictional law, noted that a RICO enterprise can also be the victim of the RICO violation.

In <u>Aetna v. P&B Auto Body,</u> the First Circuit, interpreting <u>Reves,</u> found that outsider defendants caused Aetna appraisers to approve false <u>claims</u> and to conduct their appraisals in a manner contrary to Aetna's business practices and caused Aetna to pay false claims.  The Court found that this evidence was sufficient to support a finding that the defendants exerted control over the enterprise, if not by bribery, than at least by other methods of inducement.  The Court concluded that "since a reasonable jury could find that the. . . [defendant] exerted some control

- 10 -

over Aetna and took part in directing some aspect of the enterprises affairs, the. . . [defendant] actions could be found to have satisfied the "operation or management test." 43 F. 3d 1546, 1560 (1st Cir. 1994); see United States v. Castro, 89 F3d 1443, 1452, n.5 (11th Cir. 1996) (recognizing that "outsiders may expert control through illegal means sufficient to satisfy Reve's requirements"). Clearly, the facts in the present case show that the fraud was committed in a manner substantially similar to the scheme in P&B Auto Body. By acting with purpose to cause Allstate to pay false and fraudulent claims, Dr. Seigel and Seigel, P.C. participated in the affairs of the Allstate enterprise in violation of the federal RICO statute.

Respectfully Submitted
Allstate Insurance Company and
Allstate Indemnity Company
By their Attorneys,

David G. Brink
Federal Bar No. CT23989
Richard D. King, Jr.
Federal Bar No. CT23997
Nathan A. Tilden
Federal Bar No. CT24011
Smith & Brink, P.C.
122 Quincy Shore Drive
Quincy, MA  02171
Tel.    (617) 770-2214

Joel Rottner, Esq.
Federal Bar No. CT05612
Skelley Rottner, P.C.
P.O. Box 340890
Hartford, CT 06134

- 11 -

Volume: I<br>
Pages:  1-308<br>
Exhibits: 1

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

C.A. NO. 303CV0577-JBA

ALLSTATE INSURANCE COMPANY          )
and ALLSTATE INDEMNITY COMPANY,  )
                                                        )
                          Plaintiffs,         )
                                                        )
vs.                                                   )
                                                        )
ARTHUR M. SEIGEL, M.D.,              )
ARTHUR M. SEIGEL, M.D., P.C.      )
and ELLEN SEIGEL,                      )
                                                        )
                          Defendants.       )

## DEPOSITION OF ARTHUR M. SEIGEL

A Witness called by and on behalf of the Plaintiffs, pursuant to the Federal Rules of Civil Procedure, before Linda Lee Barry, a Certified Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Skelley & Rottner, P.C., 433 South Main Street, West Hartford, Connecticut 02169, commencing on Wednesday, October 22, 2003, at 9:53 a.m.

10

1          something like that?

2                  MR. GRUDBERG: Object.  That's not what

3          he said.

4                  MR. BRINK: Well, I want to understand

5          his testimony.

6     A.    I didn't understand your question.

7                  MR. BRINK: Let's go off the record.

8                  **(Whereupon, the parties go off the**

9          **record)**

10    (BY MR. BRINK)

11    Q.    What I want to do, doctor, is try to get to

12          the point early on in this deposition of what

13          your testimony is regarding false billing of

14          any insurance company.  When I read that

15          stipulation and I see 7,000 times you billed

16          and then many of those times "I billed but

17          didn't perform the test," it doesn't matter

18          what it means to me.  What I want to do is

19          understand what you meant by that

20          stipulation.  Can you explain, in your own

21          words and in as much detail as possible, what

22          you meant?

23    A.    Well, I would have to go back to what I

24          already said in that I know it was more than

11

1          a few times.  I know that it was not a

2          preponderance of times but I don't have any

3          way of not only recollecting or

4          reconstructing how many times it was.

5     Q.   And when you say it was more than a

6          preponderance -- "it was not a preponderance

7          of times" I think is the phrase that you used

8          -- what do you mean?

9     A.   Well, preponderance to me means most.  You

10         know, my recollection, although I can't be

11         precise, is it was not a great many times but

12         it was many times.

13    Q.   Why can you not be precise?

14    A.   Well, I didn't keep any track.  I had no

15         score card on how many bills did that

16         correlate with completed EMG's and there is

17         no way of me looking at these charts and

18         telling.

19    Q.   So when you said not a preponderance -- I

20         mean preponderance for lawyers has a certain

21         meaning, preponderance of evidence -- you may

22         be familiar with that because you have been

23         an expert witness in cases -- a preponderance

24         is usually defined as more likely than not,

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

12

1               something more than 50%.  Would it be

2               accurate to say that, when you're saying less

3               than a preponderance, you think less than

4               50%?

5   A.      Yes.

6   Q.      That's what you mean by that answer?

7   A.      Well, I meant what I said by my answer.

8   Q.      All right.  But I want to -- it would be

9               correct if I were to assume from that answer

10              - let me rephrase the question.

11              You understood preponderance to mean

12              something more or less than 50%?  That's what

13              you understand the word to mean?

14   A.      What I said is that I meant preponderance to

15              mean the vast majority but being that when

16              you talk about 50%, I don't know the numbers,

17              so I can't tell you.

18   Q.      All right.  Maybe it would be good if we

19              tried to see if we can gage this at all by

20              percentage and if we can that's fine; if we

21              can't I only want what you remember.  If we

22              use as the universe of 100% this 7,000 times

23              you billed for a needle EMG test when you did

24              not really perform it can you assign any

54

1         you bill -- in those instances where you

2         billed but didn't perform the test, why did

3         you bill for a test you didn't perform?

4   A.     To get the fee.

5   Q.     You had a patient there --

6            MR. GRUDBERG: Is that a question?

7            MR. BRINK: Part of a question.

8         -- You had a patient in your office.  You

9         could have performed a needle EMG and then

10        billed for it and then gotten your fee.  Why

11        did you not perform the test?

12  A.     Well, first of all, it was the wrong thing to

13        do, so I'm not going to try to justify it,

14        but at that point I was convinced to a level

15        of a certainty you can achieve that this was

16        going to be a little study and I didn't -- I

17        just couldn't see sticking the needle into

18        them.

19 (BY MR. BRINK)

20  Q.     What do you mean when you say you couldn't

21        see sticking the needle into them?  Were you

22        concerned about causing them pain?

23  A.     In part.

24  Q.     Did you have other concerns?

71

```
 1                    terms of sending a share to our firm,

 2                    whatever you guys do.

 3        Q.          You're saying "you guys."  Are you referring

 4                    to --

 5        A.          Lawyers.

 6        Q.          Mr. Jacobs is Mr. Grudberg's partner?

 7        A.          No.

 8        Q.          It's a different guy?

 9        A.          Yes.

10                         MR. GRUDBERG: We don't do collections.

11                    It's Howard Jacobs.

12        (BY MR. BRINK)

13        Q.          What steps, if any, have you taken to make

14                    sure that you're not collecting on a false

15                    medical billing; in other words, for a needle

16                    EMG test that was not actually performed?

17        A.          First of all, for years whenever our lawyer

18                    has called us -- in many cases it's a lawyer

19                    calling us because he is representing the

20                    client, his client, my patient.  Whenever we

21                    have been asked to take a reduction in our

22                    bills -- I wouldn't say whenever but almost

23                    whenever we have been asked to take a

24                    reduction in our bills, we have done so as
```

1      part of an overall agreement for whatever

2      reason that there was not going to be enough

3      money to pay everyone's bills.  The other is

4      that if a patient ever, through their lawyer

5      or directly, said that they didn't have

6      something done it was my policy never to

7      argue with it and just, you know, to leave

8      that particular charge.  That was a much

9      rarer occasion than the lawyer calling us

10     saying, you know, "We need to reduce the

11     billing."  Those are the main two things I

12     would say.

13  Q.  But specifically with this arrangement what

14      have you done, if anything, to make sure that

15      you don't collect for a needle EMG that was

16      not actually performed; in other words, what

17      arrangements have you made to make sure

18      you're not collecting on a false billing?

19  A.  Nothing more specific than what I have told

20      you.

21  Q.  Have you given any instructions to your agent

22      that they should not collect for needle EMG

23      tests or the fee associated with a needle EMG

24      test.

73

1   A.    By our agent you mean Mr. Jacobs?

2   Q.    Yes.

3   A.    Well, he's aware of everything involved with,
4        you know, my case and understands that this
5        is an issue of contention, and I'm sure as an
6        ethical attorney he will do what he has to
7        do.

8   Q.    But have you given him any specific
9        instructions saying, "Look, I do not want to
10       collect -- for example, "I do not want to
11       collect the $140 axss0ciated with a needle
12       EMG because in any given file I don't know if
13       I really did it or not?"

14   A.    We have told him that our policy has been not
15       to contest any patient or attorney who claims
16       that we didn't do the test.

17   Q.    But that's different.  Let's say
18       hypothetically that Mr. Jacobs, who is acting
19       as a collection agent for you, that Mr.
20       Jacobs calls up Lawyer A and says, "You have
21       a patient -- client -- a patient of ours, a
22       client of yours.  We have not been paid" --
23       and you would have a list of charges; right?
24       Normally on a patient -- let's just talk

74

1        about your list of charges.  Needle EMG,

2        $140.  How about the nerve conduction?

3            MR. GRUDBERG: $90 each most recently.

4   A.    $90 each.

5   (BY MR. BRINK)

6   Q.    Were there other -- in the normal routine

7         situation were there other things that you

8         would charge for like an office visit?

9   A.    Office consultation or a re-visit.

10  Q.    So you will have the visit charge.  What was

11        that amount?

12  A.    $295 for an initial consultation and $100 and

13        change for the re-visit.

14            MR. GRUDBERG: $120.

15            MR. BRINK: I appreciate you moving

16        things along, counsel.

17  (BY MR. BRINK)

18  Q.    So the average outstanding balance for a

19        given patient would be some combination of

20        these numbers?

21  A.    Yes.

22  Q.    Routinely are you talking about $500, $600 or

23        $700?

24            MR. GRUDBERG: $795 if everything is

75

1           done.

2      A.      $795.

3      Q.      So in the hypothetical -- I'm posing a

4              hypothetical to you now, doctor, that your --

5              I say you but it's you and your company --

6              have charged Attorney Howard Jacobs --

7                  MR. GRUDBERG: Edward.

8                  MR. BRINK: Oh, your Jacobs is Howard;

9              this is Edward.  I misunderstood you.

10     Q.      You have instructed Edward Jacobs to simply

11             collect any outstanding balance that is

12             there, so it would be his standing

13             instruction to call Attorney A, who has a

14             client who is also your patient?  You can

15             say, "According to our books, we were never

16             paid the $795 for the work -- medical work

17             that we did.  Please pay us;" is that right?

18     A.      Yes.

19     Q.      Now your testimony is that you told Ed Jacobs

20             that if they contest the needle EMG then

21             don't fight it.  Just insist on being paid

22             for the other things, the nerve conduction

23             study, the visit and if there is a re-visit;

24             is that correct?

*Lee & Associates* * *Certified Court Reporters* * (781) 848-9693

76

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | What if Attorney A has no knowledge of your |
| 3 | | criminal conviction and your admission that |
| 4 | | on occasion the needle EMG was not performed? |
| 5 | A. | It doesn't exist. |
| 6 | Q. | I'm posing a hypothetical and you know what, |
| 7 | | your attorney will have an opportunity to |
| 8 | | cross examine if you feel that there is |
| 9 | | anything else that is not being elicited here |
| 10 | | that you think is important.  In my |
| 11 | | hypothetical, the way you're proceeding with |
| 12 | | your collections through your authorized |
| 13 | | agent if Attorney A has no knowledge that on |
| 14 | | occasion you billed for a needle EMG test |
| 15 | | that you didn't actually perform would you |
| 16 | | accept the money? |
| 17 | A. | Hypothetically, yes. |
| 18 | Q. | You have taken no steps to -- either directly |
| 19 | | or through your agent, Mr. Jacobs, you have |
| 20 | | taken no steps to notify these patients or |
| 21 | | their attorneys about what has happened. |
| 22 | A. | The press has done it pretty well. |
| 23 | Q. | But I'm asking what you have done. |
| 24 | A. | I plead guilty to one count of mail fraud |

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

138

1          victim?

2      A.    Usually from an insurance company unless the

3          person was self-insured.

4      Q.    So when you were billing falsely for needle

5          EMG tests that were not actually performed,

6          you knew that the money that you were going

7          to be receiving was coming from an automobile

8          insurance carrier; correct?

9      A.    What I knew is at that point it was the

10          patient's money that I was going to be given

11          my fees out of.

12      Q.    And did you know where the patient was going

13          to get that money?

14      A.    I knew it was either from the insurance

15          company or from some self-insured source or,

16          in the case of no insurance, it would be from

17          the patient directly.

18      Q.    I understand, but in automobile accident

19          cases was there normally and routinely an

20          automobile insurance company involved?

21      A.    Usually.

22      Q.    So that when you billed falsely, you

23          understood that the money you would

24          ultimately be receiving was coming from an

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

1           automobile insurance company?

2       A.   Not directly.

3       Q.   Right.  But it was coming through an

4            intermediary, that intermediary normally

5            being the attorney representing your patient.

6       A.   Well, I thought it was coming from the

7            patient rather than the attorney but the

8            attorney sent me the check.

9       Q.   Right.  So in a routine situation, when you

10           billed falsely, you understood that when you

11           mailed that false bill to the attorney

12           representing your patient that the money that

13           you would be receiving would be directed from

14           that attorney but ultimately came form the

15           automobile insurance carrier?

16      A.   Well, can I answer by example?

17      Q.   Well, can you answer my question?  Did you

18           understand that that was where the money was

19           coming from?

20      A.   I new that the money had been transferred

21           from an insurance company making a settlement

22           to the patient via their attorney.

23      Q.   And that the attorney acted as an

24           intermediary?

140

1    A.    Yes.

2    Q.    All right.  So although the check wasn't made

3          payable -- wasn't Allstate Insurance Company

4          to Dr. Seigel, you knew that Allstate, if

5          they were the auto insurer, for example, was

6          paying the attorney for your patient that

7          that attorney would then be responsible for

8          making sure that you were paid pursuant to

9          the letter of protection; is that right?

10              MR. GRUDBERG: Objection.  Objection.

11   A.    My understanding is as I stated.

12   (BY MR. BRINK)

13   Q.    Well, is that right as I have just described?

14   A.    Well, I think so.  I think that's what I

15         said.  I'm used to using my own words.

16   Q.    And I want to make sure I understand your

17         words.  So the answer to my question is yes?

18   A.    My answer is I think so.  I think I follow

19         your logic.

20   Q.    Did the existence of an insurance company,

21         any insurance company, influence your

22         decision on whether or not to create a false

23         bill for a needle EMG for a particular

24         patient?

143

1      testimony and you knew that's wrong because

2      there is no oath on it and you're a lawyer

3      and he's a doctor, so I'm just objecting to

4      that.

5      (BY MR. BRINK)

6      Q.      Paragraph 2 of your stipulation says --

7              MR. GRUDBERG: Does he have it in front

8      of him?

9              MR. BRINK: Let me get a extra copy made

10     if you don't have one.

11             MR. GRUDBERG: I do not.

12             MR. BRINK: Let's take a second.

13             **(Whereupon, the parties go off the**

14     **record)**

15     Q.      Sir, would you please read out loud the

16     second paragraph starting from "From in or

17     about?"

18     A.      *"From in our about December, 1996 through in*

19     *or about August, 2000, Seigel knowingly and*

20     *wilfully and with intent to defraud, devised*

21     *a scheme to defraud certain entities that*

22     *provide auto and health insurance, insurance*

23     *providers, and for obtaining money and*

24     *property from these entities by false and*

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

144

1          *fraudulent pretenses, representations and*

2          *promises."*

3      (BY MR. BRINK)

4      Q.      Now by that statement, sir, are you saying

5              that you devised a scheme to defraud

6              automobile insurance companies such as

7              Allstate?

8      A.      Was that the end of your question?  Repeat

9              the question.

10             MR. BRINK: May I have a read back on

11     that?

12             **(Whereupon, the court reporter read back**

13     **the previous question as follows:)**

14             Q.      Now by that statement, sir, are you

15                     saying that you devised a scheme to

16                     defraud automobile insurance

17                     companies such as Allstate?

18             THE WITNESS: Yes.

19     (BY MR. BRINK)

20     Q.      You understood, therefore, that the money you

21             were defrauding was coming from automobile

22             insurers such as Allstate; is that right?

23             MR. GRUDBERG: Object.

24         Is that right?

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

1          MR. GRUDBERG: Object. You've got to

2     separate first party claims, bills that were

3     sent direct to Allstate, from getting paid

4     from the patient.

5          MR. BRINK: I do not have to ask the

6     question that you want to ask. You can raise

7     an objection. I will press that question.

8          MR. GRUDBERG: I object, because you

9     don't separate it.

10          MR. BRINK: Please note on the transcript

11     here again I believe this is inappropriate

12     coaching. Will you answer the question, sir?

13  A.     Repeat the question, please.

14          MR. BRINK: Read back the question

15     please.

16          **(Whereupon, the court reporter read back**

17     **the previous question as follows:)**

18          Q.     You understood, therefore, that the

19               money you were defrauding was

20               coming from automobile insurers

21               such as Allstate; is that right?

22          THE WITNESS: Well, I think I have

23     answered that question. The money is coming

24     from the patient via money sent from Allstate

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

146

1              and other insurance companies.

2     (BY MR. BRINK)

3     Q.      Can you answer my question yes or no?

4     A.      No.

5     Q.      Why not?

6     A.      Because it requires an explanation.

7     Q.      What is that explanation?

8     A.      I just gave it to you.

9     Q.      What is that explanation?

10             MR. GRUDBERG: Could we read the answer?

11             **(Whereupon, the court reporter read back**

12     **the previous answer as follows:)**

13             A.      Well, I think I have answered that

14                     question.  The money is coming from

15                     the patient via money sent from

16                     Allstate and other insurance

17                     companies.

18    Q.      Let me see if I can ask it a different way,

19             sir.  When you prepared bills and reports

20             that contained false information and false

21             billings, did you know that those reports

22             would be relied upon by other people?

23    A.      Yes.

24     (BY MR. BRINK)

248

```
 1              it.
 2    Q.        But you stick a needle in somebody's arm;
 3              right?
 4    A.        That's not using -- that's not the machine.
 5              The machine is a box with a screen.  You look
 6              at the screen.
 7    Q.        But there are also --
 8    A.        The only difference between doing --
 9    Q.        The needle is connected to the machine;
10              right?
11    A.        Do you want me to explain this to you?
12    Q.        Is the needle connected to the machine?
13    A.        Yes.
14    Q.        Did you do anything with the needle?
15    A.        When?
16    Q.        When you billed for a needle EMG but did not
17              actually perform it.
18    A.        Yes.
19    Q.        What did you do?
20    A.        I put the needle on the skin or where the
21              muscle is.
22    Q.        Why?
23    A.        What I was doing was a surface EMG, which is
24              to see if I was recording anything from the
```

249

1           muscle on the surface.

2    Q.     So it's your testimony here today that you

3           were performing a medical test even though

4           you were not inserting the needle into the

5           flesh of your patient?

6    A.     That's not my testimony.

7    Q.     What are you saying that you were doing?  You

8           made reference to a surface EMG; what were

9           you making reference to?

10   A.     A surface EMG is a test where the recording

11          is done from outside, from not inside.

12   Q.     A test which has been discredited by many

13          medical practitioners; correct?

14   A.     Including me.

15   Q.     As having no diagnostic value whatsoever;

16          correct?

17   A.     Of having insignificant medical value.

18   Q.     All right.  And you agree with that as a

19          general -- based on your experience and

20          expertise that a surface EMG has little or no

21          medical value.

22   A.     Right.

23   Q.     And that it is not a diagnostic test which

24          has general acceptance in the medical

250

| 1 | | community as having value in diagnosing a |
| 2 | | soft tissue muscle type injury? |
| 3 | A. | Right. |
| 4 | Q. | Fine.  So please explain to me why you were |
| 5 | | laying the needle on the person's skin? |
| 6 | A. | Well, I can't give you a good justification. |
| 7 | | I'm telling you that's what I did.  I mean, I |
| 8 | | have already said I shouldn't have done it. |
| 9 | | I should have done the EMG but that's what I |
| 10 | | did. |
| 11 | Q. | Did you do it in order to cover your tracks? |
| 12 | A. | Well, I hardly think it covered my tracks. |
| 13 | Q. | Well, we can both admit that it -- if that |
| 14 | | was the reason it was not successful but my |
| 15 | | question is was that the reason? |
| 16 | A. | No. |
| 17 | Q. | To mislead a patient, who is normally not a |
| 18 | | medical professional and might have any level |
| 19 | | of education, so that if they were asked |
| 20 | | later on, "Did somebody take a needle and |
| 21 | | touch it to your body?" they might think, |
| 22 | | "Well, yeah.  That did happen."  Was it a |
| 23 | | part of your scheme to defraud, doctor? |
| 24 | A. | Well, I mean if I were going to bill for a |

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

251

1    test I had to do something.  I couldn't just

2    clean the machine off and bill for the test.

3  Q.    Why would a --

4         MR. GRUDBERG: Let him finish.

5  A.    I took the test as far as I was willing to

6        take it in those cases without actually

7        inserting the needle.  That was the point in

8        which I said I'm not going to actually stick

9        this needle into the person.

10 (BY MR. BRINK)

11 Q.    But in terms of rendering and providing you

12       meaningful medical data, you might have well

13       have waved the needle in the air like Harry

14       Potter's want.

15       MR. GRUDBERG: Well, you're not in front

16       of the jury.  He has already agreed it had

17       little or no medical use or justification.

18       MR. BRINK: But he has told me -- he

19       cannot tell me why he did it and my question

20       is was that a part of your scheme to defraud?

21       MR. GRUDBERG: He has answered that you

22       could very well do absolutely nothing as far

23       as the patient went.  He gave you that

24       answer, so I think he has answered it.

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

252

1          MR. BRINK: I'm going to mark the

2    transcript here.  I think it's improper

3    coaching.

4    Q.    Can you answer my question?

5          MR. GRUDBERG: That's not coaching,

6    that's what his testimony was.

7    A.    I took the test as far as I could take it and

8    didn't finish it.

9    (BY MR. BRINK)

10   Q.    You took it as far as you could take it?

11   What does that mean?

12   A.    Without finishing it.  Well, you know what it

13   means.

14   Q.    I don't know what it means.  What does it

15   mean?

16   A.    Well, I don't think -- I think you're being

17   disingenuous and you understand my answer.

18   That's my answer.

19   Q.    I'm going to make sure that I ask this

20   question, because I don't believe I got an

21   answer to it.  If counsel believes there has

22   been a yes or no answer we'll find it.

23         MR. GRUDBERG: I said it was a yes or no

24   answer?  What I said was he already answered

*Lee & Associates* * *Certified Court Reporters* * *(781) 848-9693*

253

1          the question.  Ask your question.

2    Q.    Can you answer this question yes or no, sir?

3          Was your decision, when you billed falsely

4          for a needle EMG test that you didn't

5          perform, did you lay the needle on the skin

6          of the patient as a part of your scheme to

7          defraud?

8    A.    That's what I did.  Yes, that's what I did.

9    (BY MR. BRINK)

10   Q.    Did you do it in furtherance of your scheme

11         to defraud?

12   A.    No, it's what I did.

13   Q.    Why did you do it?

14   A.    This is like who is on first.  I did it

15         because that's as far as I took the test

16         without actually completing the insertion of

17         the needle.

18   Q.    What was on your mind when you laid that

19         needle on a patient's arm or leg?

20   A.    This is going to be a normal report.

21   Q.    So why stick the needle in?

22   A.    Yes.

23   Q.    Then why take the needle out at all, sir?

24   A.    I don't know.

## CERTIFICATE OF SERVICE

I, Richard D. King, Jr., attorney for the plaintiffs, hereby certify that I mailed, first class mail, postage prepaid a copy of the documents listed below to:

Ira B. Grudberg, Esq.
David L. Belt, Esq.
Jacobs, Grudberg, Belt & Dow, P.C.
350 Orange Street
P.O. Box 606
New Haven, CT 06503-0606

Honorable Joan G. Margolis
U.S. Magistrate Judge
United States District Court
For The District of Connecticut
141 Church Street, Room 303
New Haven, CT 06510

Joel Rottner, Esq.
Skelly & Rottner, P.C.
433 S. Main St.
West Hartford, CT 06610-1670

1.  Unopposed Motion For Leave To File Surreply Memorandum Of Law In Opposition To Defendants' Motion To Dismiss; and
2.  Plaintiffs' Sur-Reply Memorandum In Opposition To Defendant's Motion To Dismiss.

_____
Richard D. King, Jr.

Dated: **11/3/03**