## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY and | : | |
| ALLSTATE INDEMNITY COMPANY, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No.: 3:03cv577 (MRK) |
| | : | |
| ARTHUR M. SEIGEL, M.D., | : | |
| ARTHUR M. SEIGEL, M.D., P.C., | : | |
| and ELLEN SEIGEL, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

In this action, Plaintiffs Allstate Insurance Company and Allstate Indemnity Company (collectively, "Allstate") have sued Dr. Arthur Seigel ("Seigel"), his medical practice, Arthur M. Seigel, P.C. ("Seigel P.C."), and his wife, Ellen Seigel, an employee and shareholder of Seigel P.C., for various alleged violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, the Connecticut Unfair and Deceptive Trade Practices Act, Conn. Gen. Stat. ("CUTPA"), § 42-110a, *et seq.*, the Connecticut Health Insurance Fraud Act ("CHIFA"), Conn. Gen. Stat. § 53-442, and common law fraud.  Briefly stated, Allstate alleges, among other things, that Seigel and Seigel P.C. created false and fraudulent invoices and medical reports on patients who had been involved in automobile accidents for the purpose of causing insurers such as Allstate to pay for medical treatments that were either never performed or were incompletely performed and/or to pay inflated amounts for the personal injury claims of

1

those patients.  This lawsuit follows Seigel's plea of guilty to, and conviction on, a single count of mail fraud in violation of 18 U.S.C. § 1341.

Presently before the Court is Defendants' Motion to Dismiss [doc. # 31].  Defendants assert that Allstate's 98-page, 452 paragraph, seven-count Amended Complaint is defective in a number of respects.  Specifically, Defendants contend that: (1) Allstate lacks standing to pursue certain of its RICO claims because Defendants' predicate acts were not the proximate cause of certain of Allstate's alleged injuries; (2) certain of Allstate's claims for damages are too speculative as a matter of law; (3) Allstate's claim against Seigel under 18 U.S.C. § 1962(a) fails because Allstate has not alleged an "investment injury" as required by § 1962(a); (4) Allstate's claim against Seigel under 18 U.S.C. § 1962(b) fails because Allstate has not alleged an "acquisition injury" as required by that section; (5) Allstate's RICO claim against Seigel P.C. is defective because, under 18 U.S.C. § 1962(c), an entity such as Seigel P.C. cannot be both a RICO "person" and the RICO "enterprise"; (5) Allstate's common law fraud claim does not sufficiently allege causation; and (6) Allstate's CUPTA claim does not allege a sufficient nexus between Allstate and the defendants.  Alternatively, Defendants move for a more definite statement.

For reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss [doc. # 31] and DENIES Defendants' Motion for a More Definite Statement [doc.# 31].

**I.**

On a motion to dismiss, this Court must accept the factual allegations contained in the

Amended Complaint [doc. #59] ("Amended Compl.") and exhibits attached thereto,[1] and

Amended RICO Statement [doc. #9] as true and draw all reasonable inferences in favor of

Allstate.  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Taylor v. Vermont Dep't Of

Educ.*, 313 F.3d 768, 776 (2d Cir. 2002) (stating that, on a motion to dismiss, the Court is

"generally limited to the facts presented within the four corners of the complaint, to documents

attached to the complaint, or documents incorporated within the complaint by reference").[2]

Although the legal issues in this case are complex the facts are relatively straightforward.

At all relevant times, Seigel was a medical doctor, board certified in neurology and

licensed to practice in Connecticut.  Amended Compl. ¶ 2.  Seigel is the principal of Seigel P.C.,

and he and Ellen Seigel, Seigel's wife, are the shareholders of Seigel P.C.  *Id.* ¶ 4.  The Amended

Complaint alleges, and Seigel has stipulated in a plea agreement with the U.S. Attorney,[3] that

from in or about December 1996 through in or about August 2000, Seigel knowingly and

willfully, and with intent to defraud, devised a scheme to defraud certain entities, including

Allstate, by obtaining money from these entities through false and fraudulent pretenses and

representations.  Amended Compl. ¶¶ 57; *see* Stipulation of Offense Conduct ("Stip.") [doc. #1],

---

[1]The exhibits attached to the original Complaint, which were not attached to the Amended Complaint, are incorporated by reference.  Citations to the exhibits are to be understood to refer to the attachments to the original Complaint.

[2] Allstate asked the Court to convert the Motion to Dismiss into a summary judgment motion under Fed. R. Civ. P. 12(b)(6).  Defendants oppose conversion.  The Court declines to convert the Motion to Dismiss.  Therefore, the Court has limited its review  to the Amended Complaint, the Amended RICO Statement and the exhibits attached to the Complaint.

[3]Seigel entered a plea agreement with the United States for a single count of mail fraud in the criminal proceedings against Seigel.  In doing so, Seigel conceded to the conduct described in the Stipulation, which is attached to the Complaint, and therefore Seigel's Stipulation will be deemed true for the present motion to dismiss.

Ex. at 8.

As part of his practice, Seigel treated a large number of patients who had been involved in automobile accidents and had been referred by attorneys or chiropractors. *See* Stip. at 8. He examined these patients for any neurological deficits, performed (or claimed to perform) certain tests and evaluated (or claimed to evaluate) the patients' conditions. *Id.* Seigel had training in performing a test called needle electromyography (EMG), a test which requires a physician to insert a needle into the patient's relaxed muscle in the injured area, moving the needle to record muscle activity. Reading the results from a machine connected to the needle, the physician gains information regarding the health of the muscle. *Id.* During the relevant period, Seigel submitted bills to various insurance providers, including Allstate, for over 7000 EMG procedures, intending that Allstate and the other insurers pay him for performing said procedures. Stip. at 8. However, many of these billings were fraudulent, as Seigel did not perform the EMG test on a significant number of his patients, but still knowingly billed the insurance providers for the tests. *Id.*

Seigel is also trained to administer Nerve Conduction Study ("NCS") testing.[4] Amended Compl. ¶ 43. NCS testing requires the clinician to measure nerve impulses during stimulation and to obtain information regarding the speed and time of nerve impulses. *Id.* ¶ 45. Since January 1, 1996, to bill for NCS testing in compliance with the American Medical Association's CPT protocols, the clinician is required to measure and record amplitude information in the completion of a legitimate NCS test. *Id.* ¶ 48. Allstate alleges that all NCS tests for which

---

[4]In his plea agreement with the United States, Seigel only pleaded guilty to generating bills for EMG testing that was either not performed or insufficiently performed. Stip. at 8. The parties agreed that the "fraud loss" attributable to Seigel's conduct amounted to $450,000. *Id.* at 9.

Seigel submitted bills under certain current procedural terminology codes were incomplete. *Id.* ¶ 50. Furthermore, Allstate alleges that Defendants intentionally authored medical reports that contained conclusions and recommendations that were false and misleading in light of actual test results. *Id.* ¶¶ 96(3), 97. Allstate asserts that Seigel's fraudulent billing scheme artificially inflated the perceived value of tort claims and the costs associated with such claims, contributing to Allstate's payment of over $3,400,000 in jury and settlement awards. *Id.* ¶ 8.

Allstate claims that it suffered substantial financial losses resulting from the pattern of criminally fraudulent conduct by Seigel. The injuries for which compensatory damages are sought include, but are not limited to: (1) Allstate's loss of its ability to conduct its insurance business on the basis of true, accurate, and complete assessments of legitimate, compensable claims; (2) Allstate's loss of funds paid for false and fraudulent (whether wholly fictitious or grossly inflated) bills for services, which funds, in part, enabled Seigel to perpetuate his pattern of racketeering activities and enhance his ability to further Seigel's business by and through the operation of the fraudulent enterprise; (3) Allstate's payments on fraudulently inflated settlement claims in third-party, bodily-injury claims where such payments were based upon Defendants' fraudulent medical documentation and billing; (4) Allstate's payments on judgments or to settle civil litigation cases where Allstate was obligated to pay bodily-injury tort awards that were artificially and falsely inflated (based upon Defendants' fraudulent medical documentation and billing); (5) Allstate's expenses incurred to review, adjust, investigate, litigate and pay the false and fraudulent claims created by Seigel and supported by and through Seigel's pattern of racketeering activity; and (6) Allstate's past and continuing financial burden to establish and carry out systems and policies to detect false, fraudulent, and inflated claims. *Id.* ¶ 11.

The Amended Complaint contains the following counts: Count I against Seigel only for violation of 18 U.S.C. § 1962(b) and § 1962(c); Count II against Seigel and Seigel P.C. for violation of 18 U.S.C. § 1962(c); Count III against Seigel only for violation of 18 U.S.C. § 1962(a); Count IV against Seigel and Seigel P.C. for common law fraud; Count V against all Defendants for violation of CUTPA, Conn. Gen. Stat. § 42-110(b); Count VI against Seigel and Seigel P.C. for violation of CHIFA, Conn. Gen. Stat. § 52-442; and Count VII against all Defendants for injunctive relief.   Amended Compl. at 86-97.

## II.

The RICO statute creates civil (and criminal) liability against any person who: (a) invests or otherwise uses, directly or indirectly, income derived from a pattern of racketeering activity to acquire an interest in or to establish or operate an enterprise engaged in interstate commerce; (b) acquires or maintains, directly or indirectly, an interest in or control of such an enterprise through a pattern of racketeering activity; (c) is employed by or associated with such an enterprise and conducts or participates, directly or indirectly, in the conduct of its affairs through a pattern of racketeering activity; or (d) conspires to do any of the foregoing.  18 U.S.C. §§ 1962(a)-(d).  Any person "injured in his business of property by reason of a violation of section 1962" may sue for damages and injunctive or other relief.  *Id*. § 1964(c).  To demonstrate standing to sue under RICO, a plaintiff must plead, at a minimum, "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation.  This third requirement is satisfied if the defendant's injurious conduct is both the factual and proximate cause of the injury alleged." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003) (internal quotations and citations omitted); *see Baisch v.Gallina*, 346 F.3d 366,

6

372 (2d Cir. 2003).

**A.**

Defendants first argue that Allstate lacks standing to pursue certain of its RICO claims because Defendants' predicate acts were not the proximate cause of certain of Allstate's alleged injuries.  *See* Memorandum of Law in Support to Motion to Dismiss [doc. #32] at 5 ("Mem. in Supp. of Mot. to Dismiss").  Allstate's Amended Complaint seeks recovery under RICO for injuries sustained in two basic types of situations.  One relates to payments that Allstate made to or on behalf of its insureds who were injured in automobile accidents and who were treated as patients by Seigel.  Amended Compl. ¶ 7.  These claims are referred to in this decision as the "insured patient" claims.  Allstate contends that on behalf of its insureds, Allstate paid for tests that Seigel either did not perform or inadequately performed.[5]  *Id.*

A second situation alleged in the Amended Complaint, and the focal point of Defendants' present motion, involves payments that Allstate made on behalf of its insureds who were involved in automobile accidents and who were alleged to have tortiously injured other individuals (the "tort victims") who, in turn, were treated as patients by Seigel.  Amended Compl. ¶¶ 6-8.  These tort victims were not insured by Allstate but they received either a money judgment or a settlement from Allstate, which paid the judgment or settlement on behalf of its insureds.  *Id.* ¶¶ 6, 11 (2), (3).  These claims are referred to in this decision as the "insured tortfeasor" claims.  Allstate alleges that Seigel fraudulently submitted bills for tests that were

---

[5]In his plea agreement with the United States, Seigel stipulates to committing mail fraud insofar as: "On or about April 17, 2000 . . . for the purposes of executing a scheme to defraud and to obtain monies and properties by false and fraudulent pretenses and representations, or attempting to do so, and with the intent to defraud, Seigel caused to be delivered by U.S. mail [a] bill [for an EMG test that was not performed], addressed to the insurance provider.  Stip. at 8.

7

either not performed or were inadequately performed on the tort victims and that Seigel

submitted medical reports that falsely claimed that the tort victims sustained injuries that they did

not, in fact, sustain.  *Id.* ¶¶ 6,7.  In the insured tortfeasor situation, Seigel typically rendered the

bills for his treatment of the tort victims directly to the tort victim's attorney, and the attorney

then held the bill during the pendency of the action or claim and ultimately paid Seigel directly

from the proceeds of any judgment or settlement paid by Allstate.  Allstate's claims involving

insured tortfeasors dwarf in magnitude its claims involving insured patients.

Defendants do not contest Allstate's standing to sue under RICO for injuries Allstate

sustained in the insured patient situation.  Transcript at 9.  However, in their Motion to Dismiss,

Defendants challenge Allstate's standing to sue under RICO for claims involving insured

tortfeasors.  Specifically, Defendants argue that Allstate's injuries arising from the insured

tortfeasor claims are too remote, indirect and speculative to satisfy the proximate cause

requirements of RICO.  Mem. in Supp. of Mot. to Dismiss at 2.  The Court disagrees.

In a trilogy of cases decided within the last year, the Second Circuit has elaborated on its

proximate cause analysis in RICO cases.  *See, e.g., Baisch v. Gallina*, 346 F.3d 366 (2d Cir.

2003); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003);[6] *Lerner v. Fleet Bank,*

*N.A.*, 318 F.3d 113 (2d Cir. 2003).  The court has specified a two-step inquiry.  "First, the

plaintiff's injury must have been 'proximately caused by a pattern of racketeering activity

violating [18 U.S.C.] § 1962 or by individual RICO predicate acts.'"  *Lerner*, 318 F.3d at 122-23

---

[6] While *Desiano* involved New Jersey's law of proximate cause, the defendants claimed
that New Jersey's common law of causation mirrored RICO's proximate cause analysis and
therefore the Court analyzed the claims under RICO's causation analysis.  *Desiano*, 326 F.3d at
348-49.

(quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990)).  This is the

so-called "direct injury" test.  The "critical question posed by the direct injury test is whether the

damages a plaintiff sustains are derivative of an injury to a third party.  If so, then the injury is

indirect; if not, it is direct." *Laborer's Local 17 Health and Benefit Fund v. Philip Morris, Inc.*,

191 F.3d 229, 238-39 (2d Cir. 1999); *see Baisch*, 346 F.3d at 373.  As the Supreme Court held in

its seminal decision on RICO standing, "a  plaintiff who complained of harm flowing merely

from the misfortunes visited upon a third person by the defendant's acts was generally said to

stand at too remote a distance to recover." *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258,

268-69 (1992); *see Baisch*, 318 F.3d at 374.  The second part of the test asks whether the plaintiff

"suffered a direct injury that was foreseeable." *Id.*  "The reasonably foreseeable victims of a

RICO violation are the targets, competitors and intended victims." *Lerner*, 318 F.3d at 123; *see*

*Desiano*, 326 F.3d at 346.

Turning first to the second requirement – foreseeability –  there can be no serious

question that Allstate was the "reasonably foreseeable or anticipated" victim of Seigel's alleged

fraudulent scheme, even in the insured tortfeasor situation. *See First Nationwide Bank v. Gelt*

*Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994).  Indeed, it is difficult to identify *any* other target

or victim of Seigel's fraudulent scheme than the insurers that paid damages or settlements based

on his fraudulent medical reports and billings.  In fact, in his guilty plea, Seigel acknowledged

that he had "knowingly, willfully and with the intent to defraud, participated in a scheme with

knowledge of its fraudulent nature and with the intent to defraud insurance providers of money

and property, through the submission of fraudulent medical invoices." Stip. at 8.  Furthermore,

even if there were other targets or victims of Seigel's alleged frauds, the Second Circuit has

recently cautioned that  "[n]o precedent suggests that a racketeering enterprise may have only one 'target' or that only a primary target has standing."  *Baisch*, 346 F.3d at 375; *see, e.g., Commercial Cleaning Servs., LLC  v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001). Assuming, as it must, the truth of the allegations set forth in the Amended Complaint, the Court concludes that Seigel's alleged acts involving insured tortfeasors were "a substantial factor in the sequence of responsible causation" and that the injuries Allstate alleges arising from the insured tortfeasor claims were "reasonably foreseeable or anticipated as a natural consequence" of Seigel's false bills and medical reports.  *See, e.g., Baisch*, 346 F.3d at 374; *Lerner*, 318 F.3d at 123.

The real issue in this case is not foreseeability, but rather directness  – the first requirement for proximate cause under RICO.  For "an allegation of specific intent does not overcome the requirement that there must be a direct injury to maintain this action."  *Laborers Local 17,* 191 F.3d at 242.  Courts have offered a variety of verbal formulations in an attempt to provide clarity to the directness inquiry, though the Supreme Court has cautioned, "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case."  *Holmes*, 503 U.S. at 274 n.20 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 (1983)).  Several decisions in the Second Circuit have asked whether the RICO plaintiff's injuries are "derivative" or "wholly derivative" of harm that the defendant's conduct caused to others.  *See, e.g., Desiano*, 326 F.3d at 350; *Laborers Local 17*, 191 F.3d 239.  Thus, in *Laborers Local 17*, the court concluded that the harm to the union insurance plans was derivative of the harm that cigarette manufacturers caused to insured smokers themselves.  *Id.* at 244.  By contrast, in *Desiano*, the

court found that the economic harm to insurers from the defendant's misrepresentations regarding Rezulin was direct and not derivative of the harm sustained by any given patient who became ill from ingesting Rezulin.  *Desiano*, 326 F.3d at 349.  As the Second Circuit explained, the defendants' "fraud directly caused economic loss to them as purchasers, since they would not have bought Defendants' product, rather than available cheaper alternatives, had they not been misled by Defendants' misrepresentations."  *Id.*

While this case is not precisely either *Desiano* or *Laborers Local 17,* the Court believes that this case is closer to *Desiano* than to *Laborers Local 17*.  Here, Allstate was directly injured by Seigel's fraudulent conduct, since Allstate paid settlements and judgments that were based, at least in part, on phony medical bills, tests that were never performed and/or medical reports that purportedly documented injuries that had never been sustained by the tort victims.  Allstate's injury in the insured tortfeasor situation – the excess money it alleges that it paid for judgments and settlements as a result of Seigel's fraud – is not derivative of harm to any third party.  *See Desiano*, 326 F.3d at 349; *see also Baisch*, 346 F.3d at 373.

Relying on *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995), Defendants contend that because Allstate did not make settlement and judgment payments in the insured tortfeasor situation directly to Seigel, Allstate's injuries from Seigel's fraud are too indirect to satisfy RICO's causation requirements.  In *Marshfield*, Blue Cross sued Marshfield Clinic under the antitrust laws to recover overcharges.[7]  The Seventh Circuit held that

---

[7] Courts frequently look to standing cases under the antitrust laws as informing the standing analysis under RICO.  *See, e.g., Lerner*, 318 F.3d at 129 ("In evaluating whether a plaintiff has standing under RICO, the court must, as in an antitrust case, 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.'") (quoting *Associated Gen. Contractors of Cal.*, 459 U.S. at 535 (1983)); *see also Allegheny Gen. Hosp. v.*

Blue Cross had standing to pursue the overcharges because Blue Cross paid the Clinic directly on behalf of Blue Cross's patient-insureds for the "lion's share" of the alleged overcharges to the patient-insureds.  In the insured tortfeasor context, Defendants correctly point out, Allstate paid the tort victim's lawyer, who then paid Seigel for his services from the settlements or judgments on behalf the tort victim.

Admittedly, the route by which Allstate's funds got into Seigel's pocket was less direct than in *Marshfield Clinic*.  But it was not so circuitous or contingent as to deny Allstate standing to seek to recover those funds from Seigel.  In this case, the tort victims (and their lawyers) were mere conduits through which Seigel fraudulently extracted funds from Allstate and other insurers to which he was not entitled.  Defendants contend that the "direct" victims of Seigel's fraud are the tort victim patients of Seigel who were charged for tests not performed or inadequately performed by virtue of the amounts that their attorneys deducted from the Allstate settlements or judgments and remitted to Seigel.  But it is fanciful to speak of the tort victim patients of Seigel as his "victims," for as a result of Seigel's fraudulent billings and medical reports, his patients received settlements and judgments to which (at least in part) they were not entitled.  While no one claims that the tort victims themselves were aware of, or complicit in, Seigel's fraud, they are more properly seen as "beneficiaries," not "victims."  That Seigel knowingly used these individuals as the vehicles by which he fraudulently obtained money from Allstate to which he was not entitled does not make Allstate's injuries any less direct.

---

*Philip Morris, Inc.*, 228 F.3d 429, 443 (3rd Cir. 2000) ("The principles underlying proximate cause in RICO are analogous to those in antitrust . . ."); *see also Holmes*, 503 U.S. at 267 (observing that Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act).

The Court is fortified in its view that Allstate's injuries satisfy the directness test by consideration of the three policy concerns that the Supreme Court in *Holmes* identified as informing RICO's proximate cause analysis:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes*, 503 U.S. at 269-70.

Defendants argue that Allstate's judgments and settlements in the insured tortfeasor setting are attributable to the negligent conduct of Allstate's insureds and, therefore, it will be too difficult to ascertain the amounts properly attributable to the tortious conduct of Allstate's insureds versus Seigel's fraud. The Court disagrees. While the tortious conduct of Allstate's insureds may well have been the reason why Allstate paid a settlement or judgment in the first place, if the allegations of the Amended Complaint are believed (as they must), at least some portion of those settlements or judgments is directly attributable to Seigel's fraud. Moreover, Allstate alleges that it would not have settled claims or paid judgments in lawsuits had it known of Seigel's fraud and instead Allstate would have defended those claims or actions on the ground that the tort victim's alleged medical treatment and diagnosis was false and fraudulent. *See* Amended Compl. ¶ 390. And at this stage of the litigation, this Court must accept Allstate's assertions as true.

To be sure, some categories of damages that Allstate seeks pose more difficult ascertainment problems than others. At one end of the spectrum are judgments that Allstate paid that expressly include as one item of economic damage, the bills for tests that Seigel either never performed or inadequately performed or amounts for injuries that Seigel falsely represented the tort victim had sustained. At the other end of the spectrum are lump-sum settlements that Allstate paid where Seigel's diagnosis or bills were but a very small portion of the amounts sought by the tort victim and the nature of the settlement does not readily lend itself to segregation. However, the Court believes that those ascertainment problems, which are not necessarily insurmountable, are better addressed in the context of the traditional standards for recovery of damages rather than in the context of standing to pursue the claims at all.

Defendants also argue that the Court will be required to allocate damages among Seigel's tort victim patients and Allstate and that those allocation problems counsel against granting RICO standing for the tortfeasor insured claims. However, as previously stated, the Court does not understand how Seigel's tort victim patients would be entitled to recover from Seigel for payments made by Allstate for medical tests that were never performed or improperly performed or for injuries that the tort victims never sustained. Any recovery of these sums by the tort victim patients from Seigel would be subject to reimbursement to Allstate – which, after all, is the party that is actually out-of-pocket as a result of Seigel's fraud – or, if there were no reimbursement, any such recovery by the tort victim patients would be a windfall for them. As a consequence, the second *Holmes* factor argues for granting standing to Allstate, not denying it.

For the same reason, the third *Holmes* factor – which counts on the most directly injured party to vindicate the interests protected by RICO – favors Allstate, not Defendants. *Holmes*,

14

503 U.S. at 269-70.  Defendants assert that Seigel's tort victim patients will vindicate the law by suing Seigel for the fraudulent bills and medical diagnoses he made on their behalf.  But for reasons stated previously, it is difficult to understand how those who actually benefitted (albeit unwittingly) from Seigel's fraud could sue him to recover amounts paid by Allstate that the tort victim patients were never entitled to receive in the first place.  That is, wouldn't Seigel claim in such actions that the tort victim patients lacked standing to sue him because they were not injured by his conduct but actually benefitted from it?  More to the point, however, it is difficult to understand *why* those tort victim patients would bother bringing such an action even if they could do so.  The tort victims who recovered more than they were entitled to because of Seigel's fraudulent bills and medical reports are unlikely to band together to sue Seigel to recover amounts to which they are never entitled and which they would likely be required to pass along to Allstate by way of reimbursement.  *See Marshfield Clinic*, 65 F.3d at 1415 ("It would be cumbersome, to say the least, for patients of Marshfield Clinic to organize in a class action to recover money that the patients never paid and that if they received in a judgment or settlement they would have to share with Blue Cross; for Blue Cross could seek and probably obtain restitution of moneys paid by mistake to the insureds because [it] paid for expenses that the insureds had not in the end incurred.").

Accordingly, based on the allegations of the Amended Complaint, the Court concludes that Allstate has alleged sufficient facts, which if proved, would entitle it to recovery under RICO in the insured tortfeasor situation.

**B.**

In a related, though independent, vein, Defendants next argue that certain of the

15

categories of damages that Allstate seeks are too speculative as a matter of law.  In particular,

Defendants target what the parties have called Allstate's "Seigel effect" damages.  The Seigel

effect damages are alleged to consist of the additional costs to Allstate resulting from: (1)

treatments that the tort-victim claimant sought from neurologists; (2) medical expenses

attributable to false testing; (3) referrals to treating chiropractors (thus escalating overall medical

expenses); (4) fraudulent medical conclusions documenting non-existent injuries; and (5) patient

"impairment" ratings based upon testing that was not performed or not performed completely.

Amended Compl. ¶ 386.  In addition to the expenses resulting from these alleged activities, the

Seigel effect damages include the amounts Allstate paid in third-party settlements and awards in

reliance upon Defendants' false medical documentation.  Allstate asserts that it can demonstrate

statistically (and it has retained a statistician to do so) that it paid an average of 31% more to

settle cases in which tort victims were treated or seen by Seigel than in other cases involving

similarly situated victims who were not treated or seen by Seigel.  *Id.* ¶ 387.  In addition, Allstate

seeks recovery of all expenses incurred to review, adjust, investigate and litigate false and

fraudulent claims submitted by Seigel, as well as the costs borne by Allstate to establish and

carry out systems and policies to detect false, fraudulent, and inflated claims.  Amended Compl.

¶ 11.

As Defendants note, certain of Allstate's claims for damages appear on their face to be

speculative and in some cases, exaggerated.  However, the Court is mindful that its task "in

ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to

assay the weight of the evidence which might be offered in support thereof."  *Official Comm. of*

*Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir.

2003) (citation and quotation marks omitted).  Hence, dismissal of a complaint pursuant to Fed.

R. Civ. P. 12(b)(6) is improper "unless it appears beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief."  *Id.*  This case is still at its

inception and the Court believes it is premature to decide *ex ante* that Allstate will not under any

circumstances be able to present proof of its damages with the precision required by relevant case

law.

The Court emphasizes that at this stage it has made no determination that Allstate will be

able to prove its damages with the precision required by case law or that the statistical evidence

Allstate has proffered is valid or will satisfy either the requirements of the Federal Rules of

Evidence or substantive law.  Those are all issues for another day, once discovery is complete

and the Court has the full record before it.

## C.

Count III of the Amended Complaint against Seigel alleges that he violated § 1962(a) on

the grounds that he "fraudulently obtained payment from Allstate through a pattern of

racketeering activity and has used and/or invested directly or indirectly said income or the

proceeds of said income in the operation of Seigel P.C."  Amended Compl. ¶ 425.  Seigel moves

to dismiss this count because Allstate has failed to allege "investment injury" as required by §

1962(a).

Section 1962(a) provides as follows:

It shall be unlawful for any person who has received any income derived, directly
or in directly, from a pattern of racketeering activity . . . to invest, directly or
indirectly, any part of such income, or the proceeds of such income, in the
acquisition of any interest in, or the establishment or operation of, any enterprise
which is engaged in, or the activities of which affect, interstate or foreign

commerce.

The Second Circuit has made clear that "a civil RICO claim under § 1962(a) must be premised on injury by means of defendants' *investment of racketeering income*." *Ouaknine v. MacFarlane*, 897 F.2d 75, 77 (2d Cir. 1990) (emphasis added). "[U]nder the plain terms of the statute, to state a civil claim . . . for a violation of § 1962(a), a plaintiff must allege injury 'by reason of' defendants' investment of racketeering income in an enterprise." *Id.* at 82-83; *see Discon, Inc. v. Nynex Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996)*, vacated in part on other grounds,* 525 U.S. 128 (1998)*.* Thus, § 1962(a) requires a plaintiff to allege and prove that the plaintiff's injury was caused by the defendant's investment of racketeering proceeds. *See Ouaknine*, 897 F.2d at 83 ("[B]ecause the conduct constituting a violation of § 1962(a) is investment of racketeering income, a plaintiff must allege injury from the defendant's investment of the racketeering income to recover under § 1962(a)").

While "investment" might appear to contemplate a channeling of fraud-derived profits back to a RICO violator, case law squarely rejects such an interpretation. For when racketeering proceeds are merely reinvested back into the same RICO enterprise, the plaintiff's injuries derive proximately not from the investment but rather from the predicate acts themselves, and "§ 1962(a) aims at punishing not the predicate offenses but the investment of the ill-gotten gains of the predicate offenses." *Allen v. New World Coffee*, No.00-CV-2610, 2002 WL 432685, at *2 (S.D.N.Y. Mar. 19, 2002); *see, e.g., Brittingham  v. Mobil Corp.*, 943 F.2d 297, 305 (3rd Cir. 1991) ("The direct cause of plaintiffs' alleged injuries was the fraudulent conduct.  Plaintiffs have neither alleged nor demonstrated a connection with the use or investment of racketeering income

18

other than the normal reinvestment of corporate profits.");[8] *see also USA Certified Merchants,*

*LLC v. Koebel*, 262 F.Supp.2d 319, 331 (S.D.N.Y. 2003) ("Where investment of racketeering

proceeds back into the same RICO enterprise is alleged, the injuries stem proximately not from

the investment, but from the predicate acts that make up the racketeering activity."); *see Falise v.*

*American Tobacco Co.,* 94 F. Supp. 2d 316, 349-50 (E.D.N.Y. 2000) ("Where reinvestment of

racketeering proceeds back into the same RICO enterprise is alleged, the injuries stem

proximately not from the investment, but from the predicate acts that make up the racketeering

activity"); *see Vista Co. v. Columbia Pictures Indus., Inc.*, 725 F.Supp. 1286, 1299-1300

(S.D.N.Y. 1989) (court rejected plaintiffs' argument that they stated a claim under § 1962(a) by

alleging that defendant invested or used the income resulting from defendant's pattern of

racketeering activity to facilitate its own operations and that the continuing operation injured the

plaintiffs, stating that "plaintiffs must allege that they were injured specifically by the use or the

investment of income derived from racketeering activity").

     The Amended Complaint alleges in conclusory fashion, without any detail whatsoever,[9]

---

[8] The Third Circuit offered a sound explanation for why mere reinvestment would be improper grounds to state a § 1962(a) claim: "Over the long term, corporations generally reinvest their profits, regardless of the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act. Section 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiff's reinvestment injury concept were accepted, almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would be meaningless." *Brittingham*, 943 F.2d at 305.

[9] Allstate argues that on a motion to dismiss it is sufficient that its Amended Complaint alleges that Seigel "invested" the proceeds in Seigel P.C. and that Allstate was injured. Pl.'s Mem. in Opp. to Mot. to Dismiss at 55. Allstate is wrong. Courts have repeatedly made it clear that "[c]onclusory allegations that the defendant 'used or invested' the income derived from racketeering in its operations are insufficient." *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, No. 01-CV-10821, 2004 WL 324477, *10 (S.D.N.Y. Feb.6, 2004); *see Katzman v.*

that Seigel invested his alleged racketeering profits in Seigel P.C., and thus did not, strictly

speaking, reinvest the fraudulently obtained funds in his own activities.  Amended Compl. ¶ 425.

However, while it may be the case that Seigel did not actually place the money in his own pocket

but into his own P.C., that should not matter in the circumstances of this case, where Seigel P.C.

was wholly owned by Seigel and his wife and was the vehicle through which Seigel is alleged to

have perpetrated the predicate acts.  *See Ouaknine*, 897 F.2d at 83 ("The essence of a violation of

§ 1962(a) is not commission of predicate acts but investment of racketeering income.").  Indeed,

the Amended Complaint repeatedly alleges that "Seigel, through Seigel, P.C." engaged in the

various predicate acts that form the basis of Allstate's RICO claims.  Thus, Allstate only alleges

injury stemming from the predicate acts of racketeering activity and no distinct injury flowing

from the investment of the ill-gotten gains.  *See United States Fire Ins. Co.*, 2004 WL 324477, at

*10 ("Here, Plaintiff's alleged injury consists of providing insurance at rates less than the rates it

could have charged if it had known the truth . . . This injury did not result from the investment of

the racketeering proceeds . . . but rather flowed directly from the predicate fraudulent acts.");

*Allen, 2002* WL 432685, at *2 ("The purpose of 18 U.S.C. §1962(a) is 'to prevent racketeers

from using their ill gotten gains to operate, or purchase a controlling interest in, legitimate

businesses.'") (citation omitted).

Moreover, the Supreme Court has characterized the "enterprise" described in § 1962(a) as

"the victim of unlawful activity."  *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259

(1994).  In essence, this RICO provision (as well as § 1962(b) discussed *infra*) is aimed at

---

*Victoria's Secret Catalogue*, 167 F.R.D. 649, 657 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir.
1997) ("Plaintiff's conclusory allegations that Defendants 'used or invested' income received . . .
is insufficient because it fails to allege how that use or investment injured them.").

preventing racketeers from using the proceeds from their racketeering scheme to invest in, or acquire interests in, legitimate enterprises. *See USA Certified Merchants*, 262 F. Supp.2d at 330-31. Based upon the allegations of the Amended Complaint, Seigel P.C. would hardly qualify as a innocent victim of Seigel's fraud.

Because Allstate has not alleged "investment injury" distinct from the injuries it sustained as a result of the predicate acts, the Court will grant Defendants' motion to dismiss Allstate's § 1962(a) claim against Seigel, Count III of the Amended Complaint.

### D.

Count I of the Amended Complaint seeks recovery from Seigel under §§ 1962(b) and (c). Defendants, however, only move to dismiss the § 1962(b) claim in Count I. With regard to § 1962(b), that provision makes it "unlawful for any person through a pattern of racketeering activity . . . to *acquire or maintain*, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." (emphasis added). It was enacted for purposes similar to those for which § 1962(a) was designed. *See United States Fire Ins. Co.*, 2004 WL 324477, at *13 ("The purpose of § 1962(b) is to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking.") (internal quotations omitted). In an argument that is similar to that which they have advanced regarding § 1962(a), Defendants contend that Allstate has failed to allege the "acquisition or maintenance" injury required by RICO.

Like § 1962(a), § 1962(b) requires a plaintiff to allege an "acquisition injury" separate and distinct from the injuries sustained as a result of the defendant's commission of predicate acts. *See Discon*, 93 F.3d at 1063; *see also Danielsen v. Burnside-Ott Aviation Training Ctr.*,

*Inc.,* 941 F.2d 1220, 1231 (D.C. Cir. 1991); *United States Fire Ins. Co.*, 2004 WL 324477, at

*13; *Redtail Leasing, Inc. v. Bellezza*, No. 95 CV 5191,1997 WL 603496, at *3 (S.D.N.Y. Sept.

30, 1997).   Here, Allstate alleges injuries stemming from Seigel's acquisition or maintenance of

an interest in Seigel P.C.  However, the Amended Complaint does not explain how the

maintenance of such an interest injured Allstate separate and apart from the injuries Allstate

sustained as a result of Seigel's fraudulent activities.  *Lightning Lube v. Witco Corp.*, 4 F.3d

1153, 1191 (1st Cir. 1993); *see Discon, Inc.*, 93 F.3d at 1063 (plaintiff failed to state a cause of

action under § 1962(b) on the ground that plaintiff only alleged injuries stemming from the

predicate acts and did not describe the injuries that resulted from the acquisition or maintenance

of an enterprise); *Allen,* 2002 WL 432685 at *5 ("A plaintiff cannot recover under § 1962(b)

unless he alleges a *distinct injury* caused not by predicate acts but by the defendant's acquisition

or maintenance of an interest in or control of an enterprise.") (emphasis added).

Allstate's claim under § 1962(b) is thus deficient for the same reason that its § 1962(a)

claim is deficient –  Allstate has failed to specify an injury that resulted from the acquisition or

maintenance of a RICO enterprise that is distinct from the injuries incurred as a consequence of

the predicate acts themselves.  *See, e.g., United States Fire Ins. Co.*, 2004 WL 324477, at *13

(dismissing §1962(b) claim for failure to allege "acquisition injury" separate from injury caused

by the predicate acts themselves).  Simply put, Allstate's contention that Seigel maintained an

interest in Seigel P.C. with the assistance of proceeds from Seigel's fraudulent activities, thereby

enabling Seigel to continue his fraudulent conduct, does not describe an independent harm that is

distinct from the predicate acts of fraud.  Therefore, the Court will grant Defendants' motion to

dismiss Allstate's § 1962(b) claim against Seigel, Count I of the Amended Complaint.

22

**E.**

In Defendants' final argument under RICO, they urge this Court to dismiss Count II of the Amended Complaint, which asserts claims against both Seigel and Seigel P.C. for violating § 1962(c).  Section 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"Under this section, the RICO 'person' must conduct the affairs of the RICO 'enterprise' through a pattern of racketeering activity." *Discon,* 93 F.3d at 1063 (quoting *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)).  The Second Circuit has made it clear "that the person and the enterprise referred to must be distinct" and that only the RICO person but not the enterprise is subject to RICO liability.  *Discon*, 93 F.3d at 1063; *see Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) (stating that § 1962(c) requires some distinctness between the RICO defendant and the RICO enterprise); *see also De Falco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001) ("[I]t is well established in this Circuit that, under § 1962(c), the alleged RICO 'person' and RICO 'enterprise' must be distinct.").

Defendants argue that Count II should be dismissed against Seigel P.C. because the P.C. cannot simultaneously be a RICO person and a RICO enterprise.[10]  Mem. in Supp. of Mot. to Dismiss at 17-18.  Allstate agrees with Defendants that Seigel P.C. cannot be both the RICO person and the RICO enterprise.  Mem. in Opp. to Mot. to Dismiss at 53.  However, Allstate

---

[10]Defendants do not argue that the § 1962(c) claim against Seigel in Count I of the § 1962(c) claim against Seigel in Count II should be dismissed.

argues that its § 1962(c) claim against Seigel P.C. is not defective because the enterprise in

Count II is not Seigel P.C. but rather Allstate itself.

In *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court considered the

meaning of § 1962(c)'s requirement that a person employed by or associated with any enterprise

"conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity."  The Court held that "one is not liable under [§1962(c)] unless

one has *participated in the operation or management of the enterprise itself*."  *Id.* at 185

(emphasis added).  Under the "operation and management" test, a defendant must have "some

part in directing the enterprise's affairs."  *Id.* at 178.  As the Supreme Court explained in *Reves*:

> Once we understand the word "conduct" to require some degree of direction and
> the word "participate" to require some part in that direction, the meaning of §
> 1962(c) comes into focus.  In order to "participate, directly or indirectly, in the
> conduct of such enterprise's affairs," one must have some part in directing those
> affairs.  Of course, the word "participate" makes clear that RICO liability is not
> limited to those with primary responsibility for the enterprise's affairs, just as the
> phrase "directly or indirectly" makes clear that RICO liability is not limited to
> those with a formal position in the enterprise, but some part in directing the
> enterprise's affairs is required.  The "operation or management" test expresses this
> requirement in a formulation that is easy to apply.

*Id.*

As one court within the Second Circuit has observed, "the 'operation and management'

test . . . is a very difficult test to satisfy . . . There is a 'substantial difference between actual

control over an enterprise and association with an enterprise in ways that do not involve control;

only the former is sufficient under *Reves*."  *Redtail Leasing, Inc.*,  2001 WL 863556, at *4; *see*

*Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003).  Courts have

held that it is not sufficient "to merely take directions and perform tasks that are necessary or

24

helpful to the enterprise." *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998); *accord United State Fire Ins. Co.*, 2004 WL 324477, at *13.  While a defendant need not be involved in the day-to-day operation of the enterprise, and indeed can be an outsider to the enterprise, a defendant will not be found to participate in the management or operation of the enterprise unless he is "associated with [the] enterprise and participate[s] in the conduct of its affairs – that is, participate[s] in the operation or management of the enterprise itself." *Id.* at 185; *see United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996).  As a consequence of the rigor of this requirement, courts have regularly dismissed claims against professional service providers, such as law firms, that failed to meet the requirements of the "operation and management" test.  *See, e.g., Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521-22 (2d Cir. 1994) (RICO claim against attorneys dismissed); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 254 (S.D.N.Y. 1997) (same).

Relying on the First Circuit's decision in *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546 (1st Cir. 1994), Allstate argues that Seigel P.C. did exercise control over Allstate's claims settlement operations by submitting false medical billings and medical reports.  In *P&B Autobody*, the First Circuit upheld a jury verdict for an insurer under § 1962(c) against certain insureds, claimants and body shops who had associated together to submit false claims to the insurer.  The Court held that the evidence viewed in the light most favorable to the insurer permitted the jury to conclude that "[b]y acting with purpose to cause Aetna to make payments on false claims, appellants were participating in the 'operation' of Aetna." *Id.* at 1560.

*P&B Autobody* reached its conclusion by extrapolating from *Reves*' recognition that an enterprise might be operated or controlled by bribery to find that the defendant exerted a degree

of control over Aetna that gave rise to a § 1962(c) claim.  42 F.3d at 1560.  However, other

courts that have considered the bribery context examined in *Reves* have noted that the effect of

bribery "is qualitatively different from mere influence or assistance because the outsider paying

the bribes buys actual control over the actions of a person within the enterprise.  Giving a bribe

can be tantamount to gaining a management position within the enterprise, because the insider

taking the bribes acts under the direction of the outsider giving them in conducting the affairs of

the RICO enterprise."  *Dept. of Econ. Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 466-67

(S.D.N.Y. 1996).  If a defendant bribes a company official to engage in certain conduct, the

defendant can rightly be seen as "participating " in the operation and management of the

company through the conduct of the bribed official.  It is considerably less clear whether that

characterization properly applies when an outside has merely defrauded a company.

Moreover, the Court is concerned that the First Circuit's construction of the operation and

management test might well read that test out of the act.  For under Allstate's reading of *P&B

Autobody*,[11] any time a company is defrauded by the conduct of a defendant, one could say that

the defendant "controlled" the company's operations, since absent the fraud, the company would

not have done what it did or acted in the manner in which it did.  Such a free-wheeling

interpretation of the operation and management test would appear to be inconsistent with *Reves*,

and as Allstate's counsel essentially conceded at oral argument, with the more rigorous approach

---

[11]  The Court notes that there are factual differences between *P&B Autobody* and the
present case that bear on the operation and management issue.  While there were no allegations
of actual bribery in *P&B Autobody*, at least two of the named defendants were Aetna appraisers
who participated in the widespread fraudulent scheme by submitting false appraisals to assist at
least one of the auto shop defendants defraud Aetna, thus arguably making *P&B Autobody* closer
to a bribed official situation than is alleged in the present case.  Thus, on its facts, *P&B Autobody*
may be a considerably more limited holding than Allstate asserts.

to the operation and management requirement that district courts in the Second Circuit have adopted.  Transcript at 101; *see Redtail Leasing*, 2001 WL 863556, at *4 ("the 'operation and management' test . . . is a very difficult test to satisfy") (citation omitted); *see also Vickers Stock Research Corp. v. Quotron Syst., Inc.*, No. 96 Civ. 2269, 1997 WL 420265, at *4 (S.D.N.Y. July 25, 1997) ("[A] defendant will not be found to participate in the management or operation of the enterprise simply because he enjoys substantial persuasive power to induce the alleged enterprise to take certain actions.") (citation and quotation marks omitted).

The Court's considerable skepticism about Allstate's theory aside, the Court is fully cognizant that it considers this issue on a motion to dismiss, before discovery and before all of the facts regarding Defendant's conduct and its effect on Allstate are fully known.  In these circumstances, the Court is unwilling at this preliminary stage of the proceeding to decide definitively that Allstate will be unable to adduce any evidence to buttress its allegations that Seigel P.C. did in fact  "participate in [Allstate's] affairs, directly or indirectly, through a pattern of racketeering activity."  Amended Compl. ¶ 421; *see, e.g.,United States Fire Ins. Co.,* 2004 WL 324477, at *15 (denying motion to dismiss); *RD Mgmt. Corp. v. Samuels*, 203 WL 21254076, *8 (S.D.N.Y. 2003) (denying motion to dismiss); *cf. United States v. Allen*, 155 F.3d 35, 42 (2d Cir. 1998) (reversing summary judgment on the issue of participation in the operation and management of an enterprise's affairs).  Therefore, the Court will not dismiss Count II against Seigel P.C.

### III.

Defendants' motions to dismiss Allstate's common law fraud and CUTPA claims do not require substantial discussion.  Defendants' motion to dismiss the common law fraud claims is

27

founded on its proximate cause arguments, which this Court has already rejected.  Since the

Second Circuit has observed that "in practice, our cases have held RICO plaintiffs to a more

stringent showing of proximate cause than would be required at common law," *Desiano,* 326

F.3d at 348 (internal quotation and citation omitted), it necessarily follows that at least at this

stage of the case, Allstate has pleaded sufficient facts to withstand a motion to dismiss the

common law claims as a matter of law.  Even if, as Defendants have argued, Connecticut has

adopted the *"Holmes* factors in determining standing for state statutory and common law claims,"

for the reasons stated previously, the Court concludes that at this stage Allstate has satisfied

*Holmes*' pleading requirements, and, therefore, Connecticut's as well.

As for Allstate's CUTPA claims, relying on *Connecticut Pipe Trades Health Fund v.

Philip Morris, Inc.*, 153 F. Supp. 2d 101, 113 n.13 (D. Conn. 2001), Defendants argue that

Allstate has not alleged any "connection or nexus – business, consumer, competitor, commercial

or otherwise – between" Allstate and Seigel with respect to the insured tortfeasor claims.

However, the court's concern in *Connecticut Pipe* was the apparent absence of *any* allegation of a

commercial or trade relationship between the plaintiffs and the defendants.  *Id.*  As Allstate was

the recipient of Defendants' fraudulent invoices whose payment obligations and litigation

decisions depended upon Defendants' invoices and medical reports, and as Seigel well

understood that Allstate (and other insurers) would be the ultimate payer of his bills in both the

insured patient and insured tortfeasor situations, the Court is not prepared at this stage to

conclude that there was no "connection or nexus"  between Allstate and the Defendants sufficient

to satisfy CUTPA.  Furthermore, *Connecticut Pipe* makes it clear that directly injured parties

have standing under CUTPA.  *Id.* at 113 ("By limiting standing under CUTPA to those who were

28

directly injured by a defendant's unfair trade practices, the intended beneficiaries of CUTPA are afforded full relief."). Since, as discussed above, the Court is persuaded at this stage that Allstate was directly injured by Defendants' fraudulent acts, the Court will not dismiss Allstate's CUTPA claim.

## IV.

As an alternative prayer for relief, Defendants ask the Court to require a more definite statement from Allstate. A motion for a more definite statement is not intended as a substitute for the normal discovery process. Rule 12(e) of the Federal Rules of Civil Procedure allows a party to make a motion for more definite statement when the pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e). Here, Allstate's 98-page, 452 paragraph Amended Complaint provides Defendants with sufficient detail to give them adequate notice of the claims against them, and, thus meets the requirement of Rule 8, which prescribes only a "short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8. Defendants will undoubtedly require further details regarding Allstate's claims, but they will have to obtain those details through the normal discovery processes.

## V.

Accordingly, Defendants' Motion to Dismiss [doc. # 31] is GRANTED IN PART and DENIED IN PART. Defendants' Motion to Dismiss the § 1962(b) claim against Seigel in Count I of the Amended Complaint and the § 1962(a) claim against Seigel in Count III is GRANTED and those claims are hereby dismissed. In all other respects, the Motion to Dismiss is DENIED. The parties should proceed to complete discovery as promptly as possible. All stays of discovery

heretofore granted are dissolved.  The parties are directed to confer regarding a schedule for completing discovery and submit a joint proposed schedule to the Court no later than **April 23, 2004**.

IT IS SO ORDERED,

/s/        Mark R. Kravitz        
U.S.D.J.

Dated at New Haven, Connecticut: <u>March 30, 2004.</u>