UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

C. A. NO. 303 CV 0577 MRK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY and ALLSTATE INDEMNITY COMPANY<br>    Plaintiffs, | )<br>)<br>)<br>) |
| v. | )<br>) |
| ARTHUR M. SEIGEL, M.D.,<br>ARTHUR M. SEIGEL, M.D., P.C.<br>and ELLEN SEIGEL,<br>    Defendants. | )<br>)<br>)<br>)  FEBRUARY 18, 2005 |

**DEFENDANT ARTHUR SEIGEL'S OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Defendant Arthur M. Seigel, M.D., respectfully submits the following memorandum in opposition to plaintiffs'[1] Motion for Partial Summary Judgment, filed January 4, 2003. Plaintiffs' Motion should be denied because 1) Allstate has proffered evidence on liability only as to a small portion of its claim; and 2) the few material facts on which Allstate does offer evidence are disputed.

I.   **Factual and Procedural Background**

On May 22, 2002, Dr. Arthur M. Seigel pled guilty to a single count of Mail Fraud (18 U.S.C. § 1341) related to allegations that he had billed patients and insurance companies for Needle EMG tests that were never performed. [Pl. Ex. G]. The Plea Agreement was signed on November 20, 2001. [Pl. Ex. D]. In it, Dr. Seigel admitted that of the more than 7000 Needle EMG tests he billed for between 1996 and 2000, "many" of the billings were fraudulent. [Pl. Ex. D. p. 8]. There was no agreement as to a specific number, nor is the Plea Agreement particular to any specific insurer. Dr. Seigel

---

[1] Following earlier practice, plaintiffs Allstate Insurance Company and Allstate Indemnity Company are collectively referred to as "Allstate" or "plaintiffs".

was not charged with, nor was he alleged to have committed, fraud related to anything other than Needle EMG testing.

The plea agreement specified that Dr. Seigel was to make payment of $450,000 in restitution to insurance providers. [Pl. Ex. D. p. 2]. That number represented the "fraud loss," or a "reasonable approximation of the value of the monies" he obtained by fraud. [Pl. Ex. D. p. 3, 9]. Nineteen separate insurers made restitution claims against Dr. Seigel. [Pl. Ex. G. p. 7]. Among them, Allstate received $62,772.15, or 13.95% of the restitution award. Dr. Seigel took no part in the determination of that figure, and made no admission related to Allstate's restitution claim. [Ex. A, Affidavit of Arthur Seigel ¶¶ 3-5].

Plaintiffs filed the present action on April 1, 2003. Their ninety-eight page First Amended Complaint ("Complaint") is pled in seven counts: Count I (for violations of RICO, 18 U.S.C. §1962(b) and (c) against Dr. Seigel only); Count II (for violations of 18 U.S.C. §1962(c) against Dr. Seigel and Arthur M. Seigel, M.D., P.C.); Count III (for violations of 18 U.S.C. §1962(a) against Dr. Seigel only); Count IV (for Common Law Fraud against Dr. Seigel and Seigel, P.C.); Count V (for CUTPA violations against all defendants); Count VI (for CHIFA violations against Dr. Seigel and Seigel, P.C.; and Count VII (for Injunctive Relief). The portion of Count I based on 18 U.S.C. § 1962(b) and the entirety of Count III were dismissed by this Court on March 30, 2004. [Docket No. 60].

Of the remaining counts, only Count I (RICO), Count IV (Common Law Fraud); Count V (CUTPA); and VI (CHIFA) are the subjects of Allstate's Motion for Partial Summary Judgment.

**Allstate's Claim:** The factual basis for each theory of liability is the same. Allstate asserts a broad pattern of wrongdoing (far broader than Dr. Seigel's plea), consisting of four separate categories of alleged fraud: 1) Needle EMG testing billed for but not performed ["Needle EMG Fraud", Complaint p. 75]; 2) nerve conduction studies

2

billed for but not performed (or inadequately reported) ["Nerve Conduction Fraud", Complaint pp. 75-80]; 3) misleading diagnoses which allegedly inflated the value of claims in contradiction of electrodiagnostic test data ["Misleading Diagnosis Fraud", Complaint pp. 80]; and 4) pattern diagnoses which are allegedly fraudulent based on the fact that that Dr. Seigel followed a "pattern" of injury type, treatment and diagnosis. ["Pattern Diagnosis Fraud", Complaint p. 82]. Allstate claims to have paid $681,040 to satisfy fraudulent medical bills.

In addition to that figure, Allstate alleges that Dr. Seigel's fraudulent bills and reports had a residual effect, inflating the settlement value of the liability claims it paid. [Complaint p. 74]. This so-called "Seigel Effect" is alleged to be a manifestation of further treatment made necessary by false reports and inflated findings that falsely inflated the value of cases. [Complaint ¶ 386]. The estimated cost of the Seigel Effect, including the $681,040 for fraudulent bills, is alleged to be $1,303,046.02.

For each category of claimed fraud, Allstate alleges scores of individual fraudulent acts. It claims, for example, that each Needle EMG test for which Dr. Seigel billed plaintiffs between 1996 and 2000 was fraudulent. [Complaint ¶ 394]. Although Allstate does not provide a precise number, it is presumably in the hundreds. Related to Nerve Conduction testing, it claims that approximately two hundred fraudulent bills were submitted. It alleges eighty-four acts of "Misleading Diagnosis Fraud," [Complaint pp. 80-82], and eighty-seven acts of pattern diagnosis fraud. [Complaint pp. 82-84].

**Allstate's "proof" of liability:** Notwithstanding the broad pattern of fraudulent conduct alleged, Allstate's submission tenders proof only as to Needle EMG Fraud. Moreover even as to that category, it offers evidence only as to a few specific acts committed against Allstate. Its offering includes a) affidavits submitted by former Seigel patients [Pl. Ex. A tabs 1-25]; b) Dr. Seigel's Plea Agreement and Stipulation of Offense [Pl. Ex. D]; and c) discovery conducted in this litigation [Pl. Ex. B, C, E, F]. None of those materials relates to anything other than Needle EMG testing.

3

**Affidavits**: According to the affidavit of Michael Bruno, an analyst for Allstate's Special Investigations Unit, Allstate made attempts to contact former Seigel patients for whom Dr. Seigel generated Needle EMG bills to ascertain whether they in fact received needle EMG testing. [Pl. Ex. A ¶9]. A few of these former patients executed affidavits indicating that they did not. [Pl. Ex. A ¶ 9].

Allstate attaches twenty five such affidavits. [Pl. Ex. A tabs 1-25]. Each is virtually the same, averring that the patient at issue treated with Dr. Seigel and at no time did he insert a needle under the patient's skin. Neither Michael Bruno's affidavit, nor any of the 25 patient affidavits raise issues of Nerve Conduction Fraud,[2] Pattern Diagnosis Fraud, or Misleading Diagnosis Fraud. Indeed, Mr. Bruno's affidavit refers to these exemplar patients as "Needle Affiants," underscoring the lack of connection to the fraud described in the latter three categories. [Pl. Ex. A ¶ 9].

**Seigel's Plea Agreement and Stipulation of Offense Conduct** [Pl. Ex. D]: As detailed above, Dr. Seigel pled guilty to a single count of Mail Fraud (18 U.S.C. § 1341) on May 22, 2002. [Pl. Ex. G]. The Plea Agreement was signed on November 20, 2001. [Pl. Ex. D], and contains an admission that, of the over 7000 Needle EMG tests for which Dr. Seigel billed between 1996 and 2000, "many" were fraudulent. [Pl. Ex. D. p. 8]. The "many" includes bills for which many different insurance carriers eventually became responsible, nineteen of whom submitted claims for restitution. Notably, the Plea Agreement contained no admission related to Allstate or any other individual insurer. Nor does it reference any allegation of fraud other than that related to Needle EMG testing.[3]

---

[2] Nerve conduction testing does not involve the subcutaneous insertion of a needle.

[3] Allstate purports to have lost or destroyed its submission to the government detailing its claim for reimbursement. We have extreme doubt that Allstate's submission referred to "paid bills" as opposed to claims it defended on behalf of its insured tortfeasors. Anthem Blue Cross/Blue Shield secured in excess of $80,000, and it would be shocking if Allstate's level of direct bill payments had been 75% of those paid by Anthem.

The plea agreement specified that Dr. Seigel was to make payment of $450,000 in restitution to insurance providers. [Pl. Ex. D. p. 2]. That number represented the "fraud loss," or a "reasonable approximation of the value of the monies" he obtained by fraud from all patients and insurance companies who paid. [Pl. Ex. D. p. 3, 9]. Nineteen separate insurers made restitution claims against Dr. Seigel. [Pl. Ex. G. p. 7]. Among them, Allstate received $62,772.15, or 13.95% of the restitution award. The latter figure, however, was determined between Allstate, the government, and the remaining eighteen insurance companies. Dr. Seigel took no part in its determination. [Ex. A, ¶¶ 3-5].

**Discovery Responses:** The discovery responses Allstate cites are largely in line with what is detailed in the Plea Agreement and Stipulation of Offense. Dr. Seigel admits that "many" of the 7000 EMG procedures for which he billed from December 1996 through August 2000 were fraudulent [Pl. Ex. B Request No. 17]; that he intentionally engaged in a scheme to defraud insurance carriers by creating false medical documentation [Pl. Ex. B Request No. 56]; and that the objective of the scheme was "to be paid improperly, in a very small percentage of cases for needle EMG's not performed." [Pl. Ex. C Response No. 1(f)]. Dr. Seigel's discovery responses contain no admission related to alleged Nerve Conduction Fraud, Misleading Diagnosis Fraud, and Pattern Diagnosis Fraud.

Based on the foregoing submissions, Allstate asserts that although disputed material facts exist as to "damages," "liability" is not in dispute. [Pl. Mem. p. 2]. The problem with that conclusion, and with Allstate's entire Motion, is that it asks the Court to hold Dr. Seigel "liable" for hundreds of acts of fraud on which Allstate has offered no proof whatsoever. While Allstate claims Dr. Seigel submitted to it hundreds of false Needle EMG bills, it only offers evidence as to twenty-five.[4] Moreover there is no evidence to support Allstate's claims of Nerve Conduction Fraud, Pattern Diagnosis

---

[4] Dr. Seigel's liability is disputed even as to these twenty-five. See infra § IV.

5

Fraud, or Misleading Diagnosis fraud, claims Dr. Seigel flatly disputes. [Ex. A ¶¶ 6-12]. Summary Judgment may not enter on liability because the disputed matters include not just how much damage Allstate sustained (damages) but how many acts of fraud Dr. Seigel committed against Allstate (liability).

**II.     The Standard On Plaintiff's Motion For Summary Judgment**

Summary judgment is proper only when there can be but one reasonable conclusion as to the verdict. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 250 (1986). Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir.2000). The court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2nd Cir. 1997).

Further, where evidence offered in support of the motion does not establish the absence of disputed material facts, summary judgment must be denied even if no opposing evidence is presented. Giannullo v. City of New York, 322 F.3d 139, 140-41 (2nd Cir. 2003) ("the non-movant is not required to rebut an insufficient showing"); Celotex Corp. v. Catrett, 477 U.S. 317, 324-24 (1986).  A party opposing summary judgment who will not bear the burden of proof at trial is "not required to produce evidence negating the existence of a material fact, but need only point out the absence of evidence" supporting the movant's case. Skotak v. Teneco Resins, Inc., 953 F.2d 909, 913 (5th Cir. 1992).

**III.    Plaintiff's Proof Is Insufficient to Support Summary Judgment On Liability**

Allstate's Motion requests the Court to find Dr. Seigel liable for hundreds of individual acts of fraud, when it has offered evidence only as to a small few.  Put another

6

way, Allstate requests the Court to find Dr. Seigel's liability for hundreds of alleged acts of fraud for which there is no evidence. This position is untenable.

"Liability" refers, of course, to the facts necessary to establish a defendant's legal responsibility, see Black's Law Dictionary 823 (6th ed. 1990), while "damages" refers to the sum of money to he or she must pay to compensate a plaintiff for injury. Id. at 352. Allstate requests judgment as to liability for Count I (RICO), Count IV (Common Law Fraud); Count V (CUTPA); and VI (CHIFA). "Liability" under each theory requires, among other things, that plaintiffs reasonably rely on a defendant's misrepresentation. Bank of China, New York Branch v. NBM LLC, 359 F.3d 171, 177 (2nd Cir. 2004) (civil liability under RICO for mail, wire or bank fraud requires a misrepresentation and reasonable reliance); Leonard v. Commissioner of Revenue Services, 264 Conn. 287, 296, 823 A.2d 1184, 1190 (2003) (to be liable for common law fraud a party must make a false representation and know the representation to be untrue); Caldor, Inc. v. Heslin, 215 Conn. 590, 577 A.2d 1009 (1990) (for CUTPA liability premised on a deceptive act or practice theory, there must be a material representation, omission or other practice likely to mislead, which is interpreted reasonably under the circumstances); Conn. Gen. Stat. § 53-442 (2005) (CHIFA liability requires a false, incomplete, deceptive or misleading statement submitted to an insurer with the intent to deceive).

As Allstate will bear the burden of proof at trial,[5] it must offer evidence of the fraudulent acts from which it claims damage.[6] Allstate's showing in this regard is phenomenally insufficient. As detailed above, Allstate offers the Court proof of only a small number (25) of fraudulent Needle EMG bills it claims to have paid. Moreover, Allstate's submission proffers zero evidence of Nerve Conduction Fraud, Pattern

---

[5] It is worth noting that, at least as to its state law causes of action, Allstate must prove any alleged fraud by proof that is "clear and satisfactory or precise and unequivocal." Miller v. Guimaraes, 78 Conn. App. 760, 780, 829 A.2d 422, 435 (2003).

[6] The existence (or absence) of a misrepresentation is unquestionably an element of "liability," since it speaks to a defendant's responsibility for damage, rather than the amount of damage itself.

7

Diagnosis Fraud, or Misleading Diagnosis Fraud. The only evidence before the Court on those issues is Dr. Seigel's denial. [Ex A ¶¶ 3-5].

Dr. Seigel, of course, can not be "liable" to Allstate for the alleged acts of fraud for which there is no evidence. Turtur v. Rothschild Regisry International, 26 F.3d 304 (2nd Cir. 1994) (denying plaintiff's motion for partial summary judgment on liability because "plaintiffs have failed to come forward with evidence that [defendant] made the pivotal representation . . .."). Moreover, Allstate may establish liability for multiple acts of fraud only by offering evidence as to each act, which it has not.[7] See, *e.g.*, Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 838 F. Supp. 216 (SDNY 1993) (where complaint alleged wrongful receipt of undisclosed commissions, in order to prevail on partial summary judgment as to liability plaintiffs "must demonstrate from the uncontested facts that [defendant] received commissions pursuant to each investment at issue").

Allstate appears to maintain that liability is established since Dr. Seigel has admitted to a scheme of fraudulent billing, and because at least some of this fraud was admittedly directed at Allstate. The problem with that argument is that the "fraudulent scheme" that Allstate alleges is not the "fraudulent scheme" to which Dr. Seigel confessed. While Dr. Seigel admitted to generating a "significant number" of false Needle EMG bills, there was no admission as to any other type of fraud. Moreover, that "significant number" was spread between at least nineteen insurers, and many different patients. It therefore provides no basis for determining the extent of Dr. Seigel's liability to Allstate.

For much the same reason, collateral *estoppel* does not preclude Dr. Seigel from disputing Allstate's claim. Stichting Ter Behartiging v. Schreiber, 327 F.3d 173 n.2 (2nd

---

[7] As a hypothetical example, the fact that Dr. Seigel created a fraudulent bill or report as to Ricky Greco [Complaint p. 47] does not mean (and indeed is not even evidence) that Dr. Seigel created a fraudulent bill or report as to Juan Flores. [Complaint p. 48]. Nonetheless, this is exactly the type of inference upon which Allstate rests its request for Summary Judgment.

8

Cir. 2003) (guilty plea can provide basis for collateral *estoppel*, "but only if . . . the issues in both proceedings are identical"). As noted, the issues raised in Allstate's Complaint are vastly different than those raised in the Plea Agreement. Nor is he precluded from contesting the $62,772.15 Allstate received in restitution. Appley v. West, 832 F.2d 1021 (7th Cir. 1987) (plaintiff convicted of mail fraud and ordered to pay $975,000 to defendant in restitution was not estopped from contesting that amount in later civil case). Dr. Seigel did not participate in the determination of that figure and was given no opportunity to object.

### IV.     The Few Claims On Which Allstate Presents Specific Evidence Are Disputed

Finally, disputed material facts exist as to Dr. Seigel's liability even on the few claims for which Allstate presents evidence. For example, of the twenty-five "exemplars" upon which Allstate requests the Court to rest its determination of liability, many were not even paid by Allstate. [Ex. B, Ellen Seigel Aff. ¶¶ 4-9]. Joseph Duro's bills were paid by Great American Insurance. Eliyah Ganues' bills were partially paid by AIG Insurance, with Dr. Seigel's office writing off the balance. Thomas Hughes' bills were primarily paid by his Blue Cross plan, with only a portion of the bill satisfied through the patient's settlement proceeds. Dorothy Mayo's bill was paid by Great American Insurance. Freeman Troche's bill was paid in part by Blue Cross, the balance written off when Mr. Troche declared bankruptcy. Plainly Dr. Seigel is not liable to Allstate for bills paid by another entity.

Further, on a significant number of the "exemplars," Allstate will be unable to demonstrate reasonable reliance. Plaintiff's Complaint alleges that by the year 2000, Allstate had reasonable notice of Dr. Seigel's fraudulent conduct. [Complaint ¶ 16]. Several of the "exemplar" bills, however, were created in 2000 or after. Walter Henry's bills are dated October 10, 2000, October 19, 2000, November 27, 2000, January 25, 2001 and March 29, 2001. Christina Cote-Mahner's bill is dated April 13, 2001. Gerald Majewski's bill is dated August 28, 2000. And Ruthann Perez' bill is dated February 7,

2000.  Given the lifecycle of a liability claim, it is likely that Allstate "paid" many of the bills generated in 1999 (and even before) in or after 2000 as part of an overall settlement.[8]  [Ex. B, ¶ 10].  Allstate, of course, can not claim reasonable reliance related to fraud of which it had notice.  [See supra § III].

Finally, the credibility of the affidavits, and of Allstate's investigation, will be an important issue at trial.  Subin v. Goldsmith, 224 F.2d 753 (2nd Cir. 1955) (summary judgment based on affidavits inappropriate where credibility of affiant is in issue).  Each affidavit is almost identical, raising at least the possibility that the facts alleged in each came from Allstate rather than the patient.  Moreover, the only patient to have clearly added his own version of events wrote in "I remember almost no details of his procedure."  [Pl. Ex. A tab 24].

Allstate thus has not proffered sufficient evidence to support judgment on liability for all of the fraudulent acts alleged.  Moreover, a large percentage of the little specific evidence that Dr. Seigel submitted fraudulent bills to Allstate (the "exemplars") is disputed.  Accordingly, summary judgment should be denied.

### IV.     Allstate Is Not Entitled to Partial Summary Judgment On Liability As to a Portion of a Claim

Allstate will likely argue that, even if its submission does not establish liability for every act of fraud alleged, it is nonetheless entitled to summary judgment on the portion for which evidence is offered.  Assuming that evidence was undisputed, which it is not, plaintiff's Motion should nonetheless be denied since summary judgment may not be had for a portion of Allstate's claim.

#### A.     Summary Judgment May Not Be Had On Part of a Single Claim

Federal Rules of Civil Procedure, Rule 56(a) provides:

---

[8] Defendant continues to maintain the Legal Position set forth in his Motion to Dismiss related to these "third party claims".

> A party seeking to recovery upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may . . .move with or without supporting affidavits for summary judgment in the party's favor upon all or any party thereof.

F.R.Civ.P., Rule 56(a) (2005).  Notwithstanding Rule 56(a)'s "any part thereof" language, it is well-settled that summary judgment may be had only as to the whole of any particular claim.[9]  Primavera Familienstifung v. Askin, 130 F. Supp.2d 450, 539 (SDNY 2001) ("[D]espite the language of Rule 56(a) permitting a party to seek summary judgment on 'all or any part' of a claim, entry of a partial judgment as to a single claim is not permitted under the Federal Rules."); In re Air Crash Disaster Near Warsaw, Poland, 979 F. Supp. 164, 166 (EDNY. 1997) (although Rule 56(d) permits a court "to make an order establishing the uncontroverted facts; it does not permit the court to enter judgment on part of a single claim"); In re F&L Plumbing & Heating Co., 114 B.R. 370, 375 (E.D.N.Y. 1990) (motion for partial summary judgment improper because it "fail[ed] to dispose entirely of one count of the complaint".); Berman v. Royal Knitting Mills, Inc., 86 F.R.D. 124, 126 (S.D.N.Y. 1980); Commonwealth Insurance Co. v. O. Henry Tent & Awning Co., 266 F.2d 200 (7th Cir. 1959) (neither Rule 56 nor any other rule contemplates summary judgment for a portion of a single claim in suit).

### B. Allstate's Motion Should be Denied Because Its Submission At Best Proves Only A Portion of Individual Claims

Here, Allstate plainly has failed to prove the entirety of its claim.  As detailed fully above, the basis for each cause of action is an alleged pattern of four categories of fraud.  Allstate's submission, however, includes evidence as to only one of them (Needle EMG fraud).  Moreover, while Allstate's Complaint alleges fraudulent billing related to hundreds of former patients, its submission includes evidence of only twenty five.  Because this proffer, even if undisputed, falls far short of proving the entirety of

---

[9] The one exception is partial summary judgment as to liability.  Fed. R. Civ. P., Rule 56(c) (2005).  Here though, the argument is not that Allstate may not request partial summary judgment as to liability, which it clearly may, but that Allstate may do so only as to the entirety of a single claim.

Allstate's claim, its Motion for summary judgment as to the entirety of liability should be denied.

It is irrelevant that Dr. Seigel's discovery responses concede that at least "some" fraudulent bills were received and paid by Allstate. Because it does not establish "who" or "how many," this concession does nothing to establish number of fraudulent acts for which he is liable to plaintiffs. Moreover, even if it did, summary judgment is improper as to a portion of a claim, even where that portion is admitted. Bonda's Veevoederfabriek, Provimi, B.V. v. Provimi, Inc., 425 F. Supp. 1034 (E.D. Wis. 1977) (just because defendant admitted liability for a portion of claimed damages does not entitle plaintiff to partial summary judgment as to that portion); Central States v. McNamara Motor Exp., Inc., 503 F. Supp. 96, 100 (W.D. Mich. 1980) (district court not empowered to enter judgment for that amount of claim to which defendant stipulated); see also In re Air crash Disaster Near Warsaw, Poland, 979 F. Supp. 164, 166 (EDNY. 1997) (court could not enter partial summary judgment on that portion of claim established as a matter of law by strict liability).

The same conclusion is required even if the Court finds that each "count" in the Complaint's consists of multiple "claims."[10] It is arguable that Allstate's Complaint is properly viewed as alleging a separate "claim" related to each patient for whom Dr. Seigel billed.[11] Because the bills and reports Dr. Seigel generated arose from

---

[10] A claim is not necessarily co-extensive with a count or cause of action. Primavera Familienstifung v. Askin, 130 F. Supp.2d 450 (SDNY 2001) (citing Aetna Casualty & Surety Co. v. Giesow 412 F.2d 468, 470 (2nd Cir. 1969); United States v. Kocher, 468 F.2d 502, 508-09 (2nd Cir.972)(single foreclosure action affecting ten parcels of land involved multiple claims—one per parcel—rather than single claim). Where multiple claims are asserted, or claims are asserted against multiple parties, a court may, of course, enter summary judgment as to one or more claims or one or more of the parties. Primavera, 130 F. Supp. At 539; see also Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10A Federal Practice and Procedure § 2715 (3d ed. 1998).

[11] A "claim" is the aggregate of operative facts that give rise to an enforceable right. Hudson River Sloop Clearwater, Inc. v. Department of Navy, 891 F.2d 414 (1989); Gottesman v. General Motors Corp., 401 F.2d 510, 512 (2nd Cir. 1968). "Claims are separable when there is more than one possible recovery and the recoveries are not mutually exclusive." Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 21 (2nd Cir. 1997) (citing 10 Wright and Miller, Federal Practice and Procedure § 2657 at 67).

examinations and procedures unique to each patient, "[d]ifferent exhibits, proof and witnesses will be necessary" and "different sets of operative facts will determine the result" of every claim.  Gottesman, 401 F.2d at 512.  Thus Allstate's claim related to one former patient arguably is separable from another.  Id.

Even with claims parsed in the manner, however, Allstate has failed to present evidence establishing Dr. Seigel's liability for the whole of any one.  Though with respect to each patient Allstate alleges up to four separate categories of fraud, it has proffered evidence as to only one.  The remaining allegations related to Dr. Seigel's treatment and billing for each patient would still need to be tried.  McDarren v. Marvel Entertainment Group, Inc., 1995 WL 214482 (S.D.N.Y. April 11, 1995) ("Where an issue is closely intertwined with an issue to be tried, a court has to deny summary judgment even if the issue is 'ripe' for summary judgment").

### V. Conclusion

For the foregoing reasons, Allstate's Motion for Partial Summary Judgment as to liability should be denied.


THE DEFENDANT,
ARTHUR M. SEIGEL, M.D.


By_____
  Joshua D. Lanning (ct 24529)
 JACOBS, GRUDBERG, BELT, DOW & KATZ P.C.
 350 Orange Street, P.O. Box 606
 New Haven, CT  06503
 Phone: (203) 772-3100
 Fax: (203) 772-1691
 E-Mail:  jlanning@jacobslaw.com

## **CERTIFICATION**

I hereby certify that the foregoing Defendant Arthur Seigel's Opposition To Plaintiffs' Motion For Partial Summary Judgment has been served by placing a copy thereof in the United States mail, first class postage prepaid, addressed to:

Joel Rottner, Esq.
Skelley Rottner, P.C.
P.O. Box 340890
Hartford, CT 06134-0890

David O. Brink, Esq.
Richard D. King, Jr., Esq.
Nathan A. Tilden, Esq.
Smith & Brink, P.C.
122 Quincy Shore Drive, 2nd Floor
Quincy, MA  02171

this 18th day of February, 2005.

                                                        _____
                                                        Joshua D. Lanning