# <u>EXHIBIT A</u>

CERTIFIED COPY

VOLUME II

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x
                                     :
ALLSTATE INSURANCE COMPANY and       :
ALLSTATE INDEMNITY COMPANY,          :
                                     :
                  Plaintiffs,        :
                                     : Civil Action No.
        vs.                          : 303 CV 0577 MRK
                                     :
ARTHUR M. SEIGEL, M.D., ARTHUR M.    :
SEIGEL, M.D., P.C. and ELLEN         :
SEIGEL,                              :
                                     :
                  Defendants.        :
                                     :
- - - - - - - - - - - - - - - - - - x

Continued deposition of ARTHUR M.

SEIGEL, taken pursuant to the Federal Rules

of Civil Procedure, at the law offices of

Jacobs, Grudberg, Belt & Dow, P.C., 350

Orange Street, New Haven, Connecticut, before

Jenny L. Albert, License #00207, a Registered

Professional Reporter and Notary Public in

and for the State of Connecticut, on Monday,

April 25, 2005, at 9:27 a.m.

1    approximation, according to what you signed with the

2    federal government, was $450,000 worth, correct?

3        A.    Yes.

4        Q.    And in light of the fact that you were

5    charging, at the end of your tenure at Seigel, P.C., a

6    hundred forty dollars per test, you would agree with me

7    that $450,000 was approximately half the tests that you

8    gave during that period; isn't that right?

9        A.    It was somewhat less than half.

10       Q.    40 plus percent, correct?

11       A.    Based on the hundred forty dollar figure, it

12   would be 40 plus percent.

13       Q.    It could be more if you charged less per test

14   if you follow the math, correct?

15       A.    Yes.

16       Q.    So when you refer to a small percentage of

17   cases, isn't it more accurate to say that in nearly

18   half the cases, improper bills were generated by you

19   and Seigel, P.C.?

20       A.    Well, it is what it is.

21             MR. KING:  We'll mark this as Exhibit

22             No. 4, please.

23             (Response to admissions marked

24             Plaintiffs' Exhibit 4 for identification)

25       Q.    Doctor, I'll present you with your first

1    radio static sometimes, correct?

2        A.    Yes.

3        Q.    The sound emitting from the machine can be

4    achieved simply by dragging the needle across the

5    surface of the skin, can it not?

6        A.    Not the same sound.

7        Q.    A sound?

8        A.    A sound can be elicited.

9        Q.    Okay.  And depending on how one drags the

10   needle, taps the needle, holds the needle could change

11   the type and quality, duration of the sound --

12       A.    Yes.

13       Q.    -- would you agree with that?

14             When you created the false medical

15   documentation in connection with the needle EMG testing

16   during this period, you were lying to your patients; is

17   that correct?

18       A.    I suppose it depends on how you mean that.

19       Q.    How do you define the word "lie"?

20       A.    How do you define lying to your patients, but

21   what I did was wrong and I don't -- I'm not denying

22   that.

23       Q.    Okay.  When you generated false medical

24   documentation in connection with a patient, let's say

25   Patient Smith and you created a false invoice, you, in

1    a sense, lied to the patient; would you agree with

2    that?

3         A.    Yes.

4         Q.    And the same thing holds true for the record,

5    the narrative record and the electrophysiology report,

6    if you generated one?

7         A.    Yes.

8         Q.    Okay.  And the same holds true for the

9    referring physician who had referred that patient to

10   you, you lied to the referring physician, correct?

11        A.    Well, let me think about that.

12                    (Pause in the proceedings)

13        A.    Yes.

14        Q.    Well, did you ever, in connection with these

15   40 plus percent of the 7,000 which you produced as

16   false medical documentation, did you ever call the

17   referring physician and say, Look, I'm just --

18                    MR. KING:  Ira, do you -- I haven't even

19             finished my question.

20                    MR. GRUDBERG:  I understand.  That's why

21             I stopped, but I will object.

22        Q.    Did you ever call the referring physician and

23   explain to them, "Look, pay no attention to my report.

24   I really didn't to the needle EMG"?

25                    MR. GRUDBERG:  I object to the form of

1          the question.  I don't think it has a

2          sufficient basis in evidence in terms of the

3          40 percent.

4      Q.    Did you ever notify the referring physicians,

5   any of them, that you had billed falsely?

6      A.    No.

7      Q.    So you lied to the referring physicians,

8   correct?

9      A.    Yes.

10     Q.    And obviously, in connection with this false

11  medical documentation, you lied to the insurance

12  carriers, correct?

13     A.    I'll answer your question and then I'm going

14  to take a short break.  Yes.  I'm going to go to the

15  bathroom.

16          (Break taken)

17          MR. KING:  We're back on the record.

18     Q.    In the -- from here on end, when I refer to

19  your practice and the criminal case and the civil case,

20  I'm talking about the period in question 1996 through

21  the closing of Seigel, P.C. and the shuttering of those

22  offices, which I think was in 2001; is that right?

23     A.    Yes.

24     Q.    Unless I specify otherwise, that's the period

25  that we're going to talk about, okay?

1          MR. KING:  You're just rambling on the

2      record.  Let's try to keep the record clean.

3          MR. GRUDBERG:  You're just trying to

4      drag it out for another day and a half.

5          MR. KING:  This just adds to it.

6          MR. GRUDBERG:  I understand.  But, you

7      know, I can only get so frustrated before

8      opening my mouth.

9   BY MR. KING:

10     Q.   With respect to the patients who you

11  administered testing to or any types of treatment prior

12  to the execution of the search warrant in August 2000

13  as opposed to those after that period in of time, have

14  you identified any of those former patients as

15  providing inaccurate information with respect to

16  whether a test was or was not performed?

17     A.   No.

18     Q.   And there would be no way for you to do so,

19  Doctor, unless the test was abnormal; isn't that a

20  fact?

21     A.   Yes.

22     Q.   So if someone comes forward from prior to the

23  execution of the search warrant and says, "You know

24  what, I saw Dr. Seigel and he didn't give me that

25  needle EMG test," you have no basis to challenge that

# <u>EXHIBIT B</u>

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - x
                                       :
ALLSTATE INSURANCE COMPANY AND
ALLSTATE INDEMNITY COMPANY,            :

          Plaintiffs,          :

                              Civil Action
                           :   No.
          vs.                      3:03 CV 0577
                                       :
ARTHUR M. SEIGEL, M.D.,
ARTHUR M. SEIGEL, M.D., P.C.,          :
AND ELLEN SEIGEL,
                                       :
          Defendants
                                       :
- - - - - - - - - - - - - - - - - - - x


       Deposition of ELLEN M. SEIGEL, taken

pursuant to the Federal Rules of Civil

Procedure, at the law offices of Jacobs,

Grudberg, Belt & Dow, P.C., 350 Orange

Street, New Haven, Connecticut, before

Janet C. Phillips, License #00124, a

Registered Professional Reporter and Notary

Public in and for the State of Connecticut,

on Tuesday, April 26, 2005, at 8:31 a.m.

1    Q.   -- and we went through for six hours

2    yesterday?

3    A.   Okay.

4    Q.   Okay.  Not whether or not Seigel P.C. mailed

5    documents to Allstate, but whether documents were

6    mailed in connection with such claimants.  Would you

7    agree with me that it in excess of 50?

8    A.   Yes.

9    Q.   Do you need Ira to answer the question?

10   A.   No.

11   Q.   Okay.  So you can answer the question,

12   correct?

13   A.   Yes.

14   Q.   In excess of 50 and there's no doubt about

15   that.  Okay.

16        MR. GRUDBERG:  That's a speech.  Come

17        on, let's move on.

18        MR. KING:  You know I'm not a speech

19        maker.

20        MR. GRUDBERG:  Well, you made a little

21        speech there.

22        (Confidentiality order marked

23        Plaintiffs' Exhibit 2 for identification.)

24        (Plaintiffs' response to second document

25        request marked Plaintiffs' Exhibit 3 for

1   me.

2       Q.   So someone from New Haven would drive down or

3   over to Wallingford?

4       A.   Yes, because we actually had a, you know, a

5   terminal in the Wallingford office that connected to

6   our main frame.

7       Q.   All right.  So by billing, I guess we can

8   agree that, in other words, the doctor or the patient

9   would come out with the Mifax, as we talked about

10  yesterday -- you know what those are --

11      A.   Yes.

12      Q.   -- and give that to you if you were there,

13  and you would enter it in and up would pop the CPT

14  information and the billing information?

15      A.   Exactly.

16      Q.   And then those would be issued via the mail

17  like the narratives and other records that you

18  generated, right?

19      A.   Exactly.

20      Q.   And we talked about mailings earlier and I

21  suppose we may talk about some mailings later as well,

22  but you would agree with me that in connection with

23  every case during the relevant period, that in

24  connection with every patient, there were mailings

25  generated and items caused to be mailed by Seigel P.C.

1    in connection with their patients?

2                    MR. GRUDBERG:  On traumatic patients?

3        Q.    Traumatic patients.

4        A.    Yes.

5        Q.    How about the medical neurology patients?

6        A.    Every time a report was always generated to

7    the referring physician, so that would be true for the

8    medical neurology patients, too.

9        Q.    Can you ever recall a patient file from '96

10   to 2001 that there wasn't at least one or two mailings?

11       A.    No.

12       Q.    That's just the way business was performed,

13   right?

14       A.    He was a consultant.  The patients that were

15   coming to see us were coming only by referral, and

16   therefore, that referring entity needed to have a

17   report.

18       Q.    So if you're at Wallingford, and that was the

19   normal course that you followed, you'd be at

20   Wallingford on the days that your husband was there and

21   you'd put in the billing, would you generate the

22   paperwork that day, that package of paperwork for the

23   bill that had to be issued on that day, or would that

24   be done later in New Haven?

25       A.    No.  The little bill that subsequently went

1     a personal business outside the office, and we also

2     used a transcription service.

3          Q.    And that would be Word Flow?

4          A.    Word Flow, thank you.  I was trying to

5     remember it.

6          Q.    And so all the transcriptionists' duties were

7     performed off-site?

8          A.    Exactly.

9          Q.    Okay.  And this was taped, right, small

10    microtape?

11         A.    Yes, yes.

12         Q.    It would go out and you'd get it back within

13    a week; is that fair to say?

14         A.    Yes.

15         Q.    And then that transcribed record would be

16    partnered with the invoice?

17         A.    Exactly.

18         Q.    Okay.  And then the invoice would always be

19    mailed?

20         A.    Yes.

21         Q.    And the narratives would always be mailed?

22         A.    Yes.

23         Q.    You wouldn't -- well, strike that.

24               Multiple parties may be copied with the

25    narrative and/or the electrophysiological report,

# **EXHIBIT C**

# CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x

ALLSTATE INSURANCE COMPANY and          :
ALLSTATE INDEMNITY COMPANY,

                                 :

               Plaintiffs,

                           : Civil Action No.
       vs.

                           : 303 CV 0577 MRK
ARTHUR M. SEIGEL, M.D., ARTHUR M.
SEIGEL, M.D., P.C., and ELLEN          :
SEIGEL,

                                 :

               Defendants.

                                 :
- - - - - - - - - - - - - - - - - - x

          Deposition of NATALIA DIAS, taken

pursuant to the Federal Rules of Civil

Procedure, at the offices of Scribes, Inc.,

445 George Street, New Haven, Connecticut,

before Bonita Cohen, a Registered Merit

Reporter and Notary Public in and for the

State of Connecticut, License Number 00041,

on Monday, May 9, 2005, at 9:04 a.m.

1    Q.    Any wires attached to your legs?

2    A.    No.

3    Q.    Any wires attached to your feet?

4    A.    No.

5    Q.    Any wires attached anywhere on your body?

6    A.    There was no wires attached on my body.

7    Q.    How long did the appointment last,

8    approximately?

9    A.    I don't remember exactly how long. It was a

10    short visit. Maybe ten minutes, around there.

11    Q.    At any time during that -- did anyone else

12    treat you or administer any kinds of testing to you,

13    other than Dr. Seigel, while you were at that

14    appointment?

15    A.    No.

16    Q.    During the entire ten-or-15-minute

17    appointment on that one occasion, at any point did

18    Dr. Seigel insert any needles into your body?

19    A.    No.

20    Q.    Any needles dragged along your skin?

21    A.    No.

22    Q.    There were no needles used in the testing or

23    treatment that you received at all?

24    A.    No.

25    Q.    Since that time, have you been contacted by

1    Dr. Seigel or anyone on his behalf?

2        A.    No.

3        Q.    Do you think if you had received needles

4    involved in this treatment that you would recall that?

5        A.    Yes, I would.

6        Q.    Why?

7        A.    Well, I tend -- like -- just a regular

8    examination, I don't remember that much, because I

9    don't pay much attention to it.

10            But like I have a 25-year-old son -- he's

11   going to be 25 next month -- and he had a seizure when

12   he was about six months, and he had these little wires

13   off his head.  And I remember that, because that's

14   something that would like stick to my mind.

15                MR. KING:  If we could mark the subpoena

16            as Exhibit Number 1.

17                (Witness subpoena marked Plaintiffs'

18            (Dias) Exhibit 1 for identification)

19                MR. KING:  I think I have nothing

20            further for this witness.

21   CROSS-EXAMINATION

22   BY MR. GRUDBERG:

23        Q.    Did you just have one accident that year?

24        A.    That year?  I had two accidents, as a matter

25   of fact.  I had that accident on -- I don't know; I

CERTIFIED COPY

## C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this __12__ day of __May__, 2005.

Bonita Cohen
Notary Public

My Commission expires:
November 30, 2007

# <u>EXHIBIT D</u>

# CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x

ALLSTATE INSURANCE COMPANY and :
ALLSTATE INDEMNITY COMPANY,

                        :

            Plaintiffs,

                        : Civil Action No.
      vs.

                        : 303 CV 0577 MRK

ARTHUR M. SEIGEL, M.D., ARTHUR M.
SEIGEL, M.D., P.C., and ELLEN      :
SEIGEL,

                        :

            Defendants.

                        :
- - - - - - - - - - - - - - - - - - x

            Deposition of JOSEPH ANTHONY DURO, taken

pursuant to the Federal Rules of Civil

Procedure, at the offices of Scribes, Inc.,

445 George Street, New Haven, Connecticut,

before Bonita Cohen, a Registered Merit

Reporter and Notary Public in and for the

State of Connecticut, License Number 00041,

on Monday, May 9, 2005, at 9:59  a.m.

1    your interaction with Dr. Seigel?

2        A.    Yes.

3        Q.    Do you recall being hooked up to any machines

4    with wires or anything of that sort?

5        A.    Yes.

6        Q.    Were there wires?

7        A.    There were wires, yes.

8        Q.    Is that how you were hooked up to the

9    machine?

10        A.    Yes.

11        Q.    Do you remember where the wires were attached

12    to your body or parts of your body?

13        A.    I think -- I'm pretty sure there were some in

14    my neck and head area, and pretty much throughout that

15    area I think they were.

16        Q.    At any point during your interaction with

17    Dr. Seigel on that occasion, did he or any member of

18    his staff insert needles into your body?

19        A.    No.

20        Q.    Earlier during your testimony, you talked

21    about the doctor rubbing a needle.

22        A.    Yes.  It was like a probe coming from a

23    machine.  He was rubbing it across the skin.

24        Q.    Was he rubbing it on your arm, as you're

25    showing us here?

1    A.    Yes.

2    Q.    So it was a dragging motion with the needle?

3    A.    Yes.

4    Q.    I say "needle."  Was it a needle or some

5    other type of probe?

6    A.    I didn't think it was a needle, itself.

7         It seemed more like a probe coming from a

8    machine.

9    Q.    But, in any event, it didn't pass through

10   your skin and into your muscles; correct?

11   A.    No.

12   Q.    Did you continue to work for Dr. Seigel or

13   for his office in connection with the software business

14   after that visit?

15   A.    Yes.

16   Q.    And approximately how many times did you

17   interact with Dr. Seigel and/or his office after that

18   visit?

19   A.    His office, probably 20 times, 25 times.

20        I really never seen him.  I usually dealt

21   with his wife, Ellen.

22   Q.    Did anyone ever contact you following that

23   treatment with the dragging of the needle, for any

24   reason?

25   A.    I think on my next appointment that he told

1      A.    Neck, shoulders, and through my hairline, I
2  think.  And there also was a couple on my arm.
3      Q.    Okay.  And you don't recall whether he did
4  the left arm and the right arm?
5      A.    No, I don't recall.
6      Q.    You just have no recollection?
7      A.    No.
8      Q.    When you said he was rubbing something, that
9  was the probe, you said?
10     A.    Yes.
11     Q.    Okay.  And you said you don't recall seeing a
12  needle at all?
13     A.    No, nothing being put into my skin.
14     Q.    I'm not asking whether you bled.  But do you
15  recall an insertion just into a muscle, right under the
16  skin --
17     A.    No.
18     Q.    -- a small needle?
19     A.    No.
20     Q.    You don't recall that one way or the other?
21     A.    No.
22     Q.    Do you recall any of the testing you had in
23  1997, NCT scans or x-rays?  Do you recall anything like
24  that at all?
25     A.    No, I don't.

CERTIFIED COPY

## C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___ day of _____ 2005.

_____
Bonita Cohen
Notary Public

My Commission expires:
November 30, 2007