UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

C. A. NO.  303 CV 0577 MRK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY and<br>ALLSTATE INDEMNITY COMPANY<br>    Plaintiffs,<br><br>v.<br><br>ARTHUR M. SEIGEL, M.D.,<br>ARTHUR M. SEIGEL, M.D., P.C.<br>and ELLEN SEIGEL,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  SEPTEMBER 30, 2005 |

MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Defendants in the above-captioned matter respectfully submit this Memorandum in Support of their Motion for Summary Judgment submitted herewith. In this case, plaintiffs seek to capitalize on Dr. Arthur Seigel's criminal conviction on a single count of mail fraud by alleging that hundreds of his bills (either submitted to Allstate or for which they became responsible in third-party actions) were fraudulent. As to the vast majority of these bills, however, plaintiffs have no evidence of fraud, but rather seek to prove their claim by aggregate statistical evidence. The Court should grant Summary Judgment as to each claim for which there is no specific evidence of fraud because 1) Allstate's statistical model is not probative on the issue of fraud and 2) plaintiffs have evidence to establish a triable issue of fact on only 44 of their claims. Only those should go to the jury.

## I.    Factual and Procedural Background

On May 22, 2002, Dr. Arthur M. Seigel pled guilty to a single count of Mail Fraud (18 U.S.C. § 1341) related to allegations that he had billed patients and insurance companies for Needle EMG tests that were never performed. [Ex. B]. The Plea Agreement was signed on November 20, 2001. [Id.]. In it, Dr. Seigel admitted that of

the more than 7000 Needle EMG tests he billed for between 1996 and 2000, "many" of the billings were fraudulent. [Id. p. 8]. There was no agreement as to a specific number, nor is the Plea Agreement particular to any specific insurer. Dr. Seigel was not charged with, nor was he alleged to have committed, fraud related to anything other than Needle EMG testing.

The plea agreement specified that Dr. Seigel was to make payment of $450,000 in restitution to insurance providers. [Ex. B p. 2]. That number represented the "fraud loss," or a "reasonable approximation of the value of the monies" he obtained by fraud. [Id. pp. 3, 9]. Nineteen separate insurers made restitution claims against Dr. Seigel. [Ex. C p. 7]. Among them, Allstate received $62,772.15, or 13.95% of the restitution award. [Id.]. Dr. Seigel took no part in the determination of that figure, and made no admission related to Allstate's restitution claim. [Ex. D ¶¶3-5].

Plaintiffs filed the present action on April 1, 2003. Their ninety-eight page First Amended Complaint ("Complaint") is pled in seven counts: Count I (for violations of RICO, 18 U.S.C. §1962(b) and (c) against Dr. Seigel only); Count II (for violations of 18 U.S.C. §1962(c) against Dr. Seigel and Arthur M. Seigel, M.D., P.C.); Count III (for violations of 18 U.S.C. §1962(a) against Dr. Seigel only); Count IV (for Common Law Fraud against Dr. Seigel and Seigel, P.C.); Count V (for CUTPA violations against all defendants); Count VI (for CHIFA violations against Dr. Seigel and Seigel, P.C.; and Count VII (for Injunctive Relief). The portion of Count I based on 18 U.S.C. § 1962(b) and the entirety of Count III were dismissed by this Court on March 30, 2004. [Docket No. 60].

**Allstate's Claim:** The factual basis for each theory of liability is the same. Allstate asserts a broad pattern of wrongdoing (far broader than Dr. Seigel's plea), consisting of four separate categories of alleged fraud: 1) Needle EMG testing billed for but not performed ["Needle EMG Fraud", Complaint p. 75]; 2) nerve conduction studies billed for but not performed (or inadequately reported) ["Nerve Conduction

2

Fraud", Complaint pp. 75-80]; 3) misleading diagnoses which allegedly inflated the value of claims in contradiction of electrodiagnostic test data ["Misleading Diagnosis Fraud", Complaint pp. 80]; and 4) pattern diagnoses which are allegedly fraudulent based on the fact that that Dr. Seigel followed a "pattern" of injury type, treatment and diagnosis. ["Pattern Diagnosis Fraud", Complaint p. 82]. In its Amended Complaint, Allstate claims to have paid $681,040 to satisfy fraudulent medical bills.

In addition to that figure, Allstate alleges that Dr. Seigel's fraudulent bills and reports had a residual effect, inflating the settlement value of the liability claims it paid. [Complaint p. 74]. This so-called "Seigel Effect" is alleged to be a manifestation of further treatment made necessary by false reports and inflated findings that falsely inflated the value of cases. [Complaint ¶ 386]. In Allstate's Amended Complaint, the estimated cost of the Seigel Effect, including the $681,040 for fraudulent bills, is alleged to be $1,303,046.02.[1]

For each category of claimed fraud, Allstate alleges scores of individual fraudulent acts. It claims, for example, "upon information and belief" that each Needle EMG test for which Dr. Seigel billed plaintiffs between 1996 and 2000 was fraudulent. [Complaint ¶ 394]. Although Allstate does not provide a precise number, it is presumably in the hundreds. Related to Nerve Conduction testing, it claims that approximately two hundred fraudulent bills were submitted. It alleges eighty-four acts

---

[1] Since drafting its Complaint, Allstate has reduced this number substantially. Dr. Herbert Weisberg, upon whose statistical model Allstate relies for its claimed "Seigel Effect," actually performed two separate regression analyses to determine the impact of Dr. Seigel's involvement in claims. Initially, he performed an analysis using 241 claims paid by Allstate in which Dr. Seigel was a treating neurologist. [Ex. E pp. 8-9]. He later reworked his analysis, reducing the number of Seigel claims analyzed to 197, removing claims paid above policy limits, claims determined by adjudication, and claims involving a major injury or only a minor injury. Id. His second analysis, upon which Allstate now relies, estimated an average "excess" per claim of $2,252 and a "total estimated excess payment by Allstate" of only $443,675. [Id. at 10]. Using the same damage calculation model illustrated in Allstate's Amended Complaint (i.e. trebling that figure), Allstate's total damage claim would thus be $1,329,025.

of "Misleading Diagnosis Fraud," [Complaint pp. 80-82], and eighty-seven acts of pattern diagnosis fraud. [Complaint pp. 82-84].

**Allstate's "proof" of fraud:**  Notwithstanding the broad pattern of fraudulent conduct alleged, Allstate is able to submit evidence only as to Needle EMG Fraud. Moreover even as to that category, it can offer evidence only as to a few specific acts committed against Allstate.  Instead of proving each act of alleged fraud, however, Allstate's strategy appears to entail proving <u>some</u> of its specific claims, and then offering the testimony of its statistician Dr. Herbert Weisberg who purports to measure the "Seigel Effect," or the total monetary impact of Dr. Seigel's fraud on Allstate claims.[2]  The problem with this strategy is twofold: 1) Dr. Weisberg's statistical model is not probative in quantifying the impact of any alleged fraud, [see infra § 3-A]; and 2) without the benefit of Dr. Weisberg's model, Allstate has specific evidence as to only a tiny portion of the frauds alleged.  On those small few, defendants will concede the existence of disputed material facts.  However, as to the large number of claims related to which there is <u>no</u> evidence of fraud, summary judgment should enter for defendants.

Evidence developed during the course of this litigation includes a) affidavits submitted by twenty-five (25) former Seigel patients [<u>See</u> Ex. A to Pliantiff's Motion

---

[2]  At oral argument on Plaintiffs' Partial Motion for Summary Judgment, counsel for Allstate stated:

> I think number one, your Honor recognized that each count, each formal count, is made up of perhaps 240 claims . . . If you follow that logic, *there would be the necessity to show that there were mail fraud and mailings in connection with numerous claims.  We would argue not every single claim but numerous claims,* that you would have to show the intent and requisite prongs, essential elements under RICO, CUTPA, CHIFA and fraud.
>
> If we are just talking about 56(d), the request that we made specifically in our reply brief, those issue to be decide beforehand, certainly we tell the jury right up front this is a person who was engaged in mail fraud, he had an intent to deceive insurers, he admits that he damaged Allstate.
>
> *Now what you've got is you've got statisticians talking about the "Seigel Effect" quantum of damages* and perhaps you have this fight of the medical experts vis-à-vis the NCS amplitude fraud that my brother wants to bring."

[Ex. F p. 23].

for Summary Judgment Docket No. 64 tabs 1-25], and depositions of thirty (30) former patients [Ex. G]; b) Dr. Seigel's Plea Agreement and Stipulation of Offense [Ex. B]; and c) depositions, interrogatories, and requests for admission directed to defendants [Exs. H, I, J]. None of those materials relates to anything other than Needle EMG testing.[3] Moreover, of the 197 claims upon which Allstate claims damage, there is specific evidence of Needle EMG fraud in only forty-four (44).

**Affidavits and Depositions of Allstate Patients**: According to the affidavit of Michael Bruno, an analyst for Allstate's Special Investigations Unit, Allstate made attempts to contact former Seigel patients for whom Dr. Seigel generated Needle EMG bills to ascertain whether they in fact received needle EMG testing. [Ex. A to Plaintiff's Motion for Partial Summary Judgment, Docket No. 64 at ¶9]. A few of these former patients executed affidavits indicating that they did not. [Id.].

Allstate has twenty five such affidavits. [Id. tabs 1-25]. Each is virtually the same, averring that the patient at issue treated with Dr. Seigel and at no time did he insert a needle under the patient's skin. Neither Michael Bruno's affidavit, nor any of the 25 patient affidavits raise issues of Nerve Conduction Fraud,[4] Pattern Diagnosis Fraud, or Misleading Diagnosis Fraud. Indeed, Mr. Bruno's affidavit refers to these exemplar patients as "Needle Affiants," underscoring the lack of connection to the fraud described in the latter three categories. [Id. ¶ 9].

Allstate also deposed of thirty former Seigel patients whose claims it paid. [Ex. G]. Each of those deponents testified either that Dr. Seigel did not pierce his or her skin with a needle, or that he or she had no memory of Dr. Seigel piercing his or her

---

[3] The only conceivable evidence related to alleged Nerve Conduction Fraud, Pattern Diagnosis Fraud, or Misleading Diagnosis Fraud would be the testimony of Dr. Neil Busis, whose affidavit was attached to Allstate's Complaint. There has been no expert disclosure of Dr. Busis, however, though the deadline has passed and, in fact, the Court precluded defendants from filing further disclosures. Moreover, as discussed infra, his testimony (based only on a review of Allstate's claim files) could not establish fraud.

[4] Nerve conduction testing does not involve the subcutaneous insertion of a needle.

skin. Eleven of the former patients who provided affidavits were also deposed, making the total number of former patients providing evidence that a Needle EMG exam was billed for but not performed to forty-four (44).  To date, these depositions and affidavits are the only specific evidence of fraud as to any of the 197 claimants upon whom Allstate bases its damage claim.

**Seigel's Plea Agreement and Stipulation of Offense Conduct** [Ex. B]:  As detailed above, Dr. Seigel pled guilty to a single count of Mail Fraud (18 U.S.C. § 1341) on May 22, 2002. [Ex. C].  The Plea Agreement was signed on November 20, 2001.  [Ex. B], and contains an admission that, of the over 7000 Needle EMG tests for which Dr. Seigel billed between 1996 and 2000, "many" were fraudulent.  [Ex. B p. 8].  The "many" includes bills for which many different insurance carriers eventually became responsible, nineteen of whom submitted claims for restitution.  Notably, the Plea Agreement contained no admission related to Allstate or any other individual insurer.  Nor does it reference any allegation of fraud other than that related to Needle EMG testing.[5]

The plea agreement specified that Dr. Seigel was to make payment of $450,000 in restitution to insurance providers.  [Ex. B p. 2].  That number represented the "fraud loss," or a "reasonable approximation of the value of the monies" he obtained by fraud from all patients and insurance companies who paid.  [Id. p. 3, 9].  Nineteen separate insurers made restitution claims against Dr. Seigel.  [Ex. C p. 7].  Among them, Allstate received $62,772.15, or 13.95% of the restitution award.  The latter figure, however, was determined between Allstate, the government, and the remaining

---

[5]  Allstate purports to have lost or destroyed its submission to the government detailing its claim for reimbursement.  We have extreme doubt that Allstate's submission referred to "paid bills" as opposed to claims it defended on behalf of its insured tortfeasors.  Anthem Blue Cross/Blue Shield secured in excess of $80,000, and it would be shocking if Allstate's level of direct bill payments had been 75% of those paid by Anthem.

eighteen insurance companies.  Dr. Seigel took no part in its determination. [Ex. D ¶¶ 3-5].

**Discovery Conducted During This Litigation:**  Defendants' discovery responses are largely in line with what is detailed in the Plea Agreement and Stipulation of Offense.  Dr. Seigel admits that "many" of the 7000 EMG procedures for which he billed from December 1996 through August 2000 were fraudulent [Ex. H Request No. 17]; that he intentionally engaged in a scheme to defraud insurance carriers by creating false medical documentation [Ex. H Request No. 56]; and that the objective of the scheme was "to be paid improperly, in a very small percentage of cases for needle EMG's not performed." [Ex. I Response No. 1(f)].  Dr. Seigel's discovery responses contain no admission related to alleged Nerve Conduction Fraud, Misleading Diagnosis Fraud, and Pattern Diagnosis Fraud.

**Dr. Seigel's Affidavits**:  In the attached Affidavit, [Ex. D], Dr. Seigel states, among other things, that only a small percentage of the Needle EMG tests he in fact billed for were not performed.  [Id. at ¶ 6].  He further states that any patient who needed a Needle EMG test received one, and the small percentage of false bills arose only in cases where the patient at issue clearly did not need a Needle EMG test.  [Id. at ¶ 7].  Any needle EMG record in which there were positive findings was in fact performed.  [Id. at ¶ 8].

Dr. Seigel further denies ever billing for nerve conduction studies that were not performed.  [Id. at ¶ 8].  When conducting nerve conduction studies, it was his practice to record amplitude measurements only when findings were positive.  Since amplitude is irrelevant to a clinically insignificant finding, those measurements were not recorded in every case.  This practice is common among medical professionals and entirely appropriate.  [Id. at ¶ 10].

Dr. Seigel further denies ever artificially inflating a patient's medical injuries in a report, or other wise writing reports that were misleading or intentionally inaccurate.

7

[Id. ¶ 11]. Finally, he denies creating false reports by making "pattern diagnoses" without regard to a patient's signs and symptoms. The patients he saw at his practice tended to have similar injuries because similar incidence gave rise to their need for medical attention. It is common and entirely appropriate for medical professionals to use similar language to describe similar injuries. [Id. at ¶12].

## II.    STANDARD FOR SUMMARY JUDGMENT

### A.  Non-Moving Party Who Will Bear The Burden At Trial Must Show a Disputed Issue of Material Fact

Summary judgment is appropriate "if the pleadings, depositions answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hayut v. State University of New York, 352 F.3d 733, 743 (2nd Cir. 2003). Summary judgment for a defendant is appropriate when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." Id.

### B.    Summary Judgment is Appropriate in this Case as to Any Individual Patient For Whose Billing There is No Evidence of Fraud

By this Motion, defendants request the Court to enter summary judgment in their favor as to all claims for which plaintiffs lack evidence establishing triable issues of fraud. Defendants contend that there is a separate "claim," related to each patient for whom Dr. Seigel billed, and the Court may enter summary judgment as to any such billing for which there is no disputed issue of material fact.

Notwithstanding Rule 56(a)'s "any part thereof" language, it is well-settled that summary judgment may be had only as to the whole of any particular claim. Primavera

8

Familienstifung v. Askin, 130 F. Supp.2d 450, 539 (SDNY 2001). A "claim,"
however,

is not necessarily co-extensive with a count or cause of action. Id. (citing Aetna
Casualty & Surety Co. v. Giesow 412 F.2d 468, 470 (2nd Cir. 1969); United States v.
Kocher, 468 F.2d 502, 508-09 (2nd Cir.972)(single foreclosure action affecting ten
parcels of land involved multiple claims—one peparcel—rather thansingle claim).
Where multiple claims are asserted, or claims are asserted against multiple parties, a
court may, of course, enter summary judgment as to one or more claims or one or
more of the parties. Primavera, 130 F. Supp. At 539; see also Charles Alan Wright,
Arthur R. Miller & Mary Kay Kane, 10A Federal Practice and Procedure § 2715 (3d
ed. 1998).

A "claim" is the aggregate of operative facts that give rise to an enforceable
right. Hudson River Sloop Clearwater, Inc. v. Department of Navy, 891 F.2d 414
(1989); Gottesman v. General Motors Corp., 401 F.2d 510, 512 (2nd Cir. 1968).
"Claims are separable when there is more than one possible recovery and the recoveries
are not mutually exclusive." Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106
F.3d 11, 21 (2nd Cir. 1997) (citing 10 Wright and Miller, Federal Practice and
Procedure § 2657 at 67).

Here, separating claims by patient is proper. Because the bills and reports Dr.
Seigel generated arose from examinations and procedures unique to each patient,
"[d]ifferent exhibits, proof and witness will be necessary" and "different sets of
operative facts will determine the result" of every claim. Gottesman, 401 F.2d at 512.
Further, parsing claims in this manner permits the Court to weed out the many upon
which Allstate can present to triable issue of fraud at the summary judgment stage,
ensuring a shorter, far more efficient trial.

III.    **Defendants Are Entitled To Summary Judgment in their Favor As to All Individual Claims For Which Allstate Can Not Offer Specific Evidence of Fraud**

    A.    **Dr. Weisberg's Affidavit Should be Precluded From Consideration Because It Confirms That Any Inflationary Effect of Dr. Seigel's Involvement Was Due To Causes Other Than Fraud**

Allstate intends to prove that Doctor Seigel committed fraud related to 197 patients without a specific showing as to the fraudulent nature of each bill or report. Instead, it seeks to introduce the regression analysis[6] of its statistics expert Herbert Weisberg to show that Dr. Seigel's fraud created a so-called "Seigel Effect," inflating the payout related to each claim. Dr. Weisberg's model, however, is invalid for that purpose, because 1) it does not measure fraud, and in fact provides <u>no basis</u> to calculate the percentage of a claim payout due to fraud as opposed to other factors, and 2) the model itself confirms that any inflationary effect due to Dr. Seigel's involvement was likely caused by his status as a neurology specialist rather than fraud.

"Like any other evidence, the opinion of an expert is not immune from the relevance requirement of Rule 401 of the Federal Rules of Evidence." <u>Hollander v. American Cyanamid Company</u>, 172 F.3d 192 (2nd Cir. 1999). "A court has an obligation to act as a gatekeeper to ensure the 'reliability and relevancy' of expert testimony presented to the jury. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999).

Specifically, where an expert statistical analysis is offered in opposition to a motion for summary judgment, courts will scrutinize the expert's report for probative value and grant summary judgment if the model is flawed in methodology or application. <u>Smith v. Xerox Corp.</u>, 196 F.3d 358 (2nd Cir. 1999) (upholding trial

---

[6] A multiple regression analysis is "a statistical tool for determining the effect of two or more explanatory variables on a variable to be explained, called the dependent variable. This tool allows the expert to determine the causal relationship, if any, between the explanatory variables and the dependent variables." <u>Bonton v. City of New York</u>, 2004 WL 2453603 n. 37 (SDNY 2004).

courts grant of summary judgment to defendant where plaintiffs' statistical methodology was flawed); Hollander v. American Cyanamid Company, 172 F.3d 192 (2nd Cir. 1999) (plaintiff's statistical evidence insufficient to prevent the grant of summary judgment, rejecting plaintiff's argument that trial court impermissibly usurped the role of the jury by weighing and rejecting proffered statistical models); Bickerstaff v. Vassar College, 196 F.3d 435 (2nd Cir. 1999) (same);   In re Wireless Telephone Services Antitrust Litigation, 2005 WL 2143335 (SDNY Sept. 2, 2005) (same).  This is true even with regression analyses because "[t]here may . . . be some regressions so incomplete as to be inadmissible as irrelevant."  Bazemore v. Friday, 478 U.S. 385, 400 (1986).  Where a court determines that the expert report is misleading, or will not aid the trier of fact in resolving a disputed material issue, the report will be disregarded.  Bonton v. City of New York, 2004 WL 2453603 at 2 (SDNY).

Here, Weisberg's statistical analysis is not probative of the issue on which it is offered: the quantum of fraud upon which Allstate may recover.  There are two reasons.  First, Weisberg's model does not measure fraud, the only basis upon which Allstate may recover.  His expert disclosure indicates that he "was engaged by Allstate to compare the Seigel versus non-Seigel claims and compute the estimated damages specifically attributable to Seigel's involvement."  [Ex. E p. 1].  His analysis then purports to measure the average effect of Dr. Seigel's involvement in a particular case, and "the reductions in an actual settlement that would be expected in Seigel's absence." [Id. at 9].  He concluded that the "particular effect of Dr. Seigel's involvement" was to add an average of approximately 25.3% to a case's settlement value (22.8% if another specialist was also involved), and that the expected "reductions in an actual settlement that would be expected in Seigel's absence" were respectively 20.2% and 18.5%. [Id.].

By his own description, Weisberg's conclusion is not that Dr. Seigel's alleged fraud inflated Allstate's settlement payments, but rather that his "involvement" in a

11

case resulted in a higher payout. He makes no conclusion as to the cause.[7] Although he posits the possibility that Dr. Seigel's report might have resulted in an upward evaluation of a claimant's general damages, he admitted at his deposition that this was a hypothesis, and that his model provides no basis of determining that point either way. [Ex. O pp. 44-45].

Critically, Weisberg's analysis makes no attempt (and would provide a jury no basis) to distinguish between purported claim inflation due to Dr. Seigel's fraud, as opposed to some other factor. For example, Allstate might pay more in Seigel cases because of the quality of his reports, his reputation as a formidable testifying expert, the quality of the attorneys and chiropractors that regularly referred patients to him, or a host of other factors. Without any of these explanatory variables accounted for in Weisberg's model, Allstate simply assumes that it may argue that all of the differential exhibited is due to fraud. It may not. Where a plaintiff proffers statistical evidence to confirm the grounds upon which it may recover, the analysis will be disregarded if it fails to rule out important explanatory variables. Smith v. Xerox Corp., 196 F.3d 358, 371 (2nd Cir. 1999) ("Plaintiff's hypothesis testing only showed that chance was most likely not responsible for the perceived difference in treatment of the older(or male) workers; this methodology could not, by itself, support a conclusion that discrimination must have been the cause for the disparity."); Bonton v. City of New York, 2004 WL 2453603 at 2 (SDNY) (in actions based on racial discrimination, "Courts have repeatedly held that statistical analyses that fail, as Zellner's does, to control for any nondiscriminatory explanations are inadmissible.").

Second, and perhaps more clearly fatal to Allstate's reliance on Weisberg's model, the analysis plainly establishes that Dr. Seigel's status as a neurology specialist

---

[7] Interestingly, Weisberg claims to have, at some point in his career, created a statistical model for identifying insurance fraud, [Ex. O pp. 10-11], though he did not use it here.

can completely explain any rise in value of cases in which he was involved.  In his original affidavit, Weisberg concluded as follows:

> The particular effect of Dr. Seigel's involvement . . . was to add an average of approximately 31% to the settlement amount.  Conversely, the reduction in an actual settlement that would be expected in Selgel's absence was 24%. *This reduction was quite similar to that attributable to other specialists, which was approximately 28%.*

[Ex. N ¶ 46].  In calculating Allstate's so-called "Seigel Effect," he further explains:

> The model was applied to obtain an estimated excess payment for each claim.  To find this excess, I estimated what settlement would have occurred without Dr. Seigel (*or another specialist*).

[Ex. Id. ¶ 48].  In his original analysis, Weisberg concluded that the reduction expected in Seigel's absence was 24%, while the reduction attributable to the absence of a different specialist would be approximately 28%. [Ex. O p. 47].  Critically, he admits that the cause of any claim inflation could be caused by the impact of a specialist's presence on Allstate's evaluation of general damages:  "[P]articipation in treatment by a medical specialist such as Dr. Seigel may have provided justification for a larger valuation of general damages."  [Ex. N ¶ 44].

The conclusion to be drawn from Weisberg's model is that Allstate's payout in Dr. Seigel cases would have been the same or even higher had a different neurologist, or other kind of specialist, been involved.  Put another way, the model provides no basis for distinguishing between inflation, if any, due to fraud (upon which Allstate can recover) and inflation due to Dr. Seigel's status as a specialist, the "specialist effect" (upon which Allstate may not).[8]

---

[8] At his deposition, Weisberg admitted that there is no basis to believe that this "specialist effect" had anything to do with fraud:

> Q. I take it you have no indication that any other specialist treating on cases that Siegel was not involved in were involved in any sort of fraud, do you?
> A. No indication.

"Where an expert conducts a regression analysis and fails to incorporate major independent variables, such analysis may be excluded as irrelevant." In re Wireless Telephone Services Antitrust Litigation, 2005 WL 2143335 at 3(SDNY Sept. 2, 2005) (granting summary judgment based, in part, on decision to preclude statistical model in case brought under Sherman Act where model failed to consider other possible causes of inflation of handset prices other than alleged anticompetitive activity); Hollander v. American Cyanamid Company, 172 F.3d 192, 203 (2nd Cir. 1999) (statistical model that suggested a 5% decrease in highly paid managers in a certain age group was not evidence that terminations did not occur in an age neutral manner; the inference of discrimination solely on the basis of the raw numbers is impermissible in the absence of any attempt to account of other cause of the trend in that age group); U.S. v. Galluzzo, 38 F.3d 872, 888 (2nd Cir. 1995) (reliance on a statistical model which failed to take into account important variables was clearly erroneous); Bickerstaff v. Vassar College, 196 F.3d 435 (2nd Cir. 1999).

The case for precluding Weisberg's analysis is better than that in any of the many cases considering and rejecting a plaintiff's statistical model. In most cases, the model is disregarded because it fails to consider and rule out important alternative explanations for its result. See, e.g., Bonton, 2004 WL at 4 (statistical model offered in support of plaintiff's *Monell* claim alleging discrimination was inadmissible since, though it showed that African-Americans were disproportionately affected by policy, it did not show that disparate effect was caused by discrimination, as opposed to other explanatory variables not considered). In those cases, the Court does not *know* the impact of the missing variable, but nonetheless finds the model invalid because it *might*,

---

Q. And you have no reason to believe that any of these other doctors resulted – withdraw that- any of the treatment by these other specialists in any way were improper or –
A. I have no evidence one way or the other. I have no reason to believe that.

[Ex. N ¶ 46].

14

if measured, explain the model's result by circumstances under which the plaintiff can not recover.

Here, by contrast, the regression model <u>includes and measures</u> the impact of an important explanatory variable (the "specialist effect"), and in fact <u>concludes</u> that it can completely explain, in a non-tortious manner, the reason Dr. Seigel's presence in a case might inflate its value. If Dr. Seigel's "fraud" actually inflated settlement payouts as Allstate claims, then one would expect that, comparing apples to apples, payouts in Seigel cases would be higher than in cases where another (non-fraud-committing) specialist treated the claimant. They were not. In fact the proper conclusion from Weisberg's analysis is that had a claimant gone to a neurologist (or other specialist) other than Dr. Seigel, the settlement amount would have been even <u>higher</u>. Thus the true "Seigel effect," (that amount attributable exclusively to his alleged improper conduct) appears to have actually saved Allstate money.[9]

The shortcomings of Dr. Weisberg's model are fatal to its probative value. It would be pure guesswork for a jury to make an award for "fraud" based on a report that does not measure fraud, and leaves open the firm possibility that any "inflationary impact" of Dr. Seigel's presence was due to factors other than fraud. Such speculation is impermissible. <u>Bonton</u>, 2004 WL at 3 (excluding statistical report that failed to account for significant explanatory variables, stating "[a]s a result, for a jury to determine solely on the basis of Zellner's report that a causal link exists between the observed disparity and an alleged policy of racial discrimination would require a logical leap that amounts to mere speculation.").

---

[9] It is not at all unlikely that the presence of Dr. Seigel, as opposed to another specialist, actually lowered the value of a file. The evidence presented shows that Allstate adjusters had significant skepticism regarding his reports and routinely discounted his bills, often by as much as 63% when evaluating a case. [Ex. A].

**B.    Allstate Can Offer Evidence of Fraud on Only a Small Portion of the 197 Claims Upon Which It Claims Damages. Only Those May Go to The Jury.**

Without the benefit of Dr. Weisberg's statistical model to prove fraud (which is the only evidence of the claimed "Seigel Effect") Allstate's damage claim is reduced to the aggregate of Dr. Seigel's bills which it paid or for which it became responsible, and which it can prove are fraudulent. There are very few.

As Allstate will bear the burden of proof at trial,[10] it must offer evidence of the fraudulent acts from which it claims damage. Liability under each theory requires, among other things, a material misrepresentation and reasonable reliance on that misrepresentation. Bank of China, New York Branch v. NBM LLC, 359 F.3d 171, 177 (2nd Cir. 2004) (civil liability under RICO for mail, wire or bank fraud requires a misrepresentation and reasonable reliance); Leonard v. Commissioner of Revenue Services, 264 Conn. 287, 296, 823 A.2d 1184, 1190 (2003) (to be liable for common law fraud a party must make a false representation and know the representation to be untrue); Caldor, Inc. v. Heslin, 215 Conn. 590, 577 A.2d 1009 (1990) (for CUTPA liability premised on a deceptive act or practice theory, there must be a material representation, omission or other practice likely to mislead, which is interpreted reasonably under the circumstances); Conn. Gen. Stat. § 53-442 (2005) (CHIFA liability requires a false, incomplete, deceptive or misleading statement submitted to an insurer with the intent to deceive).

Further, Allstate must show fraud on a claim by claim basis. In other words, before Allstate may recover damages related to any particular settled claim, it must offer specific evidence that Dr. Seigel's bill and/or report in that claim was fraudulent. This is true for two reasons. First, as discussed infra, the fact that Dr. Seigel

---

[10] It is worth noting that, at least as to its state law causes of action, Allstate must prove any alleged fraud by proof that is "clear and satisfactory or precise and unequivocal." Miller v. Guimaraes, 78 Conn. App. 760, 780, 829 A.2d 422, 435 (2003).

misrepresented Needle EMG bills as to some patients may not be used to establish a fraudulent act as to other patients, and certainly not dissimilar types of alleged fraud that do not involve Needle EMG testing.  Second, even a partial review of the claims upon which Allstate bases its damage calculation shows that, in most cases, Allstate did not rely on Dr. Seigel's reports, and indeed discounted his bills <u>substantially</u> when calculating its settlement figure.  Any attempt to quantify the impact of alleged fraud without parsing each claim would thus be pure speculation.[11]

Here, Allstate's evidence of fraud falls into two categories: 1) evidence of Needle EMG tests billed for but not performed on specific patients for which Allstate claims damage; and 2) non-specific admissions generally confirming a fraudulent scheme in which an undefined number of Needle EMG tests were billed for but not performed.  Neither is evidence of anything other than Needle EMG fraud, and neither establishes fraud in any particular claim, other than the 44 related to which Allstate has specific evidence.

### 1. Allstate Has Evidence To Create A Triable Issue of Needle EMG Fraud on 44 of its Claims

As noted, Allstate has an affidavit or deposition (or both) from 44 former Seigel patients whose claims it paid, purporting to show that Dr. Seigel billed for a Needle EMG test that he did not in fact perform.  As to these claims, defendants concede, for purposes of this Motion, that the existence or non-existence of Needle EMG fraud is a disputed material fact.  The patients are:  Gina Cassesse, Devin Cox, Audrey Davis, Deborah French, Elija Ganues, Lashon Heard, Walter Henry, Susan Leary, Gerald Majewski, Dorothy Mayo, Ruthann Perez, Michael Pesapane, Merrill Sherman, Lucy

---

[11] Even if Allstate could prove fraud in each of its claimed 197 cases of fraud, which it can not, it is highly unlikely that it could recover the full amount of Dr. Seigel's bills. As noted, a review of the claim files clearly shows that Allstate <u>routinely</u> discounted Dr. Seigel's bills, as well as his opinions. [Ex. A].

Avila, Marta Berniak, Alwrich Brown, Norman Collins, Barbara DeMayo, Josephy Duro, Cindy Gaviria, Yah Glaude, Thomas Hughes, Timoth Johnson, Natialia Dias, Suzana Kerluka, Louverta Knox, Robert Lynch, Christine Cote-Mahner, Christine McDonnel, Albert Messore, Janet Mezzatesta, Nancy Negron, Stephen Overby, Andre Ramirez, Diane Rankine, Daniel Ranno, Darren Roczynski, Theodora Tarquino, Edward Tomms, Chrlotte Carney, Audrey Davis-Panton, and Freeman Troche.  [Ex. G and Ex. A to Plaintiffs' Partial Motion for Summary Judgment, Docket No. 64].

As to all other specific claims, there exists no specific evidence of fraud, and no evidence upon which a fraudulent misrepresentation may be inferred.

> **2.    Dr. Seigel's Plea Agreement, Stipulation of Offense Conduct, and Discovery Responses Do Not Establish the Fraud Alleged As to any Particular Claim**

Allstate appears to maintain that liability for fraud on particular claims is established since Dr. Seigel, in his Plea Agreement, Stipulation of Offense Conduct, and discovery responses, has admitted to a scheme of fraudulent billing, and because at least some of this fraud was admittedly directed at Allstate.  The problem with that argument is that the "fraudulent scheme" that Allstate alleges is not the "fraudulent scheme" to which Dr. Seigel confessed.  While Dr. Seigel admitted to generating a "significant number" of false Needle EMG bills, there was no admission as to any other type of fraud.  Moreover, that "significant number" was spread between at least nineteen insurers, and many different patients.  It therefore provides no basis for determining the extent of Dr. Seigel's liability to Allstate.  It certainly does not establish the existence of fraud (even Needle EMG fraud) as to claims for which there is no specific admission.

For much the same reason, collateral *estoppel* does not preclude Dr. Seigel from disputing Allstate's claim.  Stichting Ter Behartiging v. Schreiber, 327 F.3d 173 n.2 (2nd Cir. 2003) (guilty plea can provide basis for collateral *estoppel*, "but only if . . .

the issues in both proceedings are identical"). As noted, the issues raised in Allstate's Complaint are vastly different than those raised in the Plea Agreement. Nor is he precluded from contesting the $62,772.15 Allstate received in restitution. <u>Appley v. West</u>, 832 F.2d 1021 (7th Cir. 1987) (plaintiff convicted of mail fraud and ordered to pay $975,000 to defendant in restitution was not estopped from contesting that amount in later civil case). Dr. Seigel did not participate in the determination of that figure and was given no opportunity to object.

### 3. Evidence of Fraud Related to Claims upon Which Allstate Does Have Evidence May Not Be Used To Prove Fraud On Claims it Does Not

Allstate may not offer evidence of admitted Needle EMG fraud for the inference that Needle EMG (or any other type of alleged fraud) occurred in the many claims for which there is no specific evidence. Since Dr. Seigel has admitted that only a small percentage of the total Needle EMG tests billed for were not, in fact, performed, [Ex. D] any inference that fraud occurred in particular case, without additional evidence, would be pure speculation.

Further, plaintiffs may not draw the inference based on <u>some</u> admitted acts of fraud, that other non-admitted acts of fraud in fact occurred. It is well-settled that "[t]he doing of one act is in itself no evidence that the same or a like act was again done by the same person." Wigmore, <u>Evidence</u>, § 192 p. 642 (3rd ed. 1940). "Therefore, the law forbids the attempt to prove conduct <u>even by the use of multiple episodes of other similar conduct</u>." Wright and Graham, <u>Federal Practice and Procedure</u>, vol. 22 p. 5239 (1978 & supp. 2005). "Where the proof of other acts is offered to show that the person engaged in the disputed conduct, the weak probative value of the evidence of other crimes, wrongs, or acts is swamped by the countervailing considerations of fairness and efficiency." <u>Id</u>. at 438.

Under the Federal Rules of Evidence, this common law rule is embodied in Rule 404(b),[12] which "permits introduction of other acts or crimes to prove things other than a defendant's propensity to commit a bad act, such as motive, opportunity, and intent." Schneider v. Revici, M.D., 817 F.2d 987, 992 (2ⁿᵈ Cir. 1987). In the Second Circuit, so long as "other act" evidence is not used to show propensity to commit an act, it is admissible. U.S. v. Edwards, 342 F.3d 168,176 (2ⁿᵈ Cir. 2003). Thus, in a fraud case, evidence of other misrepresentations are admissible if they are "similar in nature" and "of the same character", but such evidence is "competent <u>only</u> on the issue of scienter, motive, or intention . . . ." 37 Am. Jur.2d Fraud and Deceit § 484 (2005); United States v. Birrell, 447 F.2d 1168, 1172 (2ⁿᵈ Cir. 1971) ("Evidence of similar acts in fraud cases may be introduced where knowledge or intent is at issue to give rise to an inference of knowledge of intent . . . ."). Thus, while Allstate may offer evidence of other fraudulent acts as to issues like intent, motive, or knowledge, such evidence may not be considered to prove the <u>fact</u> of any particular misrepresentation.[13]

---

[12] Rule 404(b) reads, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible to other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident . . .

F.R.E., Rule 404(b) (2005).

[13] Wright and Graham offers the following explanation, which is worth quoting in full:

> It seems helpful in considering the purposes for which evidence may be offered under Rule 404(b) to consider the three distinct issues that may arise . . . First, proof of the other crimes may be offered to prove that the allegedly criminal act took place; this can be called the "corpus delicti" issue. Second, the disputed evidence may be tendered to show that the accused was the actor; this is the identity issue. Third, other crimes evidence may be introduced to show that the accused had the requisite mental state. Of course, evidence of another crime may be relevant on more than one of thee ultimate issues. Nevertheless, it is important to identify the appropriate ultimate issue and not to confuse the ultimate issue with some evidentiary issue.
>   Courts are most reluctant to admit evidence of other crimes when offered to prove the corpus delicti. Since, as Wigmore has stated, the doing of one act will never support a direct inference of the doing of another, the offeror must suggest some intermediate inference to make the evidence relevant. One way to do this is to argue that the proof of the prior crime shows that the defendant is the kind of person who does such acts and therefore must have

Even where, as alleged here, several fraudulent acts are committed in furtherance of common scheme, evidence as to one act may not be used to establish the fact of another. United States v. Brown, 327 F.3d 867 (9th Cir. 2003) (admission of "other" wrongful acts committed in furtherance of a scheme to inflate the price of wood chips "was proper only to prove intent," and was not admissible for the purpose of proving the fraudulent character of any other act, and thus prosecutor improperly said to the jury, "[I]f a man is willing to cheat a little bit over here, wouldn't he be willing to cheat just a little bit over here").

The Second Circuit's decision in United States v. Angelini, 660 F.2d 23, 40 (2nd Cir. 1981) is controlling on this point. There, several New York marshals were alleged to have conducted fraudulent auctions of executed property in a scheme to receive kickbacks from bidders who paid artificially low prices. The trial court admitted evidence of fraudulent auctions not charged in the indictment, and defendants appealed this admission as error. The Second Circuit held that evidence of the defendants' other fraudulent auctions was admissible to show scheme and conspiracy, but not to show that any of the specific auctions included in the charge were fraudulent. Id. at 39. It noted that consideration of the evidence for that purpose "would require an inference that the other act showed the defendant's propensity to perform acts of that type, and a further inference, from that propensity, that the defendant therefore performed the act charged." Id. at 40. "Such a chain of inferences, even if the person who performed the other acts is the person whose conduct is in issue, is logically so weak that the

---

done it again. This is, of course, the argument from propensity – the very inference that the general rule of exclusion of other crimes evidence is designed to prohibit. In the attempt to prove the corpus delicti by the use of other crimes it is very difficult to disguise the forbidden inference by casting it in some alternative form.

Wright & Graham, Federal Practice and Procedure, vol. 22 p. 5239 (1978 & supp. 2005).

relevance of the factual evidence will nearly always be outweighed by the probably prejudice resulting from its admission." Id.

4.    **There is no Triable Issue For Any Claim As to The Existence of Claimed Nerve Conduction Fraud, Pattern Diagnosis and Misleading Diagnosis Fraud**

**Fraud,**

Other than the 44 claims as to which Defendants concede a disputed issue of material fact, plaintiffs have no evidence that Dr. Seigel misrepresented Needle EMG testing as to any other patient for which it claims damages. Further, plaintiffs have no evidence of any misrepresentation as to its other three categories of alleged fraud (Nerve Conduction Fraud, Misleading Diagnoses Fraud, and Pattern Diagnosis Fraud) sufficient to support a jury's finding of fraud. There are two primary reasons. First, by their nature, the latter three categories allege not a material misrepresentation, but rather only that Dr. Seigel did not provide enough information in his report to justify payment. Second, they are supported only by information available to Allstate adjusters at the time they determined their settlement figures. Plaintiffs may not craft a fraud claim as to any particular patient where they can point to no new "facts and circumstances" related Dr. Seigel's billing that they did not know at the time of payment. See, e.g., 32 Speiser, Krause & Gans, The American Law of Torts § 32:52 p. 310 (1992) ("There can be no fraud when there is full knowledge on the part of both parties of all the facts and circumstances surrounding the transaction."); Richardson Greenshields Securities, Inc. v. Lau, 819 F. Supp. 1246, 1266 (SDNY 1993) (plaintiff could not draw inference of fraud from defendant's presence on floor of Commodities Exchange, even if improper, since they were "at all times . . . aware of [defendant's] presence on the floor" and "never protested any trades made by [defendant] on their accounts.").

**Nerve Conduction Fraud**:    Nerve Conduction Testing "involves placing a surface recorder on the skin over the muscle and using a surface stimulator to stimulate

22

the nerve that supplies the subject muscle. Then, brief electrical shocks are delivered to determine the speed at which a patient's nerves are conducting electrical current." [Ex.    K ¶ 39]. Allstate claims that "a required component of a completed nerve conduction study" is the recording of amplitude measurements showing the tests results. [Complaint ¶ 395-397]. Its "fraud" claim is base solely on the fact that, in certain cases, Dr. Seigel did not include amplitude measurements in his findings. [Id.]. Its expert, Dr. Neil Busis concludes that the tests were "incomplete in light of [Dr. Seigel's] failure to obtain and record amplitude information." [Ex. K ¶ 45].

That test results included "incomplete" information, however, does not alone support the inference of fraud. Dr. Busis does not (and indeed could not) conclude based on the lack of amplitude data that any particular test was not carried out. For a jury to do so would be pure speculation. Further, Dr. Seigel denies ever billing for nerve conduction studies that were not performed. [Id. at ¶ 8]. When conducting nerve conduction studies, it was his practice to record amplitude measurements only when findings were positive. Since amplitude is irrelevant to a clinically insignificant finding, those measurements were not recorded in every case. This practice is common among medical professionals and entirely appropriate. [Id. at ¶ 10].

Critically, assuming Allstate relied on an NCT bill in calculating its settlement figure, in each case it paid with full knowledge that amplitude measurements were not included. As noted, fraud may not be inferred where plaintiffs' knowledge of the transaction in question is exactly the same now as when the transaction occurred.

**Misleading diagnosis Fraud and Pattern Diagnosis Fraud:**

Finally, Allstate alleges "fraud" in over a hundred claims where, according to Dr. Busis, 1) Dr. Seigel's electrodiagnostic test data is allegedly inconsistent with his conclusions, [Misleading Diagnosis Fraud, Complaint pp. 80-82], and 2) Dr. Seigel's medical record does not include sufficient test data to support his conclusions, [Pattern

Diagnosis Fraud, Complaint p. 82]. Again, however, to the extent Dr. Seigel's report as to a particular patient contains inconsistencies, it contained the same inconsistencies between 1996 and 2000 when Allstate paid these claims. To the extent that a report contains insufficient findings to support his medical conclusions, it contained the same insufficiencies between 1996 and 2000 when Allstate paid these claims.[14] Allstate has no information about these claims now that it did not have at the time it calculated their payment figure.[15]

### IV. Ellen Seigel Is Entitled to Summary Judgment on All Counts As There Is No Evidence of Her Involvement in Any Fraudulent Acts

Finally, notwithstanding its claim as to defendants Arthur Seigel and Seigel, P.C., there is no evidence establishing fraud on the part of Ellen Seigel. Accordingly, she is entitled to summary judgment in her favor.

The attached affidavits show that until very shortly before Dr. Seigel's guilty plea, Ellen Seigel was completely unaware that that he had billed for but not performed Needle EMG tests. [Ex. M ¶3]. Mrs. Seigel, as office manager, was never in the examination or treatment rooms when Dr. Seigel conducted electrophysiological testing and, until shortly before his guilty plea, Dr. Seigel never told her he had billed for but not performed certain Needle EMG tests. [Ex. L ¶¶ 3, 5]. She did not learn of that until the fall of 2001. [Id. ¶ 5].

In describing Mrs. Seigel's conduct, Allstate alleges only that following Dr. Seigel's plea, she continued to collect bills on behalf of his practice. [Complaint p. 55]. Allstate has no information one way or the other as to whether these bills were fraudulent, or whether Mrs. Seigel had knowledge of the same. Further, on any

---

[14] It would be unconscionable if the fact of fraud could be inferred in every case where one doctor disputes the conclusions of another.

[15] Allstate, of course, would like the Court or jury to consider evidence of admitted Needle EMG fraud and conclude that reports submitted in these cases must also be fraudulent. This, however, is precisely the propensity inference the law forbids.

occasion where the patient, or counsel on his or her behalf, indicated the test had not been done, she waived payment for that test. [Ex. M ¶ 6]. Finally, all collection activity came only after insurers, including Allstate, were fully aware of what Dr. Seigel had done. At that time, no claim could possibly be made that anything defendant Ellen Seigel did harmed or damaged plaintiffs.

Allstate has accordingly has not alleged, and can prove no, misrepresentation or participation in any misrepresentation on her part.

## V.    Conclusion

For the foregoing reasons, the Court should grant summary judgment to defendants on all but the specified claims, and to defendant Ellen Seigel on all counts.

> THE DEFENDANTS
> ARTHUR M. SEIGEL, M.D.; ARTHUR M.
> SEIGEL, P.C.; ELLEN SEIGEL
>
> By_____
>     Ira B. Grudberg
>     David L. Belt
>     Joshua D. Lanning (ct24529)
>     JACOBS, GRUDBERG, BELT, DOW & KATZ, P.C.
>     350 Orange Street
>     New Haven, Connecticut 06503
>     Telephone No. (203) 772-3100
>     Facsimile No. (203) 772-1691
>     email: jlanning@jacobslaw.com

## CERTIFICATION

I hereby certify that the foregoing has been served by placing a copy thereof in the United States mail, first class postage prepaid, this 30th day of September, 2005, addressed to:

Joel Rottner, Esq.
Skelley Rottner, P.C.
P.O. Box 340890
Hartford, CT 06134-0890

David O. Brink, Esq.
Richard D. King, Jr., Esq.
Nathan A. Tilden, Esq.
Smith & Brink, P.C.
122 Quincy Shore Drive, 2nd Floor
Quincy, MA  02171

_____
Ira B. Grudberg