UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

C. A. NO. 303 CV 0577 MRK

|  |  |
|---|---|
| **ALLSTATE INSURANCE COMPANY and** ) | |
| **ALLSTATE INDEMNITY COMPANY** ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ARTHUR M. SEIGEL, M.D.,** ) | |
| **ARTHUR M. SEIGEL, M.D., P.C.,** ) | |
| **and ELLEN SEIGEL,** ) | |
| **Defendants.** ) | |
| ───────────────────────── ) | **November 10, 2005** |

PLAINTIFFS' MEMORANDUM OF FACT AND LAW IN SUPPORT OF
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.    **INTRODUCTION**

Now come plaintiffs, Allstate Insurance Company and Allstate Indemnity Company,

(hereinafter collectively referred to as "Allstate") and submit the within Memorandum of Fact

and Law in Opposition to Defendants' Motion for Summary Judgment.

The defendants seek partial summary judgment on a portion of the individual patient

claims that comprise Allstate's Amended Complaint. The defendants' motion is premised upon

two theories announced on page 1 of their Memorandum:

1.)    Allstate's statistical model is not probative on the issue of fraud;

2.)    Plaintiffs have evidence to establish a triable issue of fact on only 44 of
       their claims.

Defendants' Memorandum at 1.

The defendants' arguments are fatally flawed, irrelevant, or both. It is clear that

defendants fail to appreciate the nature of Allstate's case at this late stage in the litigation.

**Plaintiffs Request**
**Oral Argument**

Contrary to defendants' erroneous assertion at page 1 of their Rule 56 Memorandum, Allstate does not seek to prove fraud by resort to statistical evidence. Allstate will prove defendants' fraudulent conduct (i.e., the creation and submission of false medical documentation to Allstate with the intent to obtain money to which they were not entitled) by way of documentary evidence, lay witness testimony and expert medical testimony. Allstate will then introduce its statistical evidence to assist the trier of fact in its calculation of a portion of the damages to which Allstate is entitled as a result of Dr. Seigel's fraudulent involvement in third-party claims.

## II.    **RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

This case is brought pursuant to Title 18 U.S.C. §1962, Racketeer Influenced and Corrupt Organizations Act; Conn. Gen. Stat. § 42-110b, Connecticut Unfair Trade Practices Act ("CUPTA"), Conn. Gen. Stat. § 53-442, Connecticut Health Insurance Fraud Act, and common law fraud. By its Complaint, Allstate alleges that the defendants, Arthur M. Seigel, M.D. (hereinafter "Dr. Seigel") and Arthur M. Seigel, M.D., P.C. (hereinafter "Seigel, P.C."; or collectively "fraud defendants") defrauded Allstate through a pattern of racketeering activity. Allstate also alleges that Ellen Seigel violated CUPTA resulting in injury to Allstate.

Specifically, the gravamen of Allstate's Complaint is that Dr. Seigel and Seigel, P.C. defrauded Allstate by creating and submitting false medical documentation through the U.S. Mail in support of motor vehicle insurance claims. Plaintiffs' Exhibit 12 ¶ 21, 35-58. Allstate claims that Seigel caused it to pay for medical services that were (1) not warranted, (2) not performed, and/or (3) not performed correctly/completely in connection with rendering bogus medical diagnoses. Plaintiffs' Exhibit 12 ¶ 31-32, 45-48, 51-52, 54-57, 61. Allstate was also caused to pay third-party claims that were artificially inflated as a direct result of Dr. Seigel's fraudulent medical-billing practices. Plaintiffs' Exhibits 14 at 8-10; 15 at 3-4.

Following detection of his fraudulent billing practices, Dr. Seigel was charged with one count of mail fraud in violation of 18 U.S.C. §1341. Defendants' Exhibit B. Dr. Seigel confessed and agreed to a plea bargain. Id. Pursuant to his guilty plea, Dr. Seigel acknowledged that he knowingly and with intent to defraud, submitted bills to insurance companies for Needle EMG procedures that were never performed. Id. Dr. Seigel's admitted objective was to cause insurers to pay him money to which he was not entitled. Id.

Importantly, as part of the signed plea agreement and stipulation of offense conduct, Dr. Seigel confessed that the "fraud loss" resulting from his criminal conduct was $450,000.00, representing a "reasonable approximation of the value of the monies" Seigel knowingly and willfully obtained by fraud as a result of billing for Needle EMG tests not rendered. Id.; Plaintiffs' Exhibit 1 at 318-321. While defendants have made every attempt to minimize Dr. Seigel's acknowledged criminal conduct (for instance, throughout defendants' Rule 56 Memorandum the admitted criminal conduct is repeatedly characterized as "a very small percentage" of all tests billed), Dr. Seigel conceded during his deposition on April 25, 2005, that (1) he has no way of actually calculating the number of "improper billings", (2) his plea agreement fraud loss amount of $450,000.00 represents a "reasonable approximation" of the fraud related to Needle EMG testing, and (3) the actual percentage of false billings is greater than 40% of all Needle EMG tests billed during 1996-2000. Plaintiffs' Exhibit 1 at 318-321.

During Dr. Seigel's sentencing hearing, the government's expert medical witness, Dr.

Busis (Allstate's medical expert), testified in relevant part, as follows:[1]

1.) A legitimate Needle EMG test requires approximately 15-20 minutes per limb/testing area and that, on average a combination Needle EMG and nerve conduction study (hereinafter "NCS") typically requires 30-60 minutes of doctor-patient interaction to complete. Plaintiffs' Exhibit 7 at 45.

2.) There is little correlation between Needle EMG test, imaging studies, a patient's medical history, physical complaint(s) and findings. Id. at 45-48;

3.) NCS testing is not predictive of the results of a properly performed Needle EMG test and are "virtually useless for diagnosing cervical or lumbar disk and nerve root". Id.;

4.) Dr. Seigel billed improperly in connection with NCS testing by failing to measure and record amplitude. Id. at 35, 57, 59, 83-85;

5.) Dr. Seigel improperly billed in connection with lower extremity Needle EMG testing. Id. at 57.

---

[1] Despite their attempt to obscure the facts and procedural history, defendants have been on notice of Allstate's medical expert, Dr. Neil Amdur Busis, from the commencement of this case. Contrary to the incorrect information provided in footnote 3 at page 5 of defendants' Rule 56 Memorandum, Allstate disclosed its medical and statistical experts by overnight delivery service on April 29, 2005, in accordance with FRCP 26(2), and the Scheduling Order issued by this Court dated May 19, 2004. A copy of the April 29, 2005, cover letter, accompanying shipping label and proof of delivery are filed herewith at Plaintiffs' Exhibit 18. Defense counsel's purported ignorance of Allstate's medical expert is incredible in light of the documented travel of the case to date. Dr. Busis was the medical expert hired by the United States Attorney in connection with the criminal prosecution of Dr. Seigel. Plaintiffs' Exhibit 7. Dr. Seigel's counsel in the case at bar, Ira Grudberg, also was counsel of record in Seigel's criminal case. Id. Dr. Busis testified (and was subject to cross examination by Attorney Grudberg) at Dr. Seigel's sentencing hearing on May 21, 2002. Id. Dr. Busis was thereafter retained by Allstate. Dr. Busis was the affiant in support of Allstate's Motions for Pre-Judgment Remedy filed at the commencement of the case at bar in April 2003. Plaintiffs' Exhibit 2. Dr. Busis was formally disclosed through his Rule 26 expert report signed under the pains and penalties of perjury and served on defendants consistent with the requirements set forth in this Court's Scheduling Order. Plaintiffs' Exhibit 3. Moreover, during the hearing on Allstate's Motion for Partial Summary Judgment, on May 19, 2005, Seigel's counsel acknowledged Dr. Busis as Allstate's expert. Defendants' Exhibit F at 10.

6.)     Dr. Seigel's video performance for the FBI of NCS testing and Needle EMG
testing (wherein Ellen Seigel posed as the patient) revealed further that Dr. Seigel
was not performing the NCS testing correctly.  Id. at 58-60, 83;

7.)     The six (6) patient files reviewed by Dr. Busis in advance of Dr. Seigel's
sentencing (i.e., those patients prepared to testify on behalf of the government)
contained inappropriate medical billing,    Id. at 61; and

8.)     Dr. Seigel's medical reports regarding "electrophysiological" testing were
misleading.  Id. at 55-56, 71-72, 75-78.

In addition to the expert medical testimony presented at Dr. Seigel's sentencing hearing,
the United States also presented testimony from several former Seigel, P.C., patients who
testified and/or were prepared to testify that Dr. Seigel did not administer Needle EMG tests
despite Dr. Seigel creating and submitting medical bills demanding payment for such testing.
Exhibit 7 at 86-133.  Of particular interest for purposes of Dr. Seigel's criminal sentencing
hearing was the fact that the sentencing-hearing witnesses were patients of Dr. Seigel *following*
execution of the government's search warrant (and public announcement of its investigation of
Dr. Seigel) in August of 2000.[2]  Plaintiffs' Exhibits 1 at 467; 7 at 89, 111, 123, 132-133.
Similarly, in its Complaint, Allstate highlights ten (10) patients who sought testing/treatment
from Dr. Seigel after August of 2000, and in connection with whom Dr. Seigel billed for but did
not perform Needle EMG testing.  These witnesses executed affidavits previously filed with the
Court in connection with Allstate's Motion for Partial Summary Judgment [Docket No. 64]
and/or provided deposition testimony in connection with the case at bar.  Plaintiffs' Exhibits 16;
17 at 9-10, 12, 27, 35, 48-50, 69-70, 86-88, 103, 116, 128-129.

---

[2]  Dr. Seigel continues to insist that he ceased his Needle EMG fraud after learning of the FBI investigation.
Clearly, Dr. Seigel's credibility is a material issue of fact.  Plaintiffs' Exhibit 1 at 467.

During Dr. Seigel's sentencing hearing, the government detailed its undercover investigation of Dr. Seigel's billing practices. Plaintiffs' Exhibit 24 at 24-27. In relevant part, the government provided that undercover FBI agents posed as automobile accident victims seeking neurological testing from Dr. Seigel. Id. The results of the FBI's undercover investigation revealed that Dr. Seigel billed improperly in connection with testing that was not performed. Id. The government's version of offense conduct was acknowledged and admitted by Dr. Seigel. Id.

## III.    STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56 (c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning

whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

An issue is "genuine...if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law. " Id.

## IV.    **FRAUD THEORIES**

As defendants recognize and discuss briefly in their Memorandum, Allstate's claims are premised upon several fraud theories, each of which is supported in the record by sufficient Rule 56 material to withstand defendants' Motion for Summary Judgment:

### A.    **Needle EMG Fraud**

As discussed at length above, Dr. Seigel's criminal conviction arose out of the FBI's investigation of his billing practices. The charge against him related to false medical billing for Needle EMG testing that was not performed. Defendants' Exhibit B. Allstate's evidence in support of its claim of Needle EMG fraud includes (1) Dr. Seigel's admissions, (Plaintiffs' Exhibit 1 at 320-321, 324-325, 329, 333, 338, 345-347, 431-434, 467, 583, 607, 673, 676; 5 at No. 17-20, 22, 24-25, 28, 32, 34-35, 38, 41-44, 56), (2) testimony of former Seigel patients for whom Allstate was responsible for payment of medical expenses and/or tort claims (Plaintiffs' Exhibits 16-17), (3) testimony of Allstate's medical expert, Dr. Busis, (Plaintiffs' Exhibit 2 ¶¶ 15-18, 25-26, 38, 45-46; 3 at 5-8; 7 at 35, 45-48, 55-61, 71-72, 75-78, 83-85), (4) testimony of former Seigel, P.C. employees (Plaintiffs' Exhibit 19 at 30-33, 37, 41-42, 44, 73; 20 at 54-56; 21 at 40, 41, 79; 22 at 36, 49), and (5) documentary evidence including Seigel, P.C. medical documentation.

**B.**    **Nerve Conduction Study Fraud**

Allstate alleges that the fraud defendants created and submitted false medical

documentation for NCS testing that was never performed or performed incompletely in a manner

insufficient to warrant payment for such testing.[3]  Support for Allstate's NCS fraud claim will be

introduced through the testimony of Dr. Busis.  Plaintiffs' Exhibits 2 ¶¶ 15-18, 25-26, 38, 45-46;

3 at 5-8; 7 at 35, 57, 59, 83-85.  On page 7 of their Rule 56 Memorandum, defendants challenge

Allstate's claim of NCS fraud with the following non-evidentiary, self-serving assertion:

> When conducting nerve conduction studies, it was [Dr. Seigel's]
> practice to record amplitude measurements only when findings
> were positive.  Since amplitude is irrelevant to a clinically
> insignificant finding, those measurements were not recorded in
> every case.  This practice is common among medical professionals
> and entirely appropriate.

Critically, however, Dr. Busis, a primary drafter of the neurology CPT Codes, has opined that the

recording and reporting of amplitude is a required (not irrelevant) component of a completed

NCS test.  Plaintiffs' Exhibits 2 ¶¶ 15, 36-37, 45-46; 3 at 5-8; 7 at 35.  Clearly, a factual dispute

sufficient to defeat summary judgment exists regarding Allstate's NCS Fraud claim.

**C.**    **Misleading Diagnosis Fraud**

Allstate alleges that defendants created and submitted false medical documentation

containing misleading diagnoses and other false and deceptive medical conclusions regarding

patients for whom Allstate was responsible for payment of medical expenses in the first-party

and third-party context. Allstate's claim is supported by (1) Dr. Busis's testimony at Dr. Seigel's

sentencing hearing (Plaintiffs' Exhibit 7 at 55-56, 71-72, 75-78), (2)  Dr. Busis's affidavit

(Plaintiffs' Exhibit 2 ¶¶ 16-17, 26, 46) and, (3) Dr. Busis's expert report (Plaintiffs' Exhibit 3 at

---

[3]    The defendants do not have any expert witnesses to testify on their behalf in this case.

5-8). Further support for Allstate's Misleading Diagnosis Fraud claim is supplied by Dr. Seigel's admissions that he billed falsely by his own calculation in approximately 40+% of all Needle EMG bills issued between 1996-2000. Plaintiffs' Exhibit 1 at 318-321.

On page 7 of their Rule 56 Memorandum, defendants claim:

> Dr. Seigel further denies ever artificially inflating a patient's medical injuries in a report, or otherwise writing reports that were misleading or intentionally inaccurate.

Incredibly, Dr. Seigel denies writing reports that were misleading or intentionally inaccurate, despite his admission of billing insurance companies (by his arguably conservative estimate, thousands of times) for Needle EMG tests he never performed. Plaintiffs' Exhibits 1 at 320-321, 324-325, 329, 333, 338, 345-347. 431-434, 467, 583, 607, 673, 676; 2 at ¶¶ 15-18, 25-26, 38, 45-46; 3 at 5-8; 4 at No. 1-3; 5 at No. 17-20, 22, 24-25, 28, 32, 34-35, 38, 41-44, 56; 6 at No. 4-6, 8, 12; 7 at 35, 45-48, 55-61, 71-72, 75-78, 83-85. Taking such an outrageous, indefensible position undermines confidence in Dr. Seigel's veracity with respect to (1) statements in sworn written discovery; (2) his deposition testimony; and (3) statements advanced in his affidavits. Indeed, Dr. Seigel admitted that he lied to his patients and referring physicians by creating false medical documentation:

> Q:    When you generated false medical documentation in connection with a patient, let's say patient Smith, and you created a false invoice, you, in a sense, lied to the patient; would you agree with that?
>
> A:    Yes.
>
> Q:    And the same thing holds true for the record, the narrative record, and the electrophysiology report, if you generated one?
>
> A:    Yes.

Q:    Ok. And the same holds true for the referring physician who had referred that patient to you, you lied to the referring physician, correct?

A:    Well, let me think about that.

(pause in the proceedings)

A:    Yes.

* * *

Q:    Did you ever notify any of the referring physicians, any of them, that you had billed falsely?

A:    No.

Q:    So you lied to the referring physicians?

A:    Yes.

Q:    And obviously, in connection with the false medical documentation, you lied to the insurance carriers, correct?

A:    I'll answer your question and then I'm going to take a short break. Yes. I'm going to go to the bathroom.

Plaintiff's Exhibit 1 at 345-347.

It is beyond debate that Dr. Seigel created and submitted false medical documentation in connection with Allstate claimants. Clearly a reasonable inference can be drawn in favor of Allstate at this procedural posture, that medical records based, at least in part, on testing that was never performed renders such records "misleading, and that to the extent that Allstate paid in reliance upon such misleading medical records, those damages would be compensable under Allstate's RICO and state law claims against Dr. Seigel and Seigel P.C.

**D.    Pattern Diagnosis Fraud**

The portion of Allstate's Complaint designated "pattern diagnosis fraud" simply constitutes Allstate's good-faith attempt to put defendants on notice of the entire universe of

claims and damages sought by Allstate in this action. The "pattern" is not simply that nearly

every Seigel patient reportedly sustained similar injuries and received nearly identical treatment.

Rather, Allstate's claim arises from the fact that the medical records created and advanced in

connection with the so-called "Pattern Diagnosis" fraud patients are identical to the recipe of

testing and treatment that the "Misleading Diagnosis" fraud patients allegedly received. The

only difference between the two groups of claimants is that the "pattern diagnosis" medical

records maintained by Dr. Seigel and produced in discovery were missing data and thus were

insufficient for Allstate's medical expert to conclude with certainty that the diagnoses /medical

conclusions were misleading and deceptive. Allstate will argue to the jury that consideration of

the totality of the evidence warrants an inference that defendants adhered to their documented

pattern and practice of creating false medical documentation with the intent to be paid for

incomplete or nonexistent medical treatment. The probative strength or weight to be accorded

such evidence will properly be exclusively within the province of the jury.

### E.    CPT Upcoding Fraud

Allstate alleges that Dr. Seigel and Seigel P.C., committed CPT Upcoding fraud by

creating and submitting false medical documentation containing CPT codes that were wholly

fictitious and/or unwarranted in light of the testing/treatment actually rendered. Plaintiffs'

Exhibit 2 ¶ 46; 3 at 5-8. Allstate supports these allegations with evidence from Dr. Busis, as well

as the testimony of former Seigel P.C. employees (Plaintiffs' Exhibit 19 at 37, 41-42; 21 at 40-

41, 51-62, 80) that Seigel typically spent less than fifteen minutes with each patient and that most

every automobile accident patient received a virtually identical recipe of treatment consisting of

(1) an excessive CPT-code evaluation (i.e., a CPT code designating a high complexity of injury

and/or comprehensive exam exceeding the complexity of the actual injury and/or the time spent

with the patient by Dr. Seigel), (2) NCS testing and (3) Needle EMG testing. [4] Plaintiffs'
Exhibits 2 ¶¶ 24-26; 3 at 5-8; 12 ¶ 12. Moreover, the medical documentation defendants
advanced in connection with nearly every automobile accident patient identified in Allstate's
Complaint was nearly identical, underscoring the fact that Dr. Seigel exercised no independent
medical decision making, further corroborating Allstate's CPT upcoding fraud theory.

## V.    ARGUMENT

### A.    CONTRARY TO THE COURT'S PRIOR ADMONISHMENT, DEFENDANTS SEEK TO IMPERMISSIBLY OBTAIN JUDGMENT ON INDIVIDUAL PATIENT CLAIMS (NOT COUNTS)

*If I get a [motion for summary judgment] from you arguing that ...*
*on the basis of documents, I am supposed to decide that nobody*
*had the intent to defraud and nobody as a matter of law defrauded*
*somebody else, I'm really not going to be happy and I will,*
*actually, entertain, if its over the top, I'm going to really entertain*
*motions for sanctions for the abuse of the motion...*

Honorable Mark R. Kravitz, May 19, 2005, hearing on Allstate's Motion for Partial Summary
Judgment, transcript at 40 annexed as Exhibit F to defendants' Motion for Summary Judgment
(hereinafter "defendants' Exhibit F").

The defendants seek partial summary judgment with respect to patients in connection
with whom defendants insist there is no evidence of fraud. As an initial matter, as discussed at
length above (and throughout the balance of this memorandum) the record reflects sufficient
admissible evidence creating disputed issues of material fact regarding each of Allstate's fraud
theories to survive summary judgment.

The defendants accurately recite Second Circuit precedent for the proposition that a claim
need not be co-extensive with a count or a cause of action in a complaint. However, defendants

---

[4] The testimony of Dr. Seigel's former employees is, of course, corroborated by the documented experiences of (1)
Dr. Seigel's former patients (Plaintiffs' Exhibits 16-17) and (2) the FBI undercover agent reports (Plaintiffs' Exhibit
24 at 24-27).

seek to do precisely what this Court indicated was not appropriate in this case. Specifically,

during the May 19, 2005, hearing on Allstate's Motion for Partial Summary Judgment, in

response to Allstate's request to enter judgment for liability purposes with respect to a portion of

the claims that comprise one or more Counts of the Complaint, this Court observed:

> THE COURT: Then you are not entitled to summary judgment.
> It's not a partial summary judgment at all. It's like picking a
> paragraph out of a complaint and saying, well, Judge, they've
> admitted this paragraph so can you give me judgment on that one
> piece of my claim?
>
> I looked through your complaint, and you've just admitted it, you
> are seeking to pin liability on them for a whole variety of things,
> each one of your counts – your counts are not limited to
> individual things so I could even say, judgment against Mr. Seigel
> on Count One. I couldn't do that.
>
> The best I could do would be to say: Judgment against Mr. Seigel, Dr.
> Seigel, on that piece of Count One that incorporates the allegations
> regarding 25 Needle EMGs.
>
> There's no authorization to do things like that in the Federal Rules,
> as far as I can see.

Defendants' Exhibit B at 16-17.

Later during the hearing, the Court ruled as follows:

> THE COURT: Even if plaintiffs had established that there were
> no disputed issues of material fact as to the claims that they claim
> they're entitled to summary judgment for, the Court would still be
> inclined to deny summary judgment in this case based on both the
> complexity issues and the overlap between the damages issues
> and the liability and causation issues.
>
> The denial of summary judgment is addressed to the discretion of
> the Court. Even numerous courts have recognized, including
> Anderson against Liberty Lobby, 477 U.S. 242, 1986, even if
> technical requirements of Rule 56 are met, the Court need not
> grant summary judgment if the Court concludes that the better
> course would be to proceed to a full trial.

That is what the Court believes the better course is to do, subject
to whatever stipulations there may be from the parties and subject
to whatever. The result I might reach based on the dispositive
motions I'm going to get from the defendants.

Id. at 35-36.

Accordingly, whereas (1) Allstate has presented ample Rule 56 material on each issue of

fraud, and (2) there exists genuine issues of material fact regarding defendants' liability for a

portion of the individual patient claims comprising the Counts in the Complaint, entry of

summary judgment in this case in favor of the defendants must fail.

**B.      ALLSTATE'S STATISICIAL EVIDENCE IS ADMISSIBLE TO PROVE
         DAMAGES IN THE THIRD-PARTY CLAIM PAYMENT CONTEXT**

In support of its Motion for Summary Judgment, defendants seek to preclude admission

of Allstate's statistical evidence arguing that it "confirms that any inflationary effect of Dr.

Seigel's involvement was due to causes other than fraud."[5]  Defendants' Memorandum at 10.

Demonstrating their failure to appreciate the purpose behind, and application of, the

statistical evidence in this case, defendants' argue that Dr. Weisberg's model is invalid because

(1) it "does not measure fraud, and in fact provides no basis to calculate the percentage of a

claim pay out due to fraud as opposed to other factors", and (2) the "model itself confirms that

any inflationary effect due to Dr. Seigel's involvement were likely caused by his status as a

neurology specialist rather than fraud." Defendants' Memorandum at 10.  Even if defendants'

position was accurate (or relevant) it merely highlights the fact that there are disputed issues of

material fact anent damages, warranting denial of defendants' Motion for Summary Judgment.

---

[5] Defendants' argument in the context of this summary judgment motion appears rather to be an argument under
Daubert to preclude expert testimony.   Inasmuch as this Court's Scheduling Order mandated that all such motions
be filed by July 30, 2005, defendants' motion is time barred.  Notwithstanding this procedural defect, defendants
have failed to advance any competent rebuttal evidence whatsoever to Allstate's statistical evidence.  What's more,
defendants are precluded from retaining any such experts or advancing any rebuttal expert analysis due to their
failure to designate experts in accordance with this Court's Scheduling Order.  Defendants' Exhibit B at 8-15.

The defendants completely misconstrue the purpose of Allstate's statistical evidence concerning the effect defendants' involvement in third-party claims had on Allstate's claim-valuation process. Allstate will prove its case in two prongs. Allstate will first demonstrate by a preponderance of the evidence that Dr. Siegel and Seigel., P.C. committed fraud. See Section IV supra at 7-11. Allstate's fraud claims will be supported by evidence supplied by Allstate's medical expert, Dr. Seigel's former patients, Dr. Seigel's former employees, and Dr. Seigel himself. Id. Once defendants' fraud liability is established, Allstate will prove its damages, including those monies attributable to the artificial inflation (beyond simply the cost of the false medical bills) of third-party payments. Plaintiffs' Exhibit 14 at 8-10; 15 at 3-4. It is only for this limited purpose that Allstate will introduce statistical evidence to assist the trier of fact.

### 1. Applicable Law

Rule 702, Fed. R. Evid., provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

The Federal Rules of Civil Procedure and the Federal Rules of Evidence grant district judges broad authority to shape the nature and scope of admissible evidence for trial. "Scientific evidence – such as the sampling in statistical extrapolations – is well suited to mass tort actions. It is particularly appropriate in massive consumer fraud cases – so long as it passes the gate – keeping criteria described in the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) and related cases." In re: Simon II Litigation, 2002 U.S. Dist. LEXIS 25632, *160-161 (E.D.N.Y. Oct. 22, 2002); see also Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris , Inc., 133 F. Supp. 2d 162,168 (E.D.N.Y. 2001) (recognizing

that statistical sampling is available in federal courts as a procedural matter). In <u>Daubert</u>, the United States Supreme Court concluded that Rule 702 imposes a special obligation upon a trail judge to ensure that expert testimony admitted pursuant to the Rule be not only relevant, but reliable. 509 U.S. at 589. Importantly, there is no requirement that expert testimony be admitted only to support proof of the "ultimate" issue in the case as defendants' argument intends to suggest. The Supreme Court's ruling in <u>Daubert</u> allows statistical methods of proof pursuant to Rule 702 of the Federal Rules of Evidence so long as the statistical methods employed are reliable and comply with recognized standards for admissible and probative evidence permitting a fair adjudication. See <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152-154 (1999).

## 2. Allstate's Statistical Evidence is Competent and Admissible Under Rule 702, Fed. R. Evid., and <u>Daubert</u>

The entire premise upon which defendants challenge Allstate's statistical evidence is flawed - - that such evidence must fail because the statistics do not prove fraud. While conceding that its statistical evidence is not designed to prove fraud (nor advanced for that purpose), Allstate respectfully submits that the correct analysis to be applied under <u>Daubert</u> and its progeny is simply whether the evidence is relevant and reliable. On the first issue, Allstate's statistical evidence is relevant to the jury's determination of the extent to which Dr. Seigel caused Allstate injury in the third-party claim context (if and when Allstate proves fraud in connection with specific claims).

With respect to <u>Daubert's</u> "reliability" prong, statistical evidence including multiple regression analysis, as employed by Allstate's expert statisticians in this case, has been routinely admitted by federal courts as reliable to assist the trier of fact in understanding complex calculations and factual relationships. See, <u>e.g.</u>, <u>Castaneda v. Partida</u>, 430 U.S. 482 (1977) (using statistical data to prove discrimination in jury selection); <u>Hilao v. Estate of Marcos</u>, 103

16

F.3d 767 (9th Cir. 1996); Ageloff v. Delta Airlines, Inc., 860 F.2d 379 (11th Cir. 1988) (using

evidence of life-expectancy tables to determine damages); G.M. Brod & Co., v. U.S. Home

Corp., 759 F.2d 1526, 1538-40 (11th Cir. 1985) (using expert testimony for profit projections

based on industry norms); Capaci v. Katz & Besthoff, Inc., 711 F.2d 647, 653-57 (5th Cir. 1983)

(using census data in gender discrimination case); Exxon Corp. v. Texas Motor Exch., Inc., 628

F.2d 500 (5th Cir. 1980) (using statistical sampling in trademark infringement suit); Stewart v.

General Motors Corp., 542 F.2d 445 (7th Cir. 1976); United States v. 449 Cases Containing

Tomato Paste, 212 F.2d 567 (2d Cir. 1954) (approving inspector's testing of samples, rather than

requiring the opening of all cases); In re: Estate of Marcos Human Rights Litigation, 910 F.

Supp. 1460 (D. Haw. 1995) (using sampling to determine compensatory damages through

extrapolating "exposure" element of liability).  Zippo Manufacturing Co. v. Roger Imports, Inc.,

216 F. Supp. 670 (S.D.N.Y. 1963) (relying on sampling methodology).

 In some cases sampling techniques may prove the only practicable way to collect and

present relevant data.  See In re: Chevron U.S.A., Inc., 109 F.3d 1016, 1019-20 (5th Cir. 1997)

(admitting statistics to draw inferences about the claims of 3,000 plaintiffs and intervenors who

claimed wrongful death, personal injury, and property contamination from defendant's storage of

hazardous substances that had leaked from crude oil waste pits and migrated into the plaintiffs'

drinking water supply);  Harolds Stores, Inc. v. Dillard Dep't Stores, 82 F.3d 1533, 1544 (10th

Cir. 1996); Federal Judicial Center, Manual for Complex Litigation, § 21.493 (3d ed. 2000); see

e.g., Michael O. Finkelstein & Bruce Levin, Statistics for Lawyers vii (2d Ed. 2001) (citing wide

expansion of statistics used in trials over past decades).

 Statistical sampling and multiple regression analysis have been relied upon by the courts

in this Circuit.  See In re: Simon II Litigation, 2002 U.S. Dist. LEXIS 25632 (E.D.N.Y. Oct. 22,

2002); Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 133 F. Supp. 2d 162 (E.D.N.Y. 2001); see also Lavin-McEleney v. Marist College, 239 F.3d 476, 482 (2d Cir. 2001) (in discrimination case, holding that it "is undisputed that multiple regression analysis ... is a scientifically valid statistical technique");

Federal Courts have sanctioned introduction of multiple regression analysis evidence to determine the correct measure of damages. See, e.g., In re: Industrial Silicone Antitrust Litigation, 1998 U.S. Dist. LEXIS 20464 (W.D. Pa. Oct. 13, 1998). A multiple regression analysis need not include every conceivable independent variable to establish a party's case, so long as the analysis includes those independent variables and accounts for those major factors likely to influence decisions. See Bazemore v. Friday, 478 U.S. 385, 400 (1986). Moreover, a party challenging the admissibility of a multiple regression analysis must show that the factors it contends ought to have been included would weaken the results of the analysis. See Palmer v. Shultz, 815 F.2d 84, 101 (D.C. Cir. 1987). Importantly, a party cannot successfully challenge the admissibility of a regression analysis by simply pointing to a laundry list of possible independent variables that were not included in the study. Rather, the party must introduce *evidence* to support its contention that the failure to include those variables would change the outcome of the analysis. Id.

Employing multiple regression analysis, the statistical conclusions rendered by Allstate's experts are based upon consideration of all factors statistically relevant *to Allstate* in evaluating third-party bodily-injury claims during the relevant period. Plaintiffs' Exhibit 13 ¶¶ 11-17; 14 at 8-10; 15 at 3-4. Allstate's statistical analysis measured the degree to which Dr. Seigel's involvement in a claim artificially inflated the payment made by Allstate. Plaintiffs' Exhibit 14 at 8-10; 15 at 3-4. Presumably, defendants may be able to point to isolated claims (taken out of

context from the 800+ claims (Seigel and non-Seigel) sampled by Allstate) and argue that statistically meaningless circumstances influenced settlement valuations in discreet cases. However, Allstate's multiple regression analysis defines the relevant importance of those variables which systemically effected *Allstate's* claim evaluations across hundreds of files. Id.; 13 ¶¶ 11-17. Thus, with a confidence level of ninety-five (95%) percent, one can conclude that Dr. Seigel's involvement in the claims pled in Allstate's Complaint, on average, increased the amount Allstate paid by a factor of 25.3% if no other specialist was involved, and 22.8% if there was another specialist. Id.

       As defendants well know, Allstate's statistical analysis is supported not only by Dr. Weisberg, but also by Christopher Erath, Ph.D. Id. As indicated above, Allstate's statistical evidence is advanced to aid the jury in its calculation of the appropriate measures of damages to be awarded once fraud is proven. Accordingly, as the entire premise of defendants' arguments to preclude this evidence is based on faulty assumptions and conclusions—i.e., that Allstate's statistical model is designed to detect or "prove" fraud—defendants' motion is meritless and need not be entertained by this Court. In an abundance of caution, Allstate notes that the case law upon which the defendants rely is dispositively distinguishable.

### 3. Defendants' Cited Legal Authorities Are Distinguishable in Material, Dispositive Ways from the Instant Case

       The defendants recite caselaw to establish the uncontroverted proposition that multiple regression analysis is regularly admitted in the federal courts as an aid to assist the trier of fact. The defendants also correctly refer to cases in which federal courts have rejected multiple regression evidence upon a finding that the analysis conducted in a given case is incomplete and thus inadmissible as not probative of the issue necessary to assist the finder of fact. The fatal flaw in defendants' argument is brought into bold relief at page 11 of their Memorandum

wherein the following pronouncement is made: "Weisberg's statistical analysis is not probative of the issue on which it is offered: the quantum of fraud upon which Allstate may recover." As should be plain from the papers filed in this case, Allstate's statistical analysis is <u>not</u> offered to prove fraud. To the contrary, the statistical analysis is advanced simply to assist the trier of fact to objectively quantify the correct measure of damages to which Allstate is entitled in connection with those third-party claims in which Dr. Seigel committed fraud. Because defendants' premise is wrong, the purported legal analysis which follows (Defendants' Memorandum at 11-15) is wholly irrelevant to the issue this Court must decide.

Furthermore, Allstate's statistical analysis is utterly distinguishable from the cases cherry-picked by defendants in which the statistical analysis was deemed inadmissible because the statistical model failed to consider or account for alternative explanatory variables. <u>See, e.g.,</u> <u>Smith v. Xerox Corp.</u>, 196 F.3d 358, 371 (2d Cir. 1999) (explaining that regression analysis is statistical test that identifies factors that might influence the outcome of an observed phenomenon, called a dependent variable. The statistician identifies legitimate factors that could have influenced the dependent variable. In this manner, the influence of each independent variable can be statistically isolated); <u>Bonton v. City of New York</u>, 2004 U.S. Dist. LEXIS 22105 (S.D.N.Y. Nov. 3, 2004).

In the case at bar, the only Rule 56 compliant material in the record are the sworn affidavits and expert reports of Allstate's statistical experts. These Rule 56 materials demonstrate that Allstate's statistical model is competent and accounts for all statistically meaningful variables impacting Allstate's valuations of third-party claims. Plaintiffs' Exhibits 13 ¶¶ 11-17; 14 at 8-10; 15 at 3-4.

In light of the overwhelming acceptance of multiple regression analysis as a tool to assist triers of fact, the dispositive issue is not whether Allstate's experts' statistical evidence is the type which is admissible, but rather, may Allstate employ such analysis to assist the jury in quantifying damages in this case. To this proposition, there has been no objection advanced. Moreover, the record evidence clearly reflects that Allstate's statisticians considered all material, measurable variables, and included only those that are statistically meaningful in their ultimate model. Id.; compare Bickerstaff v. Vassar College, 196 F.3d 435, 448-450 (2d Cir. 1999) (observing that while failure to include some minor variables may affect the probative value of a statistical model, where the analysis fails to account for major variables and is incomplete, the statistical analysis becomes inadmissible as irrelevant and unreliable).

In the case at bar, in light of the fact that (1) Allstate's statistical experts accounted for all statistically significant variables, and (2) defendants have not advanced any expert statistical material or articulated any legally competent rebuttal to Allstate's statistical methodology, defendants' argument fails and their Motion for Summary Judgment must be denied. Moreover, it is respectfully requested that this Court preclude defendants' from filing any additional papers or moving to exclude expert testimony from Doctors Busis, Erath and Weisberg.

### C.  ALLSTATE'S CLAIMS ARE SUPPORTED BY AMPLE ADMISSIBLE EVIDENCE CREATING DISPUTED ISSUES OF FACT RESPECTING THOSE PORTIONS OF ALLSTATE'S FRAUD THEORIES ABOUT WHICH DEFENDANTS HAVE YET TO CONFESS

As discussed at length in Sections I and IV above, Allstate has advanced sufficient evidence to present its claims to a jury. Despite defendants' asseverations to the contrary, Allstate will present testimonial and documentary evidence in support of each fraud theory advanced. In connection with Needle EMG, NCS, misleading diagnosis, CPT upcoding, and

pattern diagnosis fraud theories, Allstate will offer evidence including, but not necessarily limited to:

- testimonial evidence from its expert medical witness (Neil Busis, M.D.) (Plaintiffs' Exhibits 2-3);

- testimony of former Seigel, P.C. employees (Plaintiffs' Exhibits 19 at 30-34, 37, 41-42, 44, 73; 20 at 36, 49, 62; 21 at 40-41, 51-62, 79-80; 22 at 54-56);

- testimony of former Seigel, P.C. patients (Plaintiffs' Exhibits 16-17);

- testimony from defendants, Dr. Seigel and Ellen Seigel (Plaintiffs' Exhibits 1, 9);

- documentary evidence (primarily in the form of Seigel, P.C. medical records and invoices) providing the manner in which defendants' fraudulent scheme was executed.

In summary, at a minimum, Allstate will present evidence at trial as follows:

- **NCS Fraud:** (1) Seigel, P.C. medical documentation demanding payment for NCS testing, (2) testimony from Allstate's expert medical witness that the tests were not performed completely (Plaintiffs' Exhibit 2 ¶¶ 15-18, 25-26, 45-46; 3 at 5-8), and (3) Dr. Seigel's admission that he did not record amplitude in connection with NCS testing as required under CPT protocols. (Defendants' Rule 56 Memorandum at 22-23).

  The defendants' argument (at page 23 of Defendants' Rule 56 Memorandum) that Allstate relied on Dr. Seigel's medical bills "with full knowledge" of their falsity is ridiculous. Allstate was presented with invoices referencing CPT Codes and unit prices for each test allegedly rendered. Consistent with the typical relationship between liability/medical insurers and medical providers, Allstate did

not receive or consider all notes and other supporting data supporting Dr. Seigel's medical invoices. In this manner, Dr. Seigel was better able to conceal his fraudulent scheme by virtue of the position of trust medical providers are routinely accorded in the transaction of insurance-based medical claims. See, e.g., United States v. Hoogenboom, 209 F.3d 665-671 (7th Cir. 2000) (recognizing that medical "providers occupy positions of trust with respect to private or public insurers. . . [and] enjoy significant discretion and. . . lack of supervision in determining the type and quality of services that are necessary and apparent for their patients. This forces [insurers]. . . .to depend on a presumption that of honesty when dealing with statements received from medical professionals"); see also United States v. Liss, 265 F.3d 1220 (11th Cir. 2001) (upholding abuse of trust enhancement when a physician receives kickbacks for patient referrals); United States v. Rutgard, 116 F.3d 1270, 1293 (9th Cir. 1997) (upholding abuse of trust enhancement for ophthalmologist who made false entries in his medical records).

- **Misleading Diagnosis Fraud:** (1) evidence of Seigel, P.C., medical documentation containing misleading and deceptive medical conclusions and diagnoses based (in whole or in part) on testing that was not completed (NCS testing) and/or testing that was not rendered at all (Needle EMG/NCS testing), (2) evidence of its expert medical witness regarding the requirements of properly performed electrodiagnostic EMG and NCS (Plaintiffs' Exhibits 2 ¶¶ 15-18, 25-26, 38, 45-46; 3 at 5-8; 7 at 35, 45-48, 55-61, 71-72, 75-78, 83-85), and (3) evidence from former Seigel, P.C. patients (Plaintiffs' Exhibits 16-17) and

employees (Plaintiffs' Exhibits 19 at 41-42; 20 at 62; 21 at 51-62, 80) regarding the treatment/testing administered/received.

- **CPT Upcoding:** (1) documentary evidence including Seigel, P.C., medical documentation that purport to document (and demand payment for) certain electrodiagnostic testing in accordance with referenced CPT codes, (2) documentary evidence including American Medical Association publications regarding CPT Coding including; American Medical Association, Current Procedural Terminology, CPT (for the years 1996-2001) and Principles of CPT Coding, and (3) testimonial evidence by its expert medical witness (Plaintiffs' Exhibit 2 ¶ 46; 3 at 5-8), former Seigel, P.C. patients (Plaintiffs' Exhibits 16-17) and employees (Plaintiffs' Exhibits 19 at 41-42; 20 at 62; 21 at 51-62, 80) regarding the testing administered/ received.

- **Pattern Diagnosis Fraud:** Same as misleading diagnosis above.

## D.   DR. SEIGEL'S CRIMINAL ADMISSIONS ARE ADMISSIBLE TO ESTABLISH HIS FRAUDULENT INTENT, KNOWLEDGE, MOTIVE AND PLAN TO MAINTAIN AND EXECUTE THE MEDICAL BILLING SCHEME OUTLINED IN ALLSTATE'S COMPLAINT

At page 18 of their Rule 56 Memorandum, defendants weakly contest the admissibility of Dr. Seigel's overwhelming admissions made in connection with his felony conviction (regarding his intent to defraud insurers through the creation of false medical bills) to prove fraud in any specific instance. While acknowledging generally the correctness of defendants' truncated legal analysis, Allstate respectfully submits that controlling legal authority supports admission of such evidence to establish Dr. Seigel's knowledge and intent to create, maintain and execute the fraud scheme. See United States v. Birrell, 447 F.2d 1168, 1172 (2d Cir. 1971)

(explaining that "evidence of similar acts in fraud cases may be introduced where knowledge or intent is at issue, to give rise to an inference of knowledge or intent, or where the actual making of the representations is at issue, to establish the existence of a larger continuing plan or design").

The defendants' concern regarding introduction of "bad acts" evidence calls for an evidentiary ruling. Allstate respectfully submits that such a ruling is premature at this procedural posture of the case. Nevertheless, applicable evidentiary rules and procedures permit introduction of the evidence defendants wish to ignore.

Federal Rule of Evidence 401 provides that, "relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Clearly, the challenged evidence in this case (Dr. Seigel's admitted criminal conduct in orchestrating thousands of false medical bills to obtain monies to which he was not entitled) is relevant to Allstate's claims as a whole as having a tendency to make the existence of material facts more probable than would be without such evidence.

Rule 404(b), Fed. R. Evid., provides as follows:

> Other crimes, wrongs, or acts, evidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The next step in the analysis is to determine whether such evidence is prohibited by Rule 404(b), which prohibits a party from introducing evidence of prior bad acts to "prove the character of a person in order to show action and conformity therewith." Id. However, a party may introduce such evidence "for other purposes such as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident". Id. The Second

Circuit follows the "exclusionary rule allowing the admission of such purpose other than to show

defendants' . . . propensity as long as the evidence is relevant and satisfies the probative-

prejudice balancing test of Rule 403." United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994).

Rule 403, Fed. R. Evid. allows a trial court to exclude relevant evidence "if its probative value is

substantially outweighed by the danger of unfair prejudice." Id.

However, the "undue prejudice" that Rule 403 is designed to address "involves some

adverse effect . . . beyond tending to prove the fact or issue that justified its addition into

evidence." United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995). Moreover, to the extent

that there is a risk of misinterpretation by the jury of this highly relevant and probative evidence,

a limiting instruction would be the appropriate remedy. See, e.g., United States Football League

v. NFL, 842 F.2d 1335 (2d Cir. 1988).

Moreover, Rule 609, Fed. R. Evid., calls for impeachment of any witness by evidence of

conviction of a crime that involved dishonesty or false statement, regardless of the punishment.

Id.

Finally, to the extent that evidence of Dr. Seigel's related acts falls within the parameters

of the second sentence of Rule 404(b), it is admissible to show continuance of a plan.

Specifically in this case, Allstate will introduce of evidence of Dr. Seigel's criminal plea and the

admissions made in furtherance thereof, to demonstrate for Dr. Seigel's knowledge, intent, and

plan to orchestrate the medical billing fraud scheme. Indeed it is Allstate's contention

(supported by its medical expert (Plaintiffs' Exhibits 2-3)) that the Needle EMG fraud in

connection with which Seigel admitted guilt, was part and parcel of his "scheme to defraud

insurance carriers."

E.    **THE RECORD IS REPLETE WITH ADMISSIBLE EVIDENCE CREATING A GENUINE ISSUE OF MATERIAL FACT THAT DEFENDANTS ENGAGED IN NERVE CONDUCTION FRAUD, PATTERN DIAGNOSIS FRAUD, MISLEADING DIAGNOSIS FRAUD AND CPT UPCODING FRAUD**

Contrary to defendants' unsupported argument at page 22 of their Rule 56 Memorandum, as detailed above in Sections IV and VC, the record reflects ample admissible evidence to support Allstate's fraud claims about which there are genuine issues of material fact barring disposition in favor of defendants. Accordingly, summary judgment on these issues must be denied.

F.    **THERE ARE GENUINE ISSUES OF MATERIAL FACT CONCERNING ELLEN SEIGEL'S VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**

In their ultimate argument at page 24 of their Rule 56 Memorandum, defendants insist that "there is no evidence establishing fraud on the part of Ellen Seigel." Allstate has not alleged fraud against Ellen Seigel. By its Complaint, Allstate alleged that Ellen Seigel's conduct violated the Connecticut Unfair Trade Practices Act ("CUTPA") by virtue of her intentional collection activities concerning medical invoices she knew or had reason to suspect contained false charges. Under CUTPA, a plaintiff may recover all damages upon a showing that defendant engaged in "unfair methods of competition and unfair deceptive acts of practices in the conduct of any trade or commerce." Factors considered in determining whether an action or practice is unfair include (1) whether the practice (without necessary having been considered unlawful) offends public policy, (2) whether the conduct is immoral, unethical, oppressive or unscrupulous, and (3) whether it causes substantial injury to consumers." See White v. O'Rourke, 1990 Conn. Super. LEXIS 783, *5 (July 18, 1999).

Ellen Seigel was present at Seigel, P.C. offices when federal law enforcement agents executed its search warrant and seized all Seigel, P.C. records in August 2000. Plaintiffs'

Exhibit 9 at 32-33, 71-73. Notwithstanding this firsthand knowledge of the government's investigation of her husband's billing practices, Ellen Seigel continued her efforts to collect Seigel, P.C. invoices containing charges for Needle EMG and NCS testing. Further, on July 17, 2002, Ellen Seigel testified that she was aware that some of the bills for which she was then currently seeking payment may contain false billing for nonexistent testing. Plaintiffs' Exhibit 8 at 63-68, 73-74, 82, 127-130. Nevertheless, Mrs. Seigel reiterated her intent to continue collection efforts despite the acknowledged risk that the bills may be false, and that she would take no action to determine the legitimacy of the bills upon which she sought collections of Seigel, P.C. invoices. Id.

The defendants' contention that Ellen Seigel's collection activities (in violation of CUPTA) occurred after Allstate was "fully aware of what Dr. Seigel had done" is false and misrepresents the record. Allstate is still in the processes of uncovering the extent of its injury sustained as a result of Dr. Seigel's fraudulent conduct. At the time of his guilty plea, the only matter that could have been conclusively deduced was that Dr. Seigel had billed falsely in connection with approximately 40+% of 7,000 Needle EMG test patients. Defendants' Exhibits B-C; Plaintiffs' Exhibit 1 at 318-321. The issues of NCS, Misleading Diagnosis, CPT Upcoding and Pattern Diagnosis Fraud subsequently detected by Allstate and alleged in the case at bar, were not even discovered (much less documented) until the investigation of such matters began following Dr. Seigel's sentencing in 2002, and continuing thereafter. Notwithstanding defendants' mischaracterization of the relevant chronology, Allstate's arguable notice of a portion of Dr. Seigel's fraud should not act as a windfall to relieve Ellen Seigel of legal responsibility for her wrongful conduct that clearly falls within the ambit of wrongful conduct CUTPA is designed to remedy.

For all the foregoing reasons, defendants' Motion for Summary Judgment must be denied.

## VI.    CONCLUSION

For all the foregoing reasons, Allstate respectfully requests that this Court enter an Order DENYING defendants' Motion for Summary Judgment.

Respectfully Submitted
Allstate Insurance Company and
Allstate Indemnity Company
By their Attorneys,


_____
David O. Brink, Federal Bar No. CT23989
Richard D. King, Jr., Federal Bar No. CT23997
Nathan A. Tilden, Federal Bar No. CT24011
Smith & Brink, P.C.
122 Quincy Shore Drive
Quincy, MA  02171
Tel.    (617) 770-2214


Dated: November 10,  2005