UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

C. A. NO. 303 CV 0577 MRK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY and ALLSTATE INDEMNITY COMPANY<br>Plaintiffs,<br><br>v.<br><br>ARTHUR M. SEIGEL, M.D.,<br>ARTHUR M. SEIGEL, M.D., P.C.<br>and ELLEN SEIGEL,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) DECEMBER 5, 2005 |

## DEFENDANTS' REPLY-BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants in the above-captioned matter respectfully offer the following Reply-Brief in response to Plaintiffs Memorandum in Opposition to Defendants' Motion for Summary Judgment. As confirmed several times in their Opposition Memorandum, Plaintiffs' litigation strategy impermissibly attempts to "group" the hundreds of fraudulent acts alleged in the Complaint.[1] Plaintiffs' strategy is to ask the jury to conclude that, because Allstate can prove <u>some</u> acts of fraud (i.e. certain Needle EMG tests billed for but not performed), the jury may conclude that "liability" exists for <u>all</u> fraudulent acts alleged and move immediately to "damages", notwithstanding a lack of

---

[1] Allstate describes its strategy as follows:

> "Allstate will prove its case in two prongs. Allstate will first demonstrate by a preponderance of the evidence that Dr. Seigel and Seigel, P.C. committed fraud . . . Allstate's <u>fraud</u> claims will be supported by evidence supplied by Allstate's medical expert, Dr. Seigel's former patients, Dr. Seigel's former employees, and Dr. Seigel himself . . . Once defendants' fraud liability is established, Allstate will prove its damages, including those monies attributable to the artificial inflation (beyond simply the cost of false medical bills) of third party payments . . . It is only for this limited purpose that Allstate will introduce statistical evidence to assist the trier of fact."

[Pl. Mem. p. 15].

evidence as to **particular acts alleged**. In doing so, Allstate suffers the same misconception that led to its failed Partial Motion for Summary Judgment. In order to recover "damages" on 197 alleged fraudulent acts, it must first establish "liability" by offering evidence that 197 fraudulent acts occurred. On the record it has developed, it cannot.

Accordingly, defendants' primary position is as follows: 1) Dr. Weisberg's analysis does not establish any quantum of fraud (a point Allstate concedes) and he affirmatively found that statistically Dr. Seigel's presence in a case caused a <u>reduction</u> in average claim payouts compared to claims where another neurologist or other specialist treated the claimant (a point Allstate <u>completely</u> fails to address).[2] Thus, a jury may not infer any quantum of fraud from Weisberg's analysis, nor may it infer "damage due to fraud" since the model neither measures "damage due to fraud", nor does it show that Dr. Seigel's involvement in a case caused an inflationary effect over what another specialist's presence would have caused; and 2) Unable to quantify fraud through its statistical model, Allstate must prove its allegations on a claim by claim basis. It has specific proof of fraud only as to a small few.

A.  **This Court May Parse The Amended Complaint's "Counts" Into Separable "Claims" For Purposes of Considering Claim Sufficiency Under Rule 56(d)**

Plaintiffs argue first that defendants' Motion impermissibly requests the Court to parse the "counts" of the Complaint into separable claims. [Pl. Mem. p. 12]. Plaintiffs concede that in the Second Circuit, a "claim" for purposes of Rule 56 need not be co-extensive with a "count," and that under the law of this Circuit, summary judgment may be had on portions of counts where those counts include multiple claims. Citing selective

---

[2] If Allstate is correct in its assertion that its "damage" claim is measured by the results of Weisberg's regression model, it would seem that Summary Judgment is appropriate as to the entire Complaint for failure to prove damage due to any alleged fraud. <u>Rizzo Pool Co. v. Del Grosso</u>, 232 Conn. 666, 683 (1995) (holding that a plaintiff cannot assert an action for fraud unless he can establish that he has been damaged or injured). As more fully explained at pages 9 to 15 of Defendant's opening Memoraundum, and as Allstate fails to refute in its Opposition, Weisberg's model affirmatively concludes that compared to other specialists, Dr. Seigel had a <u>deflationary</u> impact on claims.

2

portions of the May 19, 2005 argument transcript, however, plaintiffs maintain that parsing counts in this case violates this Courts ruling denying Plaintiffs' Motion for Summary Judgment.

Plaintiffs ignore the critical difference between this Motion and their own. Plaintiffs' Motion for Partial Summary Judgment [Docket No. 92] asked the Court to hold that "liability" had been established as to the entirety of each of its claims by submitting evidence of a few select acts of Needle EMG fraud. This argument failed because, as the Court stated: "What you really want to do is have me direct [the defendants] that they're deemed liable on that complaint that encompasses the universe just on the basis of one little planet." [Ex. F p. 20]. The Court held that such a ruling was not permitted by the Federal Rules, nor would it save time since at trial plaintiffs would still have to prove the acts of fraud from which it claimed damages.

The present Motion suffers from neither defect. The Court is certainly permitted to parse counts into separable claims for the purpose of evaluating their merit under a Rule 56 Motion. [See discussion at pp. 8-9 of Defendants' opening Memorandum]. Plaintiffs are apparently in agreement with this proposition. [Pl. Mem. p. 12]. Any other rule would enable plaintiffs to shield allegations for which they have no evidence by grouping them into a count with allegations for which there is evidence sufficient to create a material issue of fact, as plaintiffs have done here. Further, it would prevent the Court from streamlining litigation by needlessly bootstrapping unmeritorious claims into a trial with claims for which there is actual evidence. Such a rigid definition of "claim" would undermine the purposes of summary judgment. See, e.g., Matsushita Elec. Energy Corp., Ltd. v. Zenith Radio Corp., 475 U.S. 574, (1986) (purpose of summary judgment is to pierce the pleadings to assess the proof in order to see whether there is a genuine need for trial).

### B. Dr. Weisberg's Analysis Has No Probative Value In Determining the Impact of Alleged Fraud On Settlements And Should Be Precluded Under Rule 401

Plaintiffs' attempt to salvage Dr. Weisberg's conclusions with five pages of analysis under Rule 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), extolling the virtues of multiple regression in large tort actions.[3] Defendants, however, take no issue with multiple regression as a methodology and have raised no Daubert challenge. Rather, defendants argue, under Rule 401,[4] that plaintiffs may not use Dr. Weisberg's analysis to prove their damage claim because 1) Dr. Weisberg's analysis is not a measure of Allstate settlement payments <u>caused by fraud</u> (the only basis upon which plaintiffs may recover), but simply a measurement of the impact of his <u>involvement</u> in Allstate cases (due to fraud or otherwise); and 2) Dr. Weisberg's conclusion is that the net effect of Dr. Seigel's involvement was actually to <u>lower</u> the payout when compared to analogous claims with other treating specialists.

In response to the first argument, plaintiffs latch on to a single sentence from defendants' brief to the effect that Weisberg's statistical model is not probative on the issue of fraud. Plaintiff' then argue that Weisberg's model is not intended to prove "fraud" but rather "damages" so defendants' challenge should fail in its entirety. [Pl. Mem. p. 20]. The problem with that argument, as fully discussed in defendants' opening Memorandum [pp. 11-12], is that under each of its causes of action, Allstate may only

---

[3] To bolster Weisberg's testimony, Allstate also submitted an expert report by Dr. Crhistopher Erath, which at best concludes that Dr. Weisberg used the correct form of regression analysis and, if anything, is a conservative estimate of the impact Dr. Seigel had on Allstate tort claims. [Pl. Ex. 15]. It does not provide a specific damages estimate. [Id.]. Dr. Erath, however, similarly concedes the point that Dr. Weisberg's analysis shows that Dr. Seigel had a lower impact on tort settlements compared to other specialists and further concedes that the analysis makes no assumption that the difference in settlements attributable to Seigel was due to any fraud. [Erath depo p. 35].

[4] A large body of caselaw supports the preclusion of expert statistical analysis under Rule 401 without resort to a Daubert challenge. It is well-settled that "[t]here may be some regressions so incomplete as to be inadmissible as irrelevant." Bazemore v. Friday, 478 U.S. 385, 400 (1986). In the following cases, the Court considered and rejected a plaintiff's expert statistical analysis when considering a defendant's Motion for Summary Judgment, the procedural posture this Court presently faces. Smth v. Xerox Corp., 196 F.3d 358 (2nd Cir. 1999); Hollander v. American Cyanamid Company, 172 F.3d 192 (2nd Cir. 1999); Bickerstaff v. Vassar College, 196 F.3d 435 (2nd Cir. 1999); In re Wireless Telephone Services Antitrust Litigation, 2005 WL 2143335 (SDNY Sept. 2, 2005).

4

recover for claim inflation <u>specifically attributable to fraud</u>. Weisberg's model however, does not purport to be a measure of that quantum. Instead, it claims to measure only the effect of Dr. Seigel's "involvement" in a particular case (due to fraud or otherwise). Inflation (if it existed) due to Seigel's "involvement" could have been the result of a host of non-fraud factors, including his strength as a testifying expert or his status as a specialist. In fact Weisberg specifically disclaims any attempt to correlate the measured effect of Dr. Seigel's involvement with the fraud he is alleged to have committed. [Ex. O pp. 44-45].[5] Any determination that the so-called "Seigel Effect" is a "Seigel Fraud Effect" would therefore be pure speculation. <u>See, e.g., Bickerstaff v. Vassar College</u>, 196 F.3d 435 (2nd Cir. 1999) (where a regression model fails to control for important variables which might provide a non-tortious explanation for the measurement, it is inadmissible as irrelevant; noting that in evaluating a regression model the Court "must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture").[6]

Not only is Weisberg's model <u>not probative</u> on the issue for which it is offered (the quantum of damage <u>caused by fraud</u>), the model affirmatively concludes that the entire "effect" of Dr. Seigel's involvement is explained by his status as a specialist. In his original affidavit, Dr. Weisberg concluded that the appropriate reduction in an actual

---

[5] Plaintiffs assert in several places that Dr. Weisberg's regression analysis measures the "artificial inflation" caused by Dr. Seigel. [Pl. Mem. p. 18]. "Artificial" is Allstate's word not Dr. Weisberg's. [Pl. Ex. 14 at 8-10].

[6] Allstate asserts in several places that "Allstate's statisticians considered all material, measurable, variables . . . ." [Pl. Mem. p. 21]. This, however, is a reference to the experts' effort to isolate <u>Dr. Seigel's</u> effect on Allstate claims, as distinct from the effect of <u>non-Seigel</u> factors such as representation by counsel, magnitude of injuries, etc . . . . The relevance problem with Allstate's model, however, is not that it fails to isolate Dr. Seigel as having a measurable impact on claims, but rather that it fails to show that the particular impact Dr. Seigel had was in any way fraud-related. Since Allstate has no way of equating the Seigel-effect with the quantum of claim inflation specifically caused by fraud (as opposed to, for example, his status as a specialist, which clearly had a significant effect in magnifying claim value) any attempt by a jury to do so would be pure speculation. It is not, therefore, a relevant or admissible measure of Allstate's damages.

5

settlement that would be expected in Seigel's absence was 24% whereas that attributable to other specialists was 28%.[7] Plaintiffs apparently concede this point as they make no attempt at a response in their opposition. It is inconceivable that plaintiffs may ask a jury to assume that the entire "Seigel effect" is recoverable as a payout due to fraud when any neurologist (or other specialist) would have had the same or higher impact on a settlement. Under Weisberg's analysis, any causal link between the so-called Seigel Effect and fraud would require "a logical leap that amounts to mere speculation" in the face of a model that, if anything, shows Dr. Seigel tended to lower the value of a claim. See, e.g., Bonton v. City of New York, 2004 WL 2453603 (S.D.N.Y. Nov. 3, 2004).

### C. Allstate Has Evidence Sufficient To Create Disputed Issues of Material Fact as to Only 44 Needle EMG Claims

The irrelevance of Dr. Weisberg's analysis under Rule 401 has two significant effects on Allstate's claim for fraud-related damages: 1) Allstate has no mechanism to group its damage claim and must therefore prove each on a claim by claim basis; and 2) even on a claim by claim basis, Allstate has no mechanism to measure the value of a settlement in the absence of fraud. Its assertion of Misleading Diagnosis Fraud and Pattern Diagnosis Fraud, which assume the inflation of an underlying claim's settlement value, are therefore unduly speculative. [See discussion infra]. Allstate's claim is thus reduced to a claim for specific medical bills for which it issued payment and which it can now prove were fraudulent (the Needle EMG Fraud and Nerve Conduction Fraud claims). Of these, it can prove a mere few.

#### 1. Needle EMG Fraud

There is no question that Allstate can prove that Dr. Seigel billed for a number of Needle EMG's which were not performed. The problem for Allstate, however, is that having made a claim that hundreds of specific tests were billed-for but not performed, it

---

[7] Plaintiffs criticize defendants for failing to offer a statistics expert of their own to rebut Dr. Weisberg's analysis. Had defendants hired a statistician, they could only have hoped for results similar to those contained in Dr. Weisberg's report.

6

has evidence as to the fraudulent nature of only 44 of <u>those</u> tests. As noted in defendants' opening Memorandum, Allstate has obtained affidavit or deposition testimony as to 44 former Seigel patients whose bills Allstate claims to have paid. As to those, defendants concede an issue of material fact as to whether Needle EMG fraud occurred. Allstate, however, has no way of meeting its burden to prove any other specific Needle EMG claim.

Allstate misleadingly argues that Dr. Seigel "admitted" that over 40 percent of Needle EMG tests he billed for between 1996 and 2001 were not performed. [Pl. Mem. p. 3]. This statement is absolutely untrue. In his Plea Agreement and Stipulation of Offense Conduct, Dr. Seigel agreed that $450,000 represented a "reasonable approximation" of his fraudulent Needle EMG billing (related to all insurers). And in response to plaintiffs' counsel's questions, Dr. Seigel did admit that $450,000, the amount he paid in criminal restitution, <u>as a matter of math</u>, would constitute more than 40% of his Needle EMG billing for the period between 1996 and 2000.[8] From that, using simple math, plaintiffs conclude that Dr. Seigel "the actual percentage of false billings is greater than 40% of all Needle EMG tests billed between 1996 and 2000." [Pl. Mem. p. 3].

That problem with plaintiffs' inference is that $450,000 was never represented to be a "reasonable approximation" of Fraudulent Needle EMG billing <u>for the period between 1996 and 2000</u>. For purposes of sentencing, the Court was not limited to the relevant Statute of Limitations period but could include a restitution amount representing all fraudulent Needle EMG billing in the "same course of conduct" dating back to 1991

---

[8] Plaintiffs' counsel arrives at its 40% figure in the following manner using information from Dr. Seigel's Stipulation of Offense Conduct. [Def. Ex. B]. First plaintiff assumes 7000 Needle EMG tests performed between December 1996 and August of 2000. Each Needle EMG test is assumed to have generated $140 in revenue. Then, assuming $980,000 in total Needle EMG billing for that time period ($140 x 7000), plaintiffs conclude that because $450,000 is more than 40% of $980,000, Dr. Seigel falsely billed for more than 40% of Needle EMG tests performed between 1996 and 2000. As noted, however, the problem with Plaintiffs' equation is that the $450,000 figure represented fraud loss dating much further back than 1996, and therefore cannot be used to conclude a percentage of false tests via simple math.

7

when he started his own practice. [See Section 1B1.3(a)(2) of the United States Sentencing Guidelines, then in effect]; see also U.S. v. Cousineau, 929 F.2d 64, 68 (2nd Cir. 1991) ("[I]n Guidelines cases involving charges of conspiracy during periods spanning many months, we have in no way indicated any doctrinal limitation as to the period during which the 'same course of conduct' may have occurred."). Accordingly, the $450,000 figure representing a "reasonable approximation" of fraud loss can not be used as a basis for determining the likely number of fraudulent tests performed in the stated time period.[9]

Further, without the benefit of patient testimony, Allstate has no way of proving that Dr. Seigel failed to perform Needle EMG tests in the particular instances from which it claims damage. Dr. Busis' testimony is of no assistance to Allstate in this regard. Dr. Busis does not claim to make a determination that certain tests were not performed based on a review of the medical records, and admits that he would have no way of making that determination without conferring with former Seigel patients directly, which he has not done. [Pl. Ex. 7A p. 82].

The remainder of plaintiffs' Needle EMG Fraud Evidence includes Dr. Seigel's admissions and discovery responses, the testimony of former Seigel, P.C. employees, and what plaintiffs' generally refer to as "documentary evidence" apparently not included in their submission. [Pl. Mem. p. 7]. None of these materials, however, are specific to the individual claims upon which Allstate bases its damage claim. Rather, seen in their best light, they tend to show a "pattern" of some Needle EMG's not performed, a pattern already admitted. As to whether testing was done in the specific cases from which Allstate claims damage, however, they are not probative.

---

[9] There are other reasons why the $450,000 agreed to in the Plea Agreement and Stipulation of Offense Conduct in the criminal case cannot be used as a measure of damages here. The Government simply insisted on that number as the level of restitution required. Both defendant Arthur Seigel and counsel felt that it would be a huge mistake, before the sentencing judge, to argue about restitution because defendant had no way to come up with an actual figure as to the number of tests not performed – although his best estimate was that the government figure was very high.

8

2.      **Nerve Conduction Study Fraud**

Allstate's so-called NCS Fraud claim is <u>not</u> that Dr. Seigel billed for, but did not perform NCS tests. Indeed, Busis affirmatively concedes that such a determination would require patient contact on a case by case basis, something he has not done. [Pl. Ex. 7A p. 82]. Instead it is that in many cases his testing was "incomplete in light of his failure to obtain and record amplitude information," which Busis alleges must be included in the results of any NCS test for which a doctor bills. [Pl. Ex. 2 ¶ 45]. Allstate asserts no cause of action under which it may recover for mere incomplete testing. Further, Dr. Busis' conclusions were generated from a review of <u>Allstate own claim files,</u> and thus are based on information available to plaintiffs at the time they paid each claim. [Pl. Ex. 2 ¶ 45; Pl. Ex. 3 p. 4]. Plaintiffs completely ignore defendants' argument that they may not recover for fraud where, at the time of payment, they were aware of all of the facts now used to support their fraud claim. See, e.g., <u>Baker v. Cummings</u>, 181 U.S. 117, 130 (1901) (claimant waived fraud claim where he affirmed contract with full knowledge of facts upon which fraud claim is now based).

Here, Allstate certainly knew the contents of its own file at the time it chose to pay claims. Further, as one of the largest and most sophisticated casualty insurance companies in the United States, Allstate is at least as chargeable as Dr. Seigel with knowledge of the necessary prerequisites to medical billing. To the extent its files show that it made payments notwithstanding Dr. Seigel's failure to record amplitude measurements, Allstate may not later seek to rescind its payment based on a fact it knew at the time of payment. Whatever Dr. Busis' opinion may now be as to the national standard, it was clearly Allstate's policy not to require amplitude measurements before making payment.

### 3. <u>Misleading Diagnosis Fraud and Pattern Diagnosis Fraud</u>

The primary problem with plaintiffs' Misleading Diagnosis Fraud and Pattern Diagnosis Fraud claims are that, without Weisberg's analysis, Allstate has no way to prove damages. Each claim is premised on the assumption that the settlement value of a claim would have been lower had Seigel not committed fraud. [See Pl. Rule 56(a)(2) Statement ¶¶ 30-31]. Even if plaintiffs could prove fraud as to those claims, which they cannot, they have no method of accurately measuring the figure at which a claim would have settled absent that fraud. Damages must be proved with reasonable certainty. <u>Falco v. James Peter Associates, Inc.</u>, 165 Conn. 442, 445 (1973) ; <u>Bankers Trust Company v. Rhoades</u>, 859 F.2d 1096 (2nd Cir. 1988) (dismissing RICO claim where "it is impossible to determine the amount of damages that would be necessary to make plaintiff whole"); <u>Laborers Local 17 Health and Beneift Fund v. Philip Morris, Inc.</u>, 191 F.3d 229, 240 (2nd Cir. 1999) (RICO damages claim "will be virtually impossible for plaintiffs' to prove with any certainty").

Further, even in cases of settlements actually affected by fraud, it is well-settled that a jury may not award damages based on speculation as to what a settlement might have been in the absence of fraud. <u>Pacelli Brothers Transportation, Inc. v. Pacelli</u>, 189 Conn. 401, 411, 456 A.2d 325, 330 (1983) (where plaintiff sought damages related to a fraudulently induced settlement agreement, the Court cannot speculate about what different terms might have been agreed upon if there had been a full disclosure); <u>Leisure Resort Technology, Inc. v. Trading Cove Associates</u>, 2004 WL 1966952 (Conn. Super. Aug. 4, 2004) (granting summary judgment for defendants since determining what settlement parties would have negotiated in the absence of fraud "would be mere speculation"). Here, the calculation would be even more complicated by the fact that the underlying claimants and their attorneys will not be before this Court to assist in determining a figure they might have agreed to in the absence of alleged fraud. <u>See, Ganim v. Smith & Wesson Corporation</u>, 258 Conn. 313, 358, 780 A.2d 98, 126 (2001)

(reliability determining what those not before the court would have done "complicates the calculus of attributable damages even more"). In order to measure the impact of alleged fraud – one would have to compare, with reasonable certainty, the settlement value of each case absent so-called misleading statements -- versus the settlement value of the cases with claimed misleading statements. On this record, such speculation is impermissible.

Further, like so-called NCS Fraud, Allstate's Misleading Diagnosis Fraud claim is based entirely on information in Allstate's file at the time it settled each claim. Dr. Busis' characterizes certain records as "misleading" because Dr. Seigel would often report that electrodiagnostic testing data were "normal" while simultaneously reporting that such results were "consistent with muscle spasms or other injury-related symtomatology." [Pl. Ex. 3 p. 4; Pl. Ex. 7A pp. 67-70]. Apparently the argument is that, notwithstanding a record from Dr. Seigel expressly stating that electrodiagnostic testing was "normal", Allstate might have erroneously concluded that it was not normal based on his statement that the testing results were "consistent with muscle spasms or other injury-related symptomatology." This cannot be fraud. Busis admits that there is nothing untrue about a statement that "normal" electrodiagnostic test results are "consistent" with injury-related symptomology, since muscle spasms and other injuries do not necessarily result in positive electrodiagnostic findings. [See, e.g., Pl. Ex. 7A pp. 55-56]. Further, by necessity, in each case Allstate had in its file a report from Dr. Seigel stating that test results were normal. Highlands Ins. Co. v. Allstate Ins. Co., 688 F.2d 398, 404 (5th Cir. 1982) (district court properly charged Allstate with knowledge of the contents of its own policy file); Merrick v. Mercantile-Safe Deposit & Trust Co., 855 F.2d 1095, 1103 (4th Cir. 1988) (where Bank's files contained copies of opinion letter issued by counsel, company charged with knowledge of opinions set forth therein). In effect Allstate seeks to recover for its claimed conclusions that certain tests were abnormal when such

conclusions were made in the face of an express statement by Dr. Seigel that testing was normal.

Finally, Allstate's so-called Pattern Diagnosis Fraud claim expressly asks the jury to conclude that fraud occurred as to certain claims in which it admittedly has insufficient evidence to establish fraud. In its Opposition Memorandum, Allstate asserts that "the 'pattern diagnosis' medical records . . . were insufficient for Allstate's medical expert to conclude with certainty that the diagnoses/medical conclusions were misleading and deceptive." [Pl. Mem. p. 11]. Thus instead of proving these claims on evidence, Allstate will simply ask the jury to infer "that defendants adhered to their documented pattern and practice of creating false medical documentation . . .." [Id.]. This is precisely the "propensity" inference prohibited by the rules of evidence. [See discussion at pp. 18-21].

### 4. CPT Upcoding Fraud

For the <u>first</u> time in its Opposition Memorandum, Allstate alleges that Dr. Seigel committed so-called "CPT Upcoding Fraud," which apparently means that he submitted bills containing CPT codes unwarranted in light of treatment actually rendered. Allstate's Amended Complaint is silent on this issue, though Needle EMG Fraud, NCS Fraud, Misleading Diagnosis Fraud, and Pattern Diagnosis Fraud are alleged with relative particularity. [Amended Complaint pp. 75-85]. Allstate's Civil RICO Statement is silent on this issue. Nor is CPT Upcoding Fraud included in the damages analysis which appears on page 85 of Allstate's Amended Complaint. Indeed Allstate failed to mention "CPT Upcoding Fraud" in every pleading from the inception of this litigation in April 2003 until now. It has not sought to amend its Complaint further to include such a claim and in any event the relevant statutes of limitations have run.

Fraud must be pled with particularity, F.R.C.P. Rule 9(b), the purpose of which is, among other things, to provide defendants with notice of the specific allegations of fraud and an opportunity to prepare a defense. Campaniello Ltd. V. Saporiti Italia, S.p.A., 117

F.3d 655 (2nd Cir. 1997). Here, the Amended Complaint contains no allegations of so-called CPT Upcoding Fraud, let alone information as to which patients such fraud is alleged or in what way codes submitted as to those patients are fraudulent. A general allegation in a legal memorandum filed over two years after the Amended Complaint is plainly insufficient.

Further, defendants have litigated this case and prepared their defense based on the four categories of alleged fraud identified in the Amended Complaint. This preparation includes participation in over thirty depositions and analysis of hundreds of claim fails. It would be unfair to require defendants to duplicate that effort with regard to a new category of alleged fraud just two months prior to a trial anticipated to last over two weeks.[10]

### D. CONCLUSION

For the foregoing reasons, the Court should grant defendants' Motion for Summary Judgment.

THE DEFENDANTS
ARTHUR M. SEIGEL, M.D.; ARTHUR M.
SEIGEL, P.C.; ELLEN SEIGEL

By _____
Ira B. Grudberg
David L. Belt
Joshua D. Lanning (ct24529)
JACOBS, GRUDBERG, BELT, DOW & KATZ, P.C.
350 Orange Street
New Haven, Connecticut 06503
Telephone No. (203) 772-3100
Facsimile No. (203) 772-1691
email: jlanning@jacobslaw.com

---

[10] In order for plaintiffs to properly assert CPT Upcoding Fraud, they would have to amend their complaint to allege such with particularity, identifying at a minimum the patients as to which false CPT codes were used and what was fraudulent about them. There would then be litigation about whether such claims "related back" to Allstate's original filing, as the relevant limitations period has run. Then, assuming an amendment were permitted, defendants would request discovery related to CPT Upcoding Fraud. None of this can be accomplished before the anticipated timeframe for trial.

## CERTIFICATION

I hereby certify that the foregoing has been served by placing a copy thereof in the United States mail, first class postage prepaid, this 5th day of December, 2005, addressed to:

Joel Rottner, Esq.
Skelley Rottner, P.C.
P.O. Box 340890
Hartford, CT 06134-0890

David O. Brink, Esq.
Richard D. King, Jr., Esq.
Nathan A. Tilden, Esq.
Smith & Brink, P.C.
122 Quincy Shore Drive, 2nd Floor
Quincy, MA  02171

_____
Ira B. Grudberg